IN THE UNITED STATE DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

ERNEST PADILLA, PERSONAL REPRESENTATIVE
OF THE ESTATE OF ROBERT DOTSON, DECEASED;
KIMBERLY DOTSON,
INDIVIDUALLY AND AS PARENT AND NEXT FRIEND
OF JULIA
DOTSON; AND ZACHARY-MORA DOTSON,

      Plaintiffs,

vs.                                 Case No. 1:23-cv-00790-MLG-KK

CITY OF FARMINGTON, NEW MEXICO;
DANIEL ESTRADA; DYLAN GOODLUCK;
AND WAYLON WASSON,

      Defendants.

### CITY DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT No. I: DISMISSAL OF PLAINTIFFS JULIA DOTSON AND ZACHARY MORA-DOTSON'S FOURTH AMENDMENT ILLEGAL SEIZURE CLAIMS AGAINST THE OFFICERS BASED ON THE APPLICATION OF QUALIFIED IMMUNITY

Defendants, the City of Farmington, Daniel Estrada, Dylan Goodluck, and Waylon Wasson (*hereinafter* referred to as "City Defendants"), through their attorneys, Robles, Rael and Anaya, P.C. (Luis Robles), state the following for their Motion for Partial Summary Judgment No. I: Dismissal of Julia Dotson and Zachary Mora-Dotson's Fourth Amendment Illegal Seizure Claims Against the Officers Based on the Application of Qualified Immunity:[1]

### INTRODUCTION

This case arises from an officer-involved shooting by Farmington Police Department ("FPD") Officers Waylon Wasson ("Officer Wasson"), Dylan Goodluck ("Officer Goodluck") and

---

[1] As required by D.N.M.LR-Civ. 7.1(a), defense counsel contacted Plaintiffs' counsel on February 7, 2024 to determine Plaintiffs' position on City Defendants' Motion. On February 8, 2024, Plaintiff's counsel advised that Plaintiffs oppose City Defendants' Motion.

Daniel Estrada ("Officer Estrada") (collectively "the Officers" or "Defendant Officers") on April 5, 2023. The Officers, all of whom were in uniform, were dispatched to a domestic violence call at 5308 Valley View Avenue, but mistakenly went to the wrong address, 5305 Valley View Avenue. Officer Wasson repeatedly knocked and announced their presence at the well-lit front door of the residence which was also equipped with a video doorbell system. After the repeated knocking and announcements, Officer Wasson heard the sound of a firearm slide being racked on the other side of the door, indicating someone within the house was feeding a round of ammunition into the firing chamber of a gun. Within seconds, a male subsequently identified as Robert Dotson ("Mr. Dotson"), abruptly answered the door armed with a gun, took hold of the firearm with both hands and raised it in a shooting stance, aiming in Officer Wasson's and Officer Estrada's direction. The Officers used deadly force to stop the imminent threat of death or great bodily harm posed by Mr. Dotson. Within a minute, and just as the Officers had retreated from the front yard, a female, subsequently identified as Kimberly Dotson ("Mrs. Dotson"), appeared at front door of the residence armed with a gun and instantly fired at least one round in the direction of the Officers who did not have cover. To stop the imminent threat of death or great bodily harm posed by Mrs. Dotson, Officer Wasson and Officer Estrada returned fire. Shortly thereafter, other officers arrived on scene and persuaded Mrs. Dotson to exit the residence unarmed. It was determined that Mr. Dotson had died at the scene. Mrs. Dotson was not injured.

During this incident, the Dotsons' teenage children, Julia Dotson and Zachary Mora-Dotson, were upstairs. Other FPD officers, not including any of the named Defendant Officers, made contact with the teenage children upstairs and remained with them while a plan was made to escort them out of the residence without having to see their deceased father. The children were then escorted out

2

of the home together and transported together to the local police station to await family and to be interviewed by New Mexico State Police ("NMSP"), the agency investigating the officer-involved shooting.  The children were never handcuffed, and they were permitted to go into different rooms unescorted both at home and at the police station.  The Defendant Officers did not have any contact with the children nor did they participate in any of the decisions or actions taken with respect to the children.

On January 23, 2024, Plaintiffs filed an amended complaint alleging, in relevant part, that "Defendants, and each of them, deprived Robert Dotson and Plaintiffs in this case of rights secured to them by Constitution and laws of the United States ..., including the Fourth Amendment right to be free of unreasonable seizures, ... under 42 U.S.C. Section 1983." *Plaintiffs' First Amended Original Complaint*, p, 5, ¶ 20 (filed Jan. 23, 2024 ) [Doc. No. 237] ("*Amended Complaint*").  The Estate of Robert Dotson's and Kimberly Dotson's Fourth Amendment claims will be addressed by separate motions. This Motion focuses solely on the children's Fourth Amendment claims. With respect to the children's claims, the undisputed material facts demonstrate that the Defendant Officers did not personally participate in any of the decisions made or actions taken with regard to the children, and therefore the Defendant Officers did not violate the children's constitutional rights. Alternatively, the Defendant Officers are entitled to qualified immunity because the law was not clearly established at the time of the incident.  For the reasons set forth below, this Court should grant City Defendants' Motion for Partial Summary Judgment No. I: Dismissal of Julia Dotson and Zachary Mora-Dotson's Fourth Amendment Illegal Seizure Claims Against the Officers Based on the Application of Qualified Immunity.

### UNDISPUTED MATERIAL FACTS

**I.    THE OFFICERS WERE DISPATCHED TO A DOMESTIC VIOLENCE CALL**.

1.    On April 5, 2023, at approximately 11:36 p.m., Officer Waylon Wasson was dispatched as the primary officer to a 911 call reporting an incident of domestic violence at 5308 Valley View Avenue. See San Juan County Communications Authority Dispatch Audio Recording, 00:00 - 00:16, attached as **Exhibit A1**; see also San Juan County Communications Authority, Call for Service Detail Report-CFS 207 (Bates No. FPD000062), attached as **Exhibit B** ("Unit 4108 Dispatched"); Criminal Investigation Interview of Officer Waylon Wasson by NMSP Sergeant Phil Vargas, 02:32-02:36, 14:57-16:06, 26:05-27:08, 54:07-54:46 (April 20, 2023), attached as **Exhibit C1** (Officer Wasson indicating his call sign the night of the incident was 4108, that he was dispatched to a call and reviewed the nature of the call on the dispatch card, and that he was the primary officer on the call).[2]

2.    At approximately 11:37 p.m., Officer Dylan Goodluck and Officer Daniel Estrada were also dispatched to the domestic violence call as a secondary unit. See **Exhibit B**, (Bates No. FPD000062) ("Unit 4115 Dispatched"); see also **Exhibit C1**, 16:07-16:55 (Officer Wasson explaining that Officers Goodluck and Estrada were also dispatched to the call); Criminal Investigation Interview of Officer Daniel Estrada by NMSP Agent Miguel Gaytan, 02:59-03:11, 16:55-17:00, 22:46-23:16, 44:37-44:54 (April 20, 2023) attached as **Exhibit D**[3] (stating that call signs change every night, that he and Officer Goodluck were assigned the call sign of 4115 on April

---

[2]    The following segment of the audio from Officer Wasson's interview by NMSP was redacted, 01:38-01:40, because is consists of Officer Wasson providing his complete date of birth.

[3]    The following segment of the audio from Officer Estrada's interview by NMSP was redacted, 01:48-01:49, because is consists of Officer Estrada providing his complete date of birth.

5, 2023, and they responded to the call as a second or cover unit); Criminal Investigation Interview of Officer Dylan Goodluck by NMSP Agent Miguel Gaytan, 15:30-15:36, 18:40-19:16 (April 20, 2023), attached as **Exhibit E** (stating that his sergeant informed him and Officer Estrada that their call sign would be 4115 on the date of the incident and that they responded to a domestic violence call).[4]

3.      Officer Goodluck and his field training officer ("FTO"), Officer Estrada, were riding in the same police vehicle. See **Exhibit D**, 6:03-6:09, 8:31-8:39, 18:43-18:57 (Officer Estrada stating he attended the FPD Field Training Officer School and became certified as an FTO, was Officer Goodluck's FTO, and they drove together in Officer Goodluck's police unit); see also **Exhibit E**, 05:31-05:50, 11:41-12:25 (Officer Goodluck stating he was on his last day of the third phase of field training at the time of the incident and his FTO was Officer Estrada).

## II.    THE NATURE OF THE DOMESTIC VIOLENCE CALL.

4.      Over the police radio, the dispatcher advised that there was a "possible 57 [family fight] in 5308 Valley View Avenue.  We've got a male calling on 911 . . . lots of yelling in the background.  He's arguing with a female.  He's stating he's bleeding, and he's telling us the female works at the CDC [County Detention Center]." See **Exhibit A1**, 00:00 - 00:16; see also **Exhibit D**, 22:45-23:30 (Officer Estrada describing the nature of the call relayed over the police radio and that he and Officer Goodluck responded); **Exhibit E**, 18:40-18:45 (Officer Goodluck describing what he heard about the domestic violence call over the police radio); San Juan County Communications Authority Approved Radio Codes (updated Jan. 19, 2006), attached as **Exhibit F** (indicating that

_____

[4]The following segment of the audio from Officer Goodluck's interview by NMSP was redacted, 01:09-01:10, because is consists of Officer Goodluck providing his complete date of birth.

a 10-57 denotes a "family fight.").

5.      Over the police radio, the dispatcher also advised that "we lost connection with RP [reporting party].  He got pretty argumentative with us.  Pretty aggressive.  Disconnected." **Exhibit A2**, 00:00 - 00:06.

6.      Further, a Computer Aided Dispatch ("CAD") system was being utilized by FPD to track and manage calls for service, dispatch officers to respond to incidents, and provide real-time information to officers in the field. See **Exhibit C1**, 15:30-16:06 (stating he was able to review the nature of the call on the dispatch card displayed on his mobile data terminal in his vehicle); see also Homeland Security Science and Technology, Tech Note, "Computer Aided Dispatch Systems," pp. 1-2 (Sept. 2011), https://www.dhs.gov/sites/default/files/ publications/CAD_TN_0911-508.pdf. (describing the purpose of a CAD system).

7.      The dispatcher made the following notations[5] on the CAD system, also known as a CAD card, regarding the incident: "arguing in background," "m arguing with f / said he was bleeding," "advising f works with jail," "m advd he is bleeding," "m still yelling in back / rp gave 505 716 3558," "3 kids in resd," "m: daniel jackson," "m back on the line," "trying to get parties to separate," "rp being argumentative," "rp advd neg 55," "rp disconnected." **Exhibit B**, (Bates No. FPD000062); see also **Exhibit C1**, 15:30-16:06, 26:05-27:08 (stating he was able to review the nature of the call on the dispatch card displayed on his mobile data terminal in his vehicle); **Exhibit F** (indicating that "10-55" denotes "ambulance requested.").

---

[5]      For purposes of the CAD notations, "m" denotes male, "f" denotes female, "advd" denotes advised, "rp" denotes reporting party, and "neg 55" denotes that an ambulance has not been requested or has been declined. See **Exhibit F** (indicting that 10-55 denotes "ambulance Requested.").

8.      The information entered on the CAD system was available to the Officers on their mobile data terminals ("MDT"), a laptop-type computer that law enforcement officers use while in their police vehicles. See **Exhibit C1**, 15:30-16:06, 26:05-27:08 (indicating he reviewed information regarding the 911 call on the CAD card available on his MDT); see also https://www.ojp.gov/ncjrs/virtual-library/abstracts/mobile-data-terminals-past-present-and-future-computerization (describing a mobile data terminal).

## III.    THE OFFICERS' ARRIVAL ON SCENE, AND THE CIRCUMSTANCES THAT LED THEM TO THE WRONG ADDRESS.

### A.      Officer Wasson's Efforts to Determine the Location of the 911 Call.

9.      Before proceeding to the call, Officer Wasson clicked on the address function on his MDT which showed him that the address of the call was 5308 Valley View Avenue. See **Exhibit C1**, 27:09-27:28.

10.     The "pin drop" on the mapping function built into the MDT system showed Officer Wasson that 5308 Valley View Avenue was on the right (*south*) side of the street. See **Exhibit C1**, 27:09-27:28 (Officer Wasson describing that he accessed the mapping function on his MDT and the "pin drop" appeared to be on the south side of the street); see also Second Criminal Investigation Interview of Officer Waylon Wasson by NMSP Agent Miguel Gaytan, 00:37-15:39 (April 27, 2023), attached as **Exhibit C2** (Officer Wasson describing that he took a photo of the mapping function that was on his MDT from the night of the incident, authenticating that the photo is an accurate depiction of the image that was on his MDT the night of the incident, and explaining that, once it is reconnected to the internet, the MDT will update and the image as it appeared the night of the incident is no longer available); Photo of map from Officer Wasson's MDT taken by Officer Wasson (map accessed April 5, 2023), attached as **Exhibit G**.

**B.**    **Officer Goodluck's Efforts to Determine the Location of the 911 Call.**

11.    While en route to the call, Officer Goodluck typed in the address for the call on Google Maps and saw that the address was on the left (*north*) side of Valley View Avenue and a few houses east of Piedra Vista Street. See **Exhibit E**, 19:55-20:17; see also Google Map Aerial View (accessed Feb. 14, 2024), attached as **Exhibit H**.[6]

12.    Officer Goodluck had never been dispatched to this street before this incident. **Exhibit E**, 20:17-20:20.

**C.**    **The Officers Arrive to the Area of the 911 Call.**

13.    At approximately 11:45 p.m., Officer Goodluck parked his patrol car. See Officer Waylon Wasson's Dash Cam Video, 00:28-00:29 (April 5, 2023), attached as **Exhibit I**; see also NMSP Report, # NMSPR2303499-Supplemental Report - 9, p. 2, attached as **Exhibit J**.

14.    Before Officer Goodluck exited his patrol vehicle he again looked at the Google Maps image on his MDT screen to ensure they went to the correct address and stated to himself, "third house on the left." See Officer Dylan Goodluck's Body Worn Camera Video, 00:06-00:10 (April 5, 2023), attached as **Exhibit K**; see also **Exhibit E**, 21:38-21:44.

15.    At the time that Officer Goodluck told himself, "third house on the left," Officer Estrada did not hear Officer Goodluck make this statement. See **Exhibit D**, 26:08-26:22.

16.    Upon his arrival moments later, Officer Wasson saw that Officer Goodluck and Officer Estrada were already outside of their patrol car.  See **Exhibit C1**, 28:43-29:06; **Exhibit I**, 00:28-00:29.

---

[6]The Court may "take judicial notice of a Google map and satellite image as a source whose accuracy cannot reasonably be questioned." Pahls v. Thomas, 718 F.3d 1210, 1216 n.1 (10th Cir. 2013) (internal quotation marks and alterations omitted).

17.     Officer Wasson parked directly behind his fellow officers' vehicle.  See **Exhibit C1**, 29:00-29:09; see also **Exhibit E**, 20:56-20:58; **Exhibit I**, 00:28-00:29.

18.     The Officers had parked both police vehicles a few houses down (*west*) from the caller's address.  See **Exhibit D**, 25:00-25:10 (stating that upon arrival "Officer Goodluck parked near the intersection of Piedra Vista Drive and Valley View Avenue. This was a few houses down from the residence we were called to."); see also **Exhibit E**, 20:51-21:02 (Officer Goodluck stating he was parked just south of Valley View on Piedra Vista and from where they were parked he could not see the house to which they had been dispatched).

19.     Police officers are trained that, when responding to domestic violence calls at a residence, they should park a few houses down or out of sight of the residence to minimize the possibility of being ambushed as they sit in their patrol units or having residents know their exact locations to lessen chances of suspects fleeing or destroying evidence. See **Exhibit C1**, 29:18-29:44 (discussing his training on where officers should park their vehicles when responding to a domestic violence call); see also **Exhibit D**, 24:59-25:39 (same); **Exhibit E**, 21:03-21:33 (same).

**D.      As the Primary Officer on the Call, Officer Wasson Led the Way to a Residence on the Right (South) Side of the Street, Followed by Officer Goodluck and Then Officer Estrada.**

20.     Once they had parked their vehicles, each Officer activated his respective Body Worn Camera ("BWC").  See generally, **Exhibit C1**, 05:52-05:59, 06:44-06:52 (Officer Wasson stating he was wearing a WatchGuard camera - a BWC - on the upper left side of his chest and its was on and functioning properly); **Exhibit E**, 21:34-21:37 (Officer Goodluck stating he activated his BWC); **Exhibit K**, 00:00-00:18 (showing that Officer Goodluck activated his BWC while still inside his parked patrol unit); Officer Waylon Wasson's BWC video, 00:00-00:05 (April 5, 2023), attached

as **Exhibit L** (showing that Officer Wasson activated his BWC as soon as he exited his parked patrol unit); Officer Daniel Estrada's BWC video, 00.00-00:15 (April 5, 2023) (showing that Officer Estrada activated his BWC while in the parked patrol unit), attached as **Exhibit M**.

21.    Upon exiting their vehicles, Officer Wasson led the way as the Officers proceeded on foot toward a residence on the right *(south)* side of the street that Officer Wasson believed to be **5308** Valley View Ave. See **Exhibit C1**, 27:09-27:28, 29:44-30:03 (Officer Wasson explaining why he believed the residence he was approaching 5308 Valley View Avenue; see also **Exhibit H** (Google Map providing aerial view of Valley View Avenue); **Exhibit K**, 01:15-01:20 (Officer Goodluck's BWC video showing Officer Wasson leading the way to the residence); **Exhibit L**, 00:00-01:01 (showing that Officer Wasson was in the lead as there were no officers in front of him).

22.    Officer Wasson led the way toward the residence on the right *(south)* side of the street because the "pin drop" on the mapping function built into the MDT system had shown Officer Wasson that **5308 Valley View Avenue** was on the right (*south*) side of the street. See **Exhibit C1**, 27:09-27:28, 29:44-30:03 (Officer Wasson explaining why he believed the residence he was approaching 5308 Valley View Avenue); see also **Exhibit G** (Photo of map from Officer Wasson's MDT showing "pin drop" for 5308 Valley View Ave. on the right side of the street); **Exhibit K**, 01:15-01:20 (Officer Goodluck's BWC video showing Officer Wasson leading the way to the residence); **Exhibit L**, 00:00-01:01 (Officer Wasson's BWC video showing that he took the lead in approaching the residence).

23.    While still on the street and west of the residence, Officer Wasson saw the house numbers on the right side of the garage illuminated by a light and believed they read **5308 Valley View Avenue**. See **Exhibit C1**, 30:04-30:15 ("As we were approaching the first residence, I was

a little to the west of it on the street when I observed the numbers that were on the right side of the garage with a light right above it.  I observed 5308.").

24.     There was a full moon that night, obviating the need for the Officers' flashlights as they made their way to the residence.  See **Exhibit E**, 21:51-22:00; see also https://science.nasa.gov/earth/moon/april-2023-the-next-full-moon-is-the-pink-sprouting-grass-e gg-or-fish-moon/ (accessed January 3, 2024) (stating in the section captioned "Evening Sky Highlights" that Wednesday, April 5, 2023 was "the start of the night of the full Moon.").

25.     While they were walking to the residence, Officer Goodluck remembered that Google Maps showed that 5308 Valley View Ave. was on the left (*north*) side of the street, but he believed Officer Wasson was more familiar with the street and possibly the subjects of the call due to his seniority with the FPD and that it was him (Officer Goodluck) who was mistaken.  See **Exhibit E**, 22:14-23:26, 47:30-48:12.

26.     As an FTO, Officer Estrada's main focus on this call was to observe and evaluate his trainee, Officer Goodluck, and provide cover if needed.  See **Exhibit D**, 26:49-26:54.

27.     To observe and evaluate his trainee, Officer Estrada allowed Officer Wasson and Officer Goodluck to lead the way to the residence.  See **Exhibit D**, 26:33-26:39.

**E.     The Officers Make Their Way up the Driveway and to the Front Door of the Residence, Not Realizing They Were at the Wrong Residence.**

28.     Officer Wasson led the way up the driveway of a two-story residence on the right (*south)* side of the street.  See **Exhibit D**, 27:08-27:11 (Officer Estrada stating that "Officer Goodluck followed directly behind Officer Wasson."); see also **Exhibit K**, 01:17-01:30 (Officer Goodluck's BWC video showing Officer Wasson lead the way up the driveway); **Exhibit L**, 01:00-01:14 (same); Google Maps street view of 5305 Valley View Avenue (front view) (accessed Feb.

12, 2024), attached as **Exhibit N** (showing the two story residence the officers approached);  Google

Maps street view of 5305 Valley View Avenue (side view) (accessed Feb. 12, 2024), attached as

**Exhibit O** (same).[7]

29.    Officer Wasson and Officer Estrada shined their flashlights into four (4) vehicles that

were parked in the unfenced driveway of the residence to ensure a resident was not sitting inside one

of the vehicles. See **Exhibit D**, 27:16-27:34 (Officer Estrada stating there were four vehicles parked

in the driveway and explaining why he shined his flashlight into them); see also **Exhibit L**, 01:01-

1:08 (showing Officer Wasson shine his flashlight into some of the vehicles parked in the driveway

of the residence); **Exhibit M**, 01:23-01:42 (showing Officer Estrada shine his flashlight into the

vehicles parked in the driveway of the residence); **Exhibit N** (Google Maps, front view, showing

unfenced driveway of residence at 5305 Valley View Avenue).

30.    Next to the driveway was the front yard, porch, and front door, all of which were

enclosed by an approximately waist-high decorative, wrought iron fence with ornamental spikes on

top. See, e.g., **Exhibit C1**, 30:52-31:01 (Officer Wasson providing his description of the exterior

of the residence, including the fence); **Exhibit D**, 28:30-28:38 (Officer Estrada providing his

description of the exterior of the residence); **Exhibit E**, 22:28-23:43 (Officer Goodluck providing

his description of the residence); **Exhibit L**, 00:54-01:03 (Officer Wasson's BWC showing exterior

of residence); **Exhibits N** and **O** (Google Maps, front and side views of residence).

31.    While walking up the driveway to the gate at the top of the driveway, the Officers'

BWC footage shows that they passed by the well-illuminated house numbers, indicating that they

_____

[7]Pahls, 718 F.3d at 1216 n.1 (stating that the Court may "take judicial notice of a Google map
and satellite image as a source whose accuracy cannot reasonably be questioned.") (internal
quotation marks and alterations omitted).

were actually at **5305 Valley View Avenue**.  See, e.g., **Exhibit L**, 01:09-01:12.

32.     The Officers were at the wrong address. Compare **Exhibit B**, (Bates No. FPD000053) (CAD card indicating that address of call was "5308 Valley View Ave, Farmington.") with **Exhibit H** (Google Maps, aerial view showing the locations of both 5308 and 5305 Valley View Ave.); and **Exhibit L**, 01:09-01:12 (Officer Wasson's BWC video showing he passed the well-illuminated house number indicating that officers were actually at 5305 Valley View Ave.).

33.     Officer Estrada did not realize they were at the wrong address because, after seeing the four vehicles in the driveway, his focus was deterred from double checking the address to checking all the vehicles for any subjects to ensure the Officers' safety. See **Exhibit D**, 27:35-27:54.

34.     Once he completed checking the vehicles parked in the drive way of the residence, Officer Estrada noticed that both Officer Wasson and Officer Goodluck were already inside the yard and outside his view. See **Exhibit D**, 28:08-28:17; see also **Exhibit M**, 01:21-01:47.

35.     Therefore, Officer Estrada hurried towards the yard to observe and evaluate Officer Goodluck's performance. See **Exhibit D**, 28:16-28:29; see also **Exhibit M**, 01:21-01:47.

36.     Officer Estrada was also confident in deferring to Officer Wasson's judgment that they were at the proper address given that Officer Wasson was also an FTO.  See **Exhibit D**, 27:55-28:07; see also **Exhibit C1**, 11:09-11:17 (Officer Wasson confirming that he is an FTO for the FPD).

## IV.     THE OFFICERS' EFFORTS TO MAKE CONTACT WITH THE RESIDENTS.

### A.     The Layout of the Front of the Residence.

37.     Officers Wasson and Goodluck proceeded to the front porch. See **Exhibit K**, 01:34-01:48; see also **Exhibit L**, 01:13-01:27.

13

38.     The porch was well-lit with the porch light turned on, and all the Officers were in their dark blue uniforms with visible badges and patches, identifying them as police personnel with the FPD. See **Exhibit C1**, 04:32-05:04, 31:17-31:22;  (Officer Wasson describing the uniform he was wearing and stating the porch was well-lit); see also **Exhibit D**, 15:34-15:52 (Officer Estrada describing the uniform he was wearing); **Exhibit E**, 03:59-05:21, 14:01-14:38 (Officer Goodluck describing the uniform he was wearing, including equipment); **Exhibit L**, 01:19-01:27 (Officer Wasson's BWC video showing the lighting of the front porch and that the Officers were in their FPD uniforms); Video Doorbell Footage from 5305 Valley View Ave., 02:45-03:05 (April 5, 2023), attached as **Exhibit P** (same).

39.     The top half of the screen door was clear glass and there was a video doorbell camera next to the front door that Officer Wasson knew, based on his experience, is motion activated and will alert the homeowner via cell phone. See **Exhibit C1**, 32:46-33:26 (Officer Wasson recognizing there was a video doorbell camera and discussing his knowledge of its operation); see also **Exhibit K**, 02:00-02:01 (Officer Goodluck's BWC video showing video doorbell camera to the right of the front door); **Exhibit L**, 01:18-01:23 (Officer Wasson's BWC video showing same).

40.     The front door itself had a semi-circle of clear glass near the top. **Exhibit L**, 01:24-01:30.

41.     There was also a large window to the right of the front door which faced the porch and front yard. **Exhibit L**, 01:15-01:24.

42.     There was another door directly to the left and at a ninety-degree angle of the front door that appeared to lead to the garage. See **Exhibit D**, 28:38-28:51 (Officer Estrada explaining his observations, including the door that appeared to lead into the garage); see also **Exhibit L**,

01:19-01:23 (showing that door that appeared to lead to the garage).

43.     In addition to the bright porch lights, there was a full moon that night, making it brighter than normal outside. See **Exhibit E**, 22:52-23:11.

**B.     The Officers' Position Themselves at the Front of the Residence.**

44.     Officer Wasson positioned himself in front of the front door to the residence, holding the screen door open. See **Exhibit C1**, 31:44-32:23 (explaining why he held the screen door open); see also **Exhibit L**, 01:28-01:30 (showing Officer Wasson's position at the front door); **Exhibit P**, 02:45-03:08 (same).

45.     Officer Goodluck stood approximately five (5) yards from the front door, almost directly in front of it but behind Officer Wasson. See **Exhibit E**, 24:19-25:01; see also **Exhibit P**, 02:45-03:08.

46.     Officer Estrada moved laterally across the front yard and positioned himself toward the west end of the property but still within the fenced front yard. See **Exhibit D**, 28:52-28:53; see also **Exhibit M**, 01:42-01:58; **Exhibit P**, 02:53-02:55.

47.     An alleyway was located west of the property, over the waist-high decorative fence. See **Exhibit D**, 28:53-29:02; see also **Exhibits H**, **N** and **O** (Google Maps, aerial, front and side views of residence, showing the location of the alley).

**C.     Officer Wasson Repeatedly Knocks and Announces The Officers' Presence.**

48.     Beginning at the 01:27 time stamp[8] of his BWC video, Officer Wasson opened the

---

[8]     From this point forward, references to time will be based on the time stamp of the events as indicated by Officer Wasson's BCW video.  The BWC videos utilized as evidence in support of Defendants' statement of undisputed material facts do not contain references to the Coordinated Universal Time (actual time) that the events took place.

screen door, knocked on the front door approximately seven (7) times in quick succession and announced "Police Department." See **Exhibit L**, 01:27-01:34; see also **Exhibit C1**, 31:56-32:23 (Officer Wasson explaining he held he screen door open as he was trained because it can be "an obstacle that is difficult to overcome," and that he believed the male 911 caller might be confrontational because he had argued with dispatch).

49.    Officer Wasson's knocking and announcement were not hostile or threatening in tone but loud enough for someone to hear him.  See **Exhibit L**, 01:27-01:34; see also **Exhibit C1**, 32:22-32:46 (Officer Wasson explaining that his knock was "a standard knock" and his announcement was not shouting but loud enough for someone to hear him because "whoever answered the door, I wanted to gain immediate rapport with them so I could get voluntary compliance."); **Exhibit D**, 29:15-29:24 (Officer Estrada stating that Officer Wasson's knocks were "indifferent" and "not threatening in manner.").

50.    Officer Wasson did *not* attempt to enter the home.  See **Exhibit L**, 01:27-01:34.

51.    No one answered the front door in response to Officer Wasson's initial knocking and announcement. See **Exhibit L**, 01:27-02:02.

52.    Officer Wasson waited approximately twenty-eight (28) seconds and then knocked on the front door a second time. See **Exhibit L**, 01:27-02:04 (indicating the time between Officer Wasson's initial announcement of the Officers' presence and second time he knocked on front door).

53.    When he knocked a second time, Officer Wasson knocked on the front door approximately seven (7) times in quick succession.  See **Exhibit L**, 02:02-02:04.

54.    Again, no one came to the door. See **Exhibit L**, 02:02-02:15.

55.    Officer Wasson waited approximately thirteen (13) seconds after his second round

16

of knocking and then, in a slightly louder tone than the first time, announced "Farmington Police." See **Exhibit L**, 02:02-02:17 (showing that approximate time that lapsed after Officer Wasson's second round of knocking and the second time he announced their presence); see also **Exhibit C1**, 33:30-33:39 (stating that he announced "Farmington Police" in a "slightly louder tone.").

56.     Officer Wasson's second round of knocking and second announcement were not hostile or threatening in tone. See **Exhibit L**, 02:02-02:17.

57.     Officer Wasson did *not* attempt to enter the home. See id.

58.     In the meantime, Officer Goodluck did not feel comfortable positioned several feet in front of the door so he re-positioned himself to the right of the front door, near an approximately 12 inch by 12 inch front porch pillar and closer to Officer Estrada. See **Exhibit E**, 25:46-26:27; 29:39-29:46 (Officer Goodluck explaining where and why repositioned himself); see also **Exhibit K**, 02:37-02:47 (showing Officer Goodluck reposition himself); **Exhibit P**, 03:40-03:50.

59.     Meanwhile, from his position, Officer Estrada saw an upstairs window and shined his flashlight into the window in an attempt to get someone's attention. See **Exhibit D**, 29:53-30:00; see also **Exhibit M**, 02:43-02:46 (showing Officer Estrada shine his flashlight in the upstairs window).

60.     After his second announcement, Officer Wasson waited approximately ten (10) seconds and then got on his police radio and asked dispatch to call back the reporting party, Mr. Jackson, and request he come to the door. **Exhibit L**, 02:14-02:52 (also indicating Officer Wasson completed his second announcement at 02:17 and got on the police radio at 02:27).

61.     Approximately thirty-eight (38) seconds after his second announcement, Officer Wasson knocked on the front door approximately seven (7) times in quick succession for a third time

and loudly announced "Farmington Police" for a third time. See **Exhibit L**, 02:15-02:59 (indicating that the second announcement was completed at 02:17 and that Officer Wasson began to knock on front door for a third time beginning at 02:55).

62.    Officer Wasson's third round of knocking and third announcement were not hostile or threatening in tone. See **Exhibit L**, 02:55-02:59.

63.    Officer Wasson did *not* attempt to enter the home. See id.

64.    After the third round of knocking and third time announcing their presence and, while they waited on the front porch for someone to answer the door, Officer Goodluck and Officer Wasson had the following discussion as to whether they were at the correct residence - **530_8_ Valley View Ave**:

Officer Goodluck: "It might have been 4308."

Officer Wasson: "Is it 43 or 5308?"

Officer Goodluck: "Yeah, it might have been 5308."

Officer Wasson: "Is this not 5308? That's what it said right there, right?"

Officer Goodluck: "No. This is 5305, isn't it?"

**Exhibit L**, 03:10-03:23.

65.    At 03:23, Officer Wasson asked dispatch to "10-9" or repeat the address to which the dispatcher responded, "5308 Valley View Avenue." See **Exhibit L**, 03:23-03:25; see also **Exhibit F** (indicating that radio code "10-9" means "repeat.").

66.    In response to the information the dispatcher provided to Officer Wasson, Officer Goodluck uttered, "Oh." **Exhibit K**, 03:42-03:47.

67.    At 03:30, Officer Wasson jokingly told Officer Goodluck, "Don't tell me I'm wrong,

Dylan" and chuckled, all in the span of approximately four (4) seconds. See **Exhibit L**, 03:30-03:34; see also **Exhibit K**, 3:40-03:52; **Exhibit C1**, 34:59-35:45 (Officer Wasson explained that, as a field training officer with the FPD, he bantered with Officer Goodluck to encourage camaraderie and that Officer Goodluck smiled and Officer Estrada laughed).

68.     Officers Wasson and Goodluck still believed they were at the correct address. See **Exhibit C1**, 34:20-34:59 (Officer Wasson stating he believed Officer Goodluck was attempting to convey that "5308 Valley View Avenue was not the address they were supposed to be at, so I confirmed the address on my handheld [radio] with dispatch" who responded that the address was 5308 Valley View Avenue, reinforcing Officer Wasson's belief that they were at the correct residence); see also **Exhibit E**, 27:37-27:41 (Officer Goodluck stating that, after dispatch informed them the caller's address was 5308 Valley View, he believed they were at the correct address and that he was the one who was mistaken).

**V.     THE SOUND OFFICER WASSON HEARD FROM INSIDE THE RESIDENCE OF A FIREARM SLIDE BEING RACKED, INDICATING THAT SOMEONE WAS FEEDING A ROUND OF AMMUNITION INTO THE FIRING CHAMBER OF A GUN.**

69.     As he was chuckling, Officer Wasson heard footsteps coming to the door. **Exhibit C1**, 35:45-35:52.

70.     Officer Estrada also heard movement at the door from inside the house as if someone was getting ready to come out. **Exhibit D**, 31:44-31:44; 47:03-47:20.

71.     At approximately 03:34, and as he was still chuckling, Officer Wasson heard the sound of a firearm slide being racked on the other side of the door, indicating someone within the house was feeding a round of ammunition into the firing chamber of a gun. See **Exhibit L**, 03:30-03:36 (the firearm slide can be heard being racked at 03:34) and 02:55-03:34 (indicating that Officer

Wasson completed his third round of knocks and third announcement at approximately 03:18 and the sound of firearm slide being racked on the other side of the door can be heard at 03:34, a difference of 16 seconds); <u>see</u> <u>also</u> **Exhibit P**, 04:50-04:57 (the slide can be heard being racked at 04:55).

72.    Fearing that this individual was preparing to open fire on him, Officer Wasson immediately exclaimed, "Oh shit!", drew his handgun to the low ready position, and retreated from the front door at a forty-five-degree angle into the front yard to gain distance from the door to give himself time to deal with whatever situation was going to present itself.  **Exhibit L**, 03:34-03:39; <u>see</u> <u>also</u> **Exhibit P**, 04:50-5:00 (showing Officer Wasson retreating from the front door); **Exhibit C1**, 35:44-36:32 (explaining why he retreated from the front door).

73.    Hearing Officer Wasson make a "watch out type of remark" with fear in his voice and seeing Officer Wasson quickly let go of the screen door, take a few steps back, and unholster his service weapon, Officer Goodluck moved behind the porch pillar and unholstered his own service weapon and held it at the low ready position, believing Officer Wasson had perceived a threat that Officer Goodluck had not yet perceived. <u>See</u> **Exhibit K**, 03:50-03:58 (showing Officer Goodluck's movements); <u>see</u> <u>also</u> **Exhibit E**, 27:59-28:34 (Officer Goodluck describing his observations and concluding that "Officer Wasson perceived some type of threat from the other side of the door.") and 36:12-36:44 (Officer Goodluck stating that Officer Wasson made a "watch out type of remark.").

74.    Also detecting fear in Officer Wasson's voice and seeing him hastily back away from the door and pull his service weapon, Officer Estrada believed an immediate danger was coming from the other side of the front door. **Exhibit D**, 31:44-32:54; <u>see</u> <u>also</u> **Exhibit M**, 03:53-03:58.

75.    Officer Estrada therefore moved to his left towards the center of the front lawn and towards Officer Wasson, repositioning himself at an angle with the front door and drawing his service weapon. See **Exhibit D**, 31:44-32:54; see also **Exhibit M**, 03:53-03:58.

76.    Officer Wasson was positioned to Officer Estrada's left and they were in close proximity, with Officer Goodluck to their right and a few feet ahead of them. See **Exhibit M**, 03:50-04:01 (Officer Estrada's BWC video showing Officer Wasson in close proximity to his left and Officer Goodluck in close proximity to his right and a few feet in front); see also **Exhibit L**; 03:39-03:48 (Officer Wasson's BWC video showing Officer Estrada in close proximity to his right); **Exhibit D**, 49:16-49:47 (Officer Estrada stating he was close to the center of the front yard, with Officer Wasson directly to his left and Officer Goodluck directly to his right); **Exhibit E**, 28:51-28:54 (Officer Goodluck stating that Officer Estrada "stood to the left of me").

## VI.    A MALE COMES TO THE DOOR ARMED WITH A GUN AND AIMS IT IN OFFICER WASSON'S AND OFFICER ESTRADA'S DIRECTION.

77.    Within approximately three (3) seconds of Officer Wasson hearing the firearm slide being racked inside the residence, a male aggressively opened the front door and screen door. **Exhibit L**, 03:24-03:39 (also indicating that firearm slide was racked at 03:34 and male opened door at 03:37, a difference of three (3) seconds); see also **Exhibit C1**, 36:33-35:38 (Officer Wasson stating that a male opened the front door "very aggressively."); **Exhibit E**, 28:58-29:07 (Officer Goodluck stating front door swung open abnormally fast in a manner he had never experienced before).

78.    At 03:38, as the male was opening the front door, Officer Estrada illuminated the front door area with his flashlight. **Exhibit L**, 03:38-03:39; see also **Exhibit M**, 03:57-03:58; **Exhibit D**, 1:00:29-1:01:09; **Exhibit E**, 28:51-28:56.

21

79.     At 03:39, Officer Wasson called out "Hey." **Exhibit L**, 03:39.

80.     Also at 03:39, the male opened the front door and screen door, brandishing a firearm in his right hand. **Exhibit L**, 03:38-03:39; see also **Exhibit M**, 03:57-03:58; **Exhibit P**, (doorbell camera video); Screenshot taken from Officer Wasson's BWC video at 03.39.76, attached as **Exhibit Q1** (showing the male brandishing a firearm and aiming in direction of Officers Wasson and Estrada); Screenshot taken from Officer Estrada's BWC video at 03.48.206, attached as **Exhibit Q2** (same); Screenshot taken from Officer Goodluck's BWC video at 03.58.429, attached as **Exhibit Q3** (same); Screenshots taken from doorbell camera video at 5305 Valley View Ave., at 05.01.022 and 05.01.323, attached as **Exhibits R1** and **R2** (same); **Exhibit C1**, 36:41-36:47 (Officer Wasson stating he saw the male brandishing a firearm in his right hand); **Exhibit D**, 33:03-33:11 (Officer Estrada stating he saw a male subject aggressively open the front door armed with a black pistol); **Exhibit E**, 29:08-29:13 (Officer Goodluck stating he "observed a male quickly step out of the front door with a dark colored handgun in one of his hands.").

81.     Also at approximately 03:39, the male began to raise the gun in Officer Wasson and Officer Estrada's direction. See **Exhibit L**, 03:39-03:40; see also **Exhibit K**, 03:58; **Exhibit M**, 03:58; **Exhibit P**, 04:59- 05:01, **Exhibits Q1**, **Q2** and **Q3** (screen shots of male aiming firearm in direction of Officers Wasson and Estrada); **Exhibit R1 and R2** (screen shots from video doorbell footage of male aiming firearm in direction of the Officers); **Exhibit C1**, 36:46-36:55 (Officer Wasson stating that the male "began to punch the firearm out in my direction."); **Exhibit D**, 33:12-33:15 (Officer Estrada stating that, before he could say anything, "the male raised his pistol, aiming it at me.").

**A.    Officer Wasson's Reaction to the Imminent Threat of Death or Great Bodily Harm Posed by the Male Resident Who Pointed His Gun in Officer Wasson's and Officer Estrada's Direction.**

82.     Also at 03:39, Officer Wasson issued the following order to the male: "Hands up!"

See **Exhibit L**, 03:39; see also **Exhibit C1**, 36:46-36:55 (Officer Wasson stating that the male "began to punch the firearm out in my direction. The male did this before I gave him the command to put his hands up."); **Exhibit E**, 28:44-28:50 (Officer Goodluck stating, "What I'm about to describe to you is a number of events that happened simultaneously in a very short  matter of time.").

83.     The male disregarded Officer Wasson's command and took hold of the firearm with both hands and raised it in a shooting stance, aiming in the direction of Officers Wasson and Estrada.

See **Exhibit L**, 03:39-03:40; **Exhibit K**, 03:58; **Exhibit M**, 03:58; **Exhibit P**, 04:59- 05:01, **Exhibits Q1**, **Q2** and **Q3**, (screen shots of male aiming firearm in direction of Officers Wasson and Estrada); **Exhibit R1** and **R2**, (screen shots from video doorbell footage of male aiming firearm in direction of Officers Wasson and Estrada); **Exhibit C1**, 36:55-37:24 (Officer Wasson stating "I used the command of 'hands up' because it is the way I was trained when you are beginning to detain someone at gunpoint[;]" and "the phrase ... 'get your hands up, open, and empty and turn and face away from me' was what would have been said if I wasn't met with an immediate threat. The male ignored my command and put his left hand on the gun and it appeared he was attempting to get a shooting stance."); **Exhibit D**, 33:12-33:19 (Officer Estrada stating that male aimed a gun at him).

84.     Officer Wasson believed the male was going to shoot him, and he did not have cover.

See **Exhibit C1**, 37:24-37:29 (Officer Wasson stating, "I believed he was attempting to acquire a site picture to shoot. I believed he was going to shoot me[.]") and 38:48-38:53 (Officer Wasson

stating there was no cover in the front yard for any of the Officers); <u>see also</u> **Exhibit L**, 03:36-03:39

(showing that Officer Wasson was in the open front yard and did not have cover when the male

aimed his fire arm in the direction of Officer Wasson).

85.　　At this moment, Officer Wasson estimated he "within five yards" or ten (10) to

fifteen (15) feet from the front door where the male was standing and still within the fenced front

yard. **Exhibit C1**, 1:03:10-1:03:49; **Exhibit L**, 03:35-03:39; **Exhibits N** and **O** (showing the front

yard enclosed by a waist-high fence).

> **B.　　Officer Estrada's Reaction to the Imminent Threat of Death or Great Bodily Harm Posed by the Male Resident Who Pointed His Gun in Officer Wasson's and Officer Estrada's Direction.**

86.　　Officer Estrada was directly to Officer Wasson's right and Officer Goodluck was to

Officer Estrada's right. <u>See</u> **Exhibit C1**, 38:09-38:13.

87.　　Officer Estrada observed a firearm in the male's left hand and, before Officer Estrada

could say anything, the male raised the pistol and aimed it in Officer Estrada's direction, making

Officer Estrada believed he was about to be shot. <u>See</u> **Exhibit D**, 33:03-33:19 ("A male subject

aggressively exited the front door. As the male exited, I observed a black in color pistol in his left

hand. Before I could say anything, the male raised a pistol, aiming it at me. I believed I was about

to be shot due to the male aiming a pistol at me."), and 48:23-48:39 (stating that a warning was not

feasible prior to using deadly force because as soon as the male exited he immediately pointed the

gun at Officer Estrada).

88.　　At this moment, Officer Estrada estimated he was less than five (5) yards away from

the front door, still in approximately the center of the fenced front yard and without cover. <u>See</u>

**Exhibit D**, 53:19-53:28 (Officer Estrada estimated the distance at less than five yards) and 49:16-

49:47 (Officer Estrada stating he was close to the center of the front yard, with Officer Wasson directly to his left and Officer Goodluck directly to his right); see also **Exhibit M**, 03:57-03:58 (showing that Officer Estrada was in the open front yard and did not have cover when the male aimed his fire arm in the direction of Officer Estrada); **Exhibit C1**, 38:48-38:53 (Officer Wasson stating there was no cover in the front yard for any of the Officers); **Exhibits N** and **O** (Google Maps, front and side views, showing the front yard enclosed by a waist-high fence and that there was no cover within the front yard).

### C. Officer Goodluck's Reaction to the Imminent Threat of Death or Great Bodily Harm Posed by the Male Resident Who Pointed His Gun in Officer Wasson's and Officer Estrada's Direction.

89.    Officer Goodluck observed the male hold his handgun "at a forty-five degree angle to the ground and was looking in the direction of Officer Wasson" but the male "was not facing me and the handgun was not pointed in my direction." **Exhibit E**, 29:27 -29:38.

90.    Officer Goodluck believed the male posed an imminent threat of death or great bodily harm to Officer Wasson. See **Exhibit E**, 29:22-30:14 (stating he discharged his firearm to stop Officer Wasson from being shot).

91.    At this moment, Officer Goodluck estimated he was approximately six (6) yards away from the front door, and he was still within the fenced front yard. See **Exhibit E**, 38:20-38:36 (Officer Goodluck stating he was approximately six yards away from the male when he shot); see also **Exhibit K**, 03:57-03:58; **Exhibits N** and **O** (Google Maps, front and side views, showing the front yard enclosed by a waist-high fence).

**VII.    THE OFFICERS' USE OF DEADLY FORCE TO STOP THE IMMINENT THREAT OF DEATH OR GREAT BODILY HARM POSED BY THE MALE RESIDENT WHO POINTED HIS GUN IN OFFICER WASSON'S AND OFFICER ESTRADA'S DIRECTION.**

92.    One second after the male raised his gun in the direction of Officer Wasson and Officer Estrada, at approximately 03:40, the Officers each fired their department issued service weapons at the him, backing away further from the front door as they did so. See **Exhibit L**, 03:39-03:42 (showing Officer Wasson raise his service weapon at 03:39 and discharge it at 03:40); see also **Exhibit K**, 03:58-03:59 (showing Officer Goodluck raise his service weapon at 03:58 and discharge it at 03:59 at the male); **Exhibit M**, 03:58-03:59 (showing Officer Estrada raise his service weapon at 03:58 and discharge it at 03:59 at the male); **Exhibit C1**, 37:26-37:39 (Officer Wasson stating, "I believed he was going to shoot me so I made the decision to bring my firearm up. I aimed at the male's center torso area and I fired my weapon. I shot before the male could shoot me."); **Exhibit D**, 33:03-33:21 (believing he was going to be shot, Officer Estrada stated he shot at the male subject); **Exhibit E**, 29:22-30:14 (Officer Goodluck stating he discharged his firearm to stop Officer Wasson from being shot).

93.    The Officers fired at the male between 03:40-03:41, a span of approximately one (1) to two (2) seconds. **Exhibit L**, 03:39-03:42.

94.    The male fell backwards into the residence, and the front screen door swung shut. See **Exhibit M**, 03:59-04:00; **Exhibit P**, 05:00-05:02.

95.    The Officers immediately ceased fire. See **Exhibit L**, 03:39-03:42 (showing that at 03:42 the Officers had ceased firing); see also **Exhibit C1**, 37:41-37:54 (Officer Wasson stating he stopped shooting when the male collapsed into the residence and the screen door swung shut); **Exhibit E**, 30:30-30:39 (Officer Goodluck stating he stopped firing when he could no longer see

26

the male and did not perceive a direct threat to the other officers).

96.    From the time the slide to the gun was racked inside the residence at 03:34 to the last shot being fired at 03:41, approximately seven (7) seconds had elapsed. **Exhibit L**, 03:34-03:42.

97.    From the time, the male had opened the front door and brandished a gun at 03:39 to the last shot being fired at 3:41, approximately two (2) seconds had elapsed. See **Exhibit L**, 03:38-03:42.

## VIII.   THE OFFICERS RETREAT FROM THE FRONT YARD INTO THE ALLEY.

98.    At 03:42, Officer Wasson called out over the police radio, "Shots fired! Shots fired!" See **Exhibit L**, 03:42.

99.    Although they saw the male go down and the screen door shut, the Officers did not know what condition the male was in or if he still posed a threat to them.  See **Exhibit C1**, 37:49-37:54, 38:21-38:47 (Officer Wasson stating he still considered the male a threat because Officer Wasson was unable to see the male after he fell back into the residence, did not know his condition, or the location of his firearm); see also **Exhibit D**, 33:44-33:53 (Officer Estrada stating he was unable see the male or verify if he was incapacitated); .

100.    Officer Wasson directed Officer Goodluck and Officer Estrada to back up, fearing the male may still have the ability to harm them and because they did not have cover in the front yard. See **Exhibit L**, 03:48-04:12; see also **Exhibit C1**, 37:49-37:54, 38:21-38:56 (Officer Wasson explaining why he directed the Officers to back up), **Exhibit E**, 31:06-31:11 (Officer Goodluck stating, "We began to back away from our positions to get more distance from the front of the door.").

101.    Officer Estrada, however, maintained his position in the front yard to provide cover

so that Officers Wasson and Goodluck could safely retreat from the front yard. See **Exhibit L**, 04:07-04:27 (Officer Wasson's BWC video showing that as he and Officer Goodluck were retreating and climbing over the waist-high wrought iron fence, Officer Estrada took a kneeling position behind a small tree in the middle of the lawn in the front yard); **Exhibit M**, 04:29-04:43 (Officer Estrada BWC video showing him take a position by the small tree in the middle of the yard to provide cover for Officers Wasson and Estrada); **Exhibit C1**, 38:53-39:02 (Officer Wasson explaining the process of retreating from the front yard); **Exhibit D**, 33:44-34:30 (unable to see the male or verify if he was incapacitated, Officer Estrada stated he held his position to provide cover for Officers Wasson and Goodluck to retreat towards the alley); **Exhibit E**, 31:17-31:28 (Officer Goodluck stating they "continued to slowly back up westbound through the front lawn" but the black gate "with the ornamental spikes that surrounded the front yard made it more difficult for us to retreat quickly.").

102.    Officers Wasson and Goodluck retreated out of the front yard into the alleyway on the west side of the residence but were slowed down by having to climb over the waist-high fence. See **Exhibit L**, 04:07-04:27; see also **Exhibit K**, 04:27-04:44; **Exhibit C1**, 38:57-39:06; **Exhibit E**, 31:17-31:28 (Officer Goodluck stating they "continued to slowly back up westbound through the front lawn" but the black gate "with the ornamental spikes that surrounded the front yard made it more difficult for us to retreat quickly.") and 31:28- 31:41 (Officer Goodluck stating he had to reholster his weapon to safely get over the waist high fence and pulled it out again once he and Officer Wasson made it over the fence).

103.    Once Officers Wasson and Goodluck had retreated out of the yard, Officer Wasson informed dispatch that "we have one down at the doorway" and provided cover so that Officer

Estrada could retreat from the front yard. See **Exhibit L**, 04:19-04:30; see also **Exhibit C1**, 39:07-39:23; **Exhibit D**, 34:30-34:36.

## IX.    A FEMALE RESIDENT COMES TO THE DOOR ARMED WITH A GUN AND SHOOTS IN THE DIRECTION OF THE OFFICERS.

104.    At approximately 04:27, while Officer Estrada was still in the process of retreating from the front yard and climbing over the waist-high fence into the alleyway west of the residence, a female inside the residence began repeatedly screaming "Oh my God!" See **Exhibit L**, 04:23-04:32 (female screaming can be heard beginning at 04:27); see also **Exhibit M**, 04:40-04:53 (female can be heard screaming as Officer Estrada is retreating out of the front yard and climbing over the waist-high fence); **Exhibit D**, 34:30-34:41 (Officer Estrada stating that the female began screaming as he was retreating); **Exhibit E**, 31:47-31:52 (Officer Goodluck stating that moments after stepping over the fence he heard a woman screaming from inside the residence).

105.    At approximately 04:29, Officer Wasson loudly ordered, "Hands up!" **Exhibit L**, 04:29-04:30.

106.    At approximately 04:33, the female suddenly flung the screen door open, leaned out armed with a handgun and, and within one (1) second, aimed her gun in the Officers' direction and fired *at least* one (1) round. See **Exhibit L**, 04:33-04:34; see also *Amended Complaint*, ¶ 15 (conceding that Mrs. Dotson "fired outside at whoever had shot her husband."); **Exhibit C1**, 39:58-40:11 (Officer Wasson explaining that screen door flung open, he observed a portion of the female's head and upper torso, and "I observed a firearm to be in her right hand. As soon as I observed the muzzle pointed directly at me, the female had already began shooting at me."); **Exhibit D**, 34:30-35:44 (Officer Estrada stating he heard female screaming and then she leaned out the front door armed with a handgun and it was pointed directly at him); **Exhibit E**, 32:14-32:31 (Officer

Goodluck stating he saw "a silver colored handgun appear from the threshold of the doorway. The handgun was not pointed at me but was pointed in the direction of Officer Wasson or Estrada."); **Exhibit P**, 05:48-05:56 (video doorbell footage showing screen door being flung open).

107.    At 04:34, a muzzle flash can be seen coming from the female's handgun as she shot in the direction of the Officers. See **Exhibit L**, 04:34; Screenshot of Officer Wasson's BWC video at 04:34, attached as **Exhibit S** (showing the muzzle flash).

108.    In the split-second before the female fired in the direction of the Officers, Officer Estrada quietly stated "please don't" and then loudly called out, "Ma'am!" because he feared the female was about to shoot him. See **Exhibit M**, 04:52-04:53; see also Exhibit D, 34:30-35:44 and 54:16-54:35 (stating he was attempting to announce their presence again when he called out "Ma'am!" but she was already pointing a gun at him).

109.    Officer Wasson saw the muzzle flash and felt the bullet "zip" past to the left of him. See **Exhibit C1**, 40:11-40:17 (Officer Wasson stating, "I observed the flash of the muzzle, and I felt the velocity and the zip of the round as it passed to the left of me.").

110.    At this point, Officer Wasson estimated he was approximately twenty-five (25) feet away from the female, Officer Estrada estimated he was approximately fifteen to twenty (15-20) yards away from the female, and Officer Goodluck estimated he was approximately ten to twelve (10-12) yards away from the female. See **Exhibit C1**, 1:05:42-1:05:58 (providing distance estimate); see also **Exhibit D**, 53:03-53:18 (same); **Exhibit E**, 38:54-39:12 (same) and 46:43-47:04 (stating the Officers were all about the same distance from the doorway when the female came out).

111.    Also at this point, the Officers were in the alleyway immediately west of the front yard and not behind cover. See **Exhibit L**, 04:33-04:34; See **Exhibit E**, 31:55-32:03 (Officer

Goodluck stating he was directly west of the front door with Officer Estrada to his left and then Officer Wasson on the other side of Officer Estrada); **Exhibits N** and **O** (Google Maps, front and side views, showing that the front yard is separated from the alley only by the waist-high decorative iron fence).

112.    Also before the female had discharged her gun, Officer Goodluck had turned on the flashlight that was on his gun, and he illuminated the front door.  **Exhibit E**, 31:58-32:19.

## X.    OFFICER WASSON'S AND OFFICER ESTRADA'S USE OF DEADLY FORCE TO STOP THE IMMINENT THREAT OF DEATH OR GREAT BODILY HARM POSED BY THE FEMALE WHO SHOT AT THEM.

113.    Due to the threat on their lives posed by the female, Officer Wasson and Officer Estrada immediately returned fire for approximately two (2) seconds, between 04:34-04:36, and ceased fire as soon as the female retreated into the residence. See **Exhibit L**, 04:34-04:36; see also **Exhibit M**, 04:53-04:55; **Exhibit P**, 05:54-05:57 (doorbell video showing the screen being flung door open at 04:54 and closing at 04:57); **Exhibit C1**, 40:18-40:45 (Officer Wasson stating, "Due to the threat on my life, I began shooting at the female as I started moving laterally to the south towards Largo street. I returned fire on the female to prevent her from continuing her life threatening actions. I believe the female had shot multiple times at me but was not sure of how many. When I returned fire, I believe I shot a total of four rounds at the female. I stopped shooting as soon as the female had retreated back into the residence."); **Exhibit D**, 35:29-36:02 (fearing the female was going to shoot him, Officer Estrada stated he fired toward the female with his duty pistol).

114.    When the female discharged her weapon, Officer Goodluck did not return fire because, although he saw a gun appear from the threshold of the doorway, he did not have a clear line of sight to the female holding the gun. See **Exhibit E**, 32:14-32:39.

115.    Approximately fifty-four (54) seconds had elapsed from the time the male pointed his handgun at the Officers to the time the female fired in the direction of the Officers. See **Exhibit L**, 03:39-04:43 (showing the male open front door armed with handgun at approximately 03:39, and the female open the front screen door armed with gun at approximately 04:33).

## XI.    THE OFFICERS RETREAT FURTHER DOWN THE ALLEY AND AGAIN ANNOUNCE THEIR PRESENCE TO THE RESIDENTS.

116.    At 04:37, Officer Wasson directed Officers Estrada and Goodluck to "Go! Go! Go!" and they quickly moved south, down the alleyway to gain some cover behind a white vinyl fence that enclosed the side and back yard of the residence. See **Exhibits L**, 04:37-04:40; see also **Exhibit M**, 04:56-05:00; **Exhibit K**, 04:56-04:59; **Exhibit C1**, 40:45-40:59 (Officer Wasson stating he yelled to Officers Estrada and Goodluck to move, and they ran to the point where the backyard's white fence met with the front yard's decorative iron fence, near the northwest corner of the residence); **Exhibit E**, 32:46-32:59 (Officer Goodluck stating that "Officer Wasson and Officer Estrada moved toward my position southbound to seek concealment of a six-foot tall white fence. The fence surrounded the backyard of the residence."); **Exhibits H, N** and **O** (Google Maps, aerial, front and side views showing that the front yard is separated from the alley only by the waist-high decorative iron fence and that the white fence enclosing the side and back yard appears to be vinyl).

117.    At approximately 04:51, Officer Goodluck loudly announced, "Farmington Police." See **Exhibit L**, 04:50-04:51; **Exhibit M**, 05:09-05:10; **Exhibit C1**, 41:05-41:09 (stating it was Officer Goodluck who yelled, "Farmington Police."); **Exhibit E**, 33:26-33:32 (Officer Goodluck stating, he "loudly yelled, 'Farmington Police' in an attempt to let the female know police officers were outside her residence.").

118.    Officers Estrada and Goodluck took positions in the alley, maintaining a visual on

the front of the house.  See **Exhibit K**, 04:57-08:42; **Exhibit M**, 04:57-13:47; **Exhibit D**, 36:07-36:12 (Officer Estrada stating he took a position directly next to the fence where he could see the glass security door moving).

119.    At approximately 04:55, Officer Wasson ran southbound through the alley and took a position at the back of the residence, outside the fence the enclosed the back yard, in case the subject attempted to flee. See **Exhibit L**, 04:55-07:45; see also **Exhibit C1**, 41:48-42:10 (stating he ran to the southwest side of the property, next to Largo Street); **Exhibit D**, 36:13-36:20 (Officer Estrada stating he directed Officer Wasson or Officer Goodluck to take a position at the back of the house in case the subject attempted to flee).

## XII.    ADDITIONAL POLICE OFFICERS ARRIVE ON SCENE, AND THE FEMALE EVENTUALLY EXITS THE RESIDENCE UNARMED.

120.    At approximately 05:45, other officers began to arrive on scene. See, e.g., **Exhibit L**, 04:55-07:45.

121.    One of the arriving police units parked behind (*south*) of the residence on Largo Street, and Officer Wasson retreated to the cover provided by this vehicle. See **Exhibit L**, 05:50-07:45.

122.    At approximately 07:03, Officer Estrada loudly issued the following order to the female: "Ma'am, this is the Farmington Police Department. Come out with your hands up, open, and empty." See **Exhibit L**, 07:03-07:06 (Officer Estrada can be heard in the background issuing command beginning at 07:03); see also **Exhibit M**, 07:19-07:25 (Officer Estrada issuing order).

123.    FPD Sergeant Christopher LaMonica ("Sgt. LaMonica") and other FPD personnel who arrived on scene took over communications with the female, repeatedly requesting that she exit the residence unarmed so that they could help the male and identifying themselves as the "police

department." See **Exhibit M**, 08:11-11:42; see also Sergeant Christopher LaMoncia's BWC video (April 5-6, 2023), 03:40-07:27, attached as **Exhibit T**.

124.    As Sgt. LaMonica was issuing commands to the female to exit the residence, Officer Estrada informed Sgt. LaMonica that the female had pointed a gun at them. See **Exhibit M**, 08:12-08:30.

125.    At approximately 08:20, Officer Wasson got on the police radio and asked Officers Estrada and Goodluck if they wanted to move to his (Officer Wasson's) position of cover behind the residence. See **Exhibit L**, 08:20-08:24.

126.    Officer Estrada remained in the alley, but Officer Goodluck ran south through the alleyway until he was also behind the cover of the police unit on Largo Street with Officer Wasson, remaining here until he was subsequently called by a supervisor and concluded his involvement at the scene. See **Exhibit E**, 34:26-34:35 (Officer Goodluck stating: "Officer Wasson told me over the radio to come to his position. I ran southbound through the alley until I was behind the cover of the vehicle."); see also **Exhibit K**, 08:48-09:19 (in response to Officer Wasson's question, Officer Goodluck runs southward in the alley to a position of cover behind a patrol vehicle that is parked behind the residence); **Exhibit L**, 08:20-08:52 (showing Officer Goodluck running from the alley to a position of cover behind a patrol vehicle that is parked behind the residence); **Exhibit M**, 08:47-08:58 (in response to Officer Wasson's question, Officer Estrada remains in the alley, telling Officer Goodluck, "Go for it. I got this.").

127.    Officers Wasson and Goodluck, who remained at the back of the residence, did not participate in directing the female to exit the residence. See **Exhibit L**, 04:36-13:16; see also **Exhibit K**, 04:57-13:35.

34

128.    The female eventually exited the residence unarmed and with her hands up. See **Exhibit T**, 11:29-12:01.

129.    Once the female exited the residence, Officer Estrada instructed law enforcement personnel to handcuff her. See **Exhibit M**, 12:02-12:04.

130.    The female was handcuffed by another FPD officer, placed in the back of a police vehicle, where she was identified as Kimberly Dotson ("Mrs. Dotson"), and ultimately transported to the FPD where she was interviewed by members of the New Mexico State Police. See Farmington Police Case Report Detail, Case Number 2023-00019241, p. 11 (Officer B. Lin's Original Narrative stating "a female was placed in my patrol vehicle.  The female was later identified as Kimberly Dotson. *** Officer Boyd and I transported Kimberly. *** Detectives told me that New Mexico State [P]olice were coming from Albuquerque and were conducting the interview.  We provided her with water and other necessary bathroom breaks [until] State Police arrived." ) and p. 14 (Officer J. Duponte's Original Narrative stating "Once the female exited the residence, Officer Hernandez and I detained her and placed [her] in the back seat of a patrol unit parked directed outside the residence."), attached as **Exhibit U**.

131.    The Defendant Officers did not handcuff Mrs. Dotson, place her in the back of a police vehicle, transport her to the police station, or interview her. See id.

## XIII.    IN ADDITION TO THE THREATS THEY POSED TO THE OFFICERS, MR. AND MRS. DOTSON ALSO POSED AN IMMINENT THREAT OF DEATH OR GREAT BODILY HARM TO NEIGHBORS WHOSE HOMES WERE IN THE DOTSONS' LINE OF FIRE.

132.    In addition to Officers Wasson and Estrada, other residences were in Mr. and Mrs. Dotson's line of fire.  See **Exhibt H** (Google Maps, aerial view showing other residences surrounding 5305 Valley View); see also **Exhibit T**, 13:54-15:13 (Officer Wasson and Sgt.

LaMonica discussing which residences were potentially in the Dotsons' line of fire, and Sgt. LaMonica assigning other FPD officers to canvass those residences to ensure neighbors were not struck by possible gunfire from the Dotsons).

## XIV. THE DEFENDANT OFFICERS DID NOT HAVE ANY CONTACT WITH THE RESIDENTS' TEENAGE CHILDREN NOR ANY ROLE IN MAKING DECISIONS RELATED TO THE CHILDREN.

133.    A team of officers, including Officer Estrada, entered the residence to clear it of any potential threats. See **Exhibit D**, 37:41-38:28; see also **Exhibit M**, 13:43-14:50.

134.    Officer Wasson and Officer Goodluck never entered the residence.  See **Exhibit K**, 04:57-22:55; see also **Exhibit L**, 04:37-17:20.

135.    When he entered the residence, Officer Estrada saw a male laying at the entrance, deceased.  See, e.g., **Exhibit D**, 38:29-38:41; **Exhibit M**, 13:56-14:02.

136.    There was one gun near the deceased male's right hand and another gun between his feet. See, e.g., **Exhibit D**, 38:29-38:41; **Exhibit M**, 13:56-14:02, 14:45-14:46.

137.    The deceased male was subsequently identified as Robert Dotson, Kimberly Dotson's husband. See **Exhibit U**, Supplemental Narrative by Sergeant C. Raybon, pp. 18-19.

138.    The team of officers, including Officer Estrada, cleared the first floor of the residence. See, e.g., **Exhibit M**, 13:43-14:50 (showing the entry team, including Officer Estrada, enter and clear the first floor of the residence).

139.    At this point, Officer Estrada exited the residence. See **Exhibit D**, 38:41-37:48 ("Once it was apparent the residence was clear of all known threats, I removed myself from the area."); **Exhibit M**, 13:43-14:50 (showing Officer Estrada briefly remain in the residence and only on the first floor before exiting).

140.    After the team of officers cleared the first floor, Officer Brian Castillo, Officer Jose Hernandez and Officer Rhett Silver, who are *not* named defendants in this case, went upstairs where they located the Dotsons' two children in a bedroom: fourteen-year-old Julia Dotson ("Julia") and eighteen-year-old Zachary Mora-Dotson ("Zachary") (collectively "the children"). See Farmington Police Department Field Case Report Supplement, p. 2 (Officer Silver's supplement), attached as **Exhibit V**; Officer Rhett Silver's BWC video, 09:21-09:52; 15:12-16:04, attached as **Exhibit W**[9]; *Amended Complaint*, p. 1 (caption listing individual Defendants and that does not include Officers Castillo, Hernandez or Silver).

141.    Officer Hernandez remained upstairs accompanying the children until the officers were able to escort them out of the house without having to see their deceased father.  See Farmington Police Department Field Case Report Supplement, p. 2 (Officer Brian Castillo's supplement), attached as **Exhibit X**; see also Farmington Police Department Field Case Report Supplement, Officer Hernandez's supplement, p. 2, attached as **Exhibit Y**; **Exhibit W**, 10:27-11:13; 11:31-12:00 (showing that Officer Hernandez, who is not a Defendant, remained with children upstairs while other FPD personnel determined how to escort children out of the house without having to see their deceased father); **Exhibit T**, 36:27-37:13 (Sgt. LaMonica discussing how to get the children out of the house).

142.    Eventually, Officer Hernandez led the children out the back of the residence. See **Exhibit Y**, p. 2 (Officer Hernandez's supplement); see also **Exhibit W**, 1:02:06-1:04:09.

143.    Officer Jonathan Thornton, who is *not* a named defendant in this case, transported

---

[9]The segment of this video between 15:12-16:04 has been redacted to exclude the audio of Julia and Zachary providing their full dates of birth.

Julia and Zachary together to the Farmington Police Department for interviews conducted by New Mexico State Police personnel and where they were met by family members. See **Exhibit Y**, p. 2 (Officer Hernandez's supplement); Jonathon Thornton's BWC Video, 1:04:12-1:06:00, 04:24:15-04:24:31, attached as **Exhibit Z** (showing the children exiting the home and being escorted to a patrol vehicle, and once they are at the police station, a NMSP law enforcement officer advises the children and their family that once his detectives arrive they will get come get the children); Officer Jonathon Thornton's Second BWC video, 00:36-00:56; 02:22-02:36; 02:48-03:51, attached as **Exhibit AA** (showing that Julia and Zachary were with family members); *Amended Complaint*, p. 1 (caption does not list Officer Thornton as a defendant).

144.    Julia and Zachary were not handcuffed at any point. See, e.g., **Exhibit W**, 10:29-11:07; 16:06-16:28 (showing that Julia and Zachary were not handcuffed during the time they were upstairs in the residence); Officer Rhett Silver's Dash Cam Video, 1:04:37-1:04:46 (showing Julia holding a jacket and Zachary swinging his arms and then putting an arm around Julia's shoulder while they were being escorted from the residence to a police vehicle), attached as **Exhibit BB**; **Exhibit AA**, 00:36-00:56; 02:22-02:36; 02:48-03:51(showing that Zachary and Julia were not handcuffed while at the police station and that they were with family members).

145.    The Defendant Officers, to include Officer Estrada, did not have any contact with the Dotsons' children and did not participate in any of the decisions or actions related to the children. See generally, **Exhibit K**, 04:57-22:55 (showing that Officer Goodluck had no contact with the children); **Exhibit L**, 04:37-17:20 (showing that Officer Wasson had no contact with the children); **Exhibit M**, 13:21-20:25  (showing that Officer Estrada had no contact with the children); **Exhibit C1**, 43:17-44:10 (Officer Wasson stating that after he took cover behind the police vehicle at the

back of the house, he met with his sergeant, answered general safety questions and was transported to the police department to commence an officer-involved shooting investigation); **Exhibit E**, 34:14-35:11 (same for Officer Goodluck); **Exhibit D**, 38:41-39:05 and 54:39-56:28 (Officer Estrada stating that after he assisted in clearing the first floor of the residence, he exited the residence, awaited instructions from the on-scene supervisors, was assigned a companion officer, and transported to the police department where he was processed by NMSP).

## XV.    DECEDENT ROBERT DOTSON'S BLOOD ALCOHOL CONCENTRATION

146.    The toxicology tests performed as part of Mr. Dotson's autopsy revealed he had a blood alcohol concentration of 0.059. NMS Labs, Toxicology Report, p. 1 (dated Sept. 15, 2023), attached as **Exhibit CC**.

147.    According to the Toxicology Report, "Ethyl Alcohol (ethanol, drinking alcohol) is a central nervous system depressant and can cause effects such as impaired judgment, reduced alertness and impaired muscular coordination." Id., p. 2.

## LEGAL ARGUMENT

The children allege that Defendants deprived them of their Fourth Amendment right to be free from unreasonable seizures. *Amended Complaint*, p, 5, ¶ 20 (First Claim for Relief). The Defendant Officers are entitled to qualified immunity for this claim because Plaintiffs cannot demonstrate that the Defendant Officers violated the children's clearly established Fourth Amendment rights. "[Q]ualified immunity is an immunity from suit rather than a mere defense to liability." Brown v. Montoya, 662 F.3d 1152, 1162 (10th Cir. 2011) (citing Mitchell v. Forsyth, 472 U.S. 511, 526 (1985)).  Qualified immunity "balances two important interests–the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials

from harassment, distraction, and liability when they perform their duties reasonably." Pearson v. Callahan, 555 U.S. 223, 231 (2009). The qualified immunity doctrine "'gives ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the law.'" Hunter v. Bryant, 502 U.S. 224, 229 (1991) (quoting Malley v. Briggs, 475 U.S. 335, 343 (1986)).

"After a defendant asserts a qualified immunity defense, the burden shifts to the plaintiff." Holland ex rel. Overdorff v. Harrington, 268 F.3d 1179, 1185 (10th Cir. 2001). Accordingly, the plaintiff must meet the following two-part burden: "the first inquiry must be whether a constitutional right would have been violated on the facts alleged; second, assuming the violation is established, the question whether the right was clearly established must be considered . . .." Saucier v. Katz, 533 U.S. 194, 200 (2001). The Saucier procedure is no longer mandatory, and courts may address either prong of the Saucier test first. Pearson, 555 U.S. at 236. If the plaintiff fails to satisfy either part of the heavy two-part burden, the court must find that the defendant is protected by qualified immunity. Gross v. Pirtle, 245 F.3d 1151, 1156 (10th Cir. 2001).

Here, the Defendant Officers did not have any contact with the children nor did they personally participate in the decisions or actions related to the children. Therefore, the Defendant Officers did not violate the children's Fourth Amendment rights to be free from unreasonable seizures. However, even if the Court determines that the Defendant Officers violated the children's Fourth Amendment rights, those rights were not clearly established, pursuant to the Tenth Circuit precedent in Jenkins v. Wood, 81 F.3d 988 (10th Cir. 1996). In either case, the Defendant Officers are entitled to qualified immunity, and this Court should dismiss Julia Dotson and Zachary Mora-Dotson's unreasonable seizure claim.

I.    **HAVING PLED THEIR CLAIMS AGAINST THE DEFENDANT OFFICERS IN THEIR INDIVIDUAL CAPACITIES ONLY, THE DEFENDANT OFFICERS ARE ENTITLED TO THE DISMISSAL OF THE CHILDREN'S FOURTH AMENDMENT CLAIM BECAUSE THE DEFENDANT OFFICERS DID NOT PERSONALLY PARTICIPATE IN THE ALLEGED DEPRIVATION OF THE CHILDREN'S RIGHT AGAINST UNREASONABLE SEIZURES.**

"If the Court is to hold [a government official] personally liable for violating a citizen's constitutional rights, the Court needs the evidence to provide a sound basis for concluding that the [official] is the one who violated the Constitution." Sisneros v. City of Albuquerque, No. Civ. 02-1035 JB/KBM, slip op. at 14 (D.N.M. filed Nov. 7, 2003) [Doc. No. 35] (dismissing excessive force claim against certain officers and stating that plaintiff "cannot prove, what, if anything, any of the officers did to him.") (citations omitted). The law is clear in the Tenth Circuit that "[i]ndividual liability under §1983 must be based on personal involvement in the alleged constitutional violation." Foote v. Spiegel, 118 F.3d 1416, 1423 (10th Cir. 1997); see also Mitchell v. Maynard, 80 F.3d 1433, 1441 (10th Cir. 1996) (same). This is an essential element of proof. Id.; see also Scull v. New Mexico, 236 F.3d 588, 599 (10th Cir. 2000) (stating that "none of the BCDC Appellees was involved in the delay" and "[c]onsequently, Mr. Reed has no § 1983 claims against the BCDC Appellees, regardless of the lawfulness of the detention."). Indeed, it is not enough for a plaintiff to merely allege a violation of his constitutional rights. Panaderia La Diana, Inc. v. Salt Lake City Corp., 342 F.Supp.2d 1013, 1031 (D. Utah 2004).

A.    **THE TENTH CIRCUIT CASELAW REGARDING SECTION 1983's PERSONAL PARTICIPATION REQUIREMENT.**

Consider Jenkins v. Wood, 81 F.3d 988 (10th Cir. 1996), a Tenth Circuit case which addressed a situation relevant to the one before this Court. Agents with the Kansas Bureau of Investigation ("KBI") and officers with the City of Topeka Police Department executed a search

warrant, using a "flash bang" while making entry. Id. at 991. Upon hearing the commotion and not

knowing who was in his home, James Jenkins ran to grab a shotgun which was kept downstairs. Id.

Mr. Jenkins was met by two law enforcement officers who told him to drop the gun, get on the floor,

and put his hands behind his back. Id. The officers handcuffed him face-down on the floor at

gunpoint and asked him questions about the location of his son. Id. One of the officers was a

member of the Topeka Police Department and the other was a KBI agent. Id. According to Mr.

Jenkins, the KBI agent was a slender, white man of medium height in his mid-forties. Id.

Otherwise, Mr. Jenkins could not identify the agent. Id.

Another officer met Mr. Jenkins' wife, Lula Jenkins, at gunpoint and ordered her down the

stairs. Id. That officer ordered Mrs. Jenkins to lay on the floor in a spread-eagle position. Id. Mrs.

Jenkins was not handcuffed but was held at gunpoint, prostrate on the floor, for about twenty

minutes. Id. at 992. At one point, a second officer walked up to Mrs. Jenkins, pointed his gun at

her head and threatened to shoot her if she did not tell him where her son was located. Id. Other

than to say that this officer was a "'real big guy . . . kind of casually dressed,'" Mrs. Jenkins could

not identify him. Id. While lying on the floor, Mrs. Jenkins pleaded with officers to let her help her

younger daughter with her inhaler as she suffered from asthma and was having difficulty breathing.

Id. An officer told her "if she didn't shut her 'goddamn mouth . . . he was going to slap the shit out

of her.'" Id.

The Tenth Circuit affirmed the dismissal of Mr. and Mrs. Jenkins' excessive force claims

against defendant, Agent Sabel, concluding:

> the evidence is not sufficient to implicate Agent Sabel as a personal participant in the
> alleged violations. First, Mr. and Mrs. Jenkins have brought forward no evidence
> indicating Agent Sabel participated in the use of excessive force against them
> personally . . .. Though Mr. and Mrs. Jenkins have detailed some disturbing

> behavior to support claims of excessive force, their allegations relate to the time period when they were held-face-down on the floor at gunpoint . . . . [T]here is no logical or evidentiary support for the proposition that Agent Sabel participated in what happened before he came downstairs . . .. As with Agent Wood, neither Mr. nor Mrs. Jenkins identified Agent Sabel as one of the officers who subjected them personally to excessive force.

Id. at 995. In his concurring opinion, Judge Henry noted that the plaintiffs, though possibly

wronged, could "not rely on a constitutional tort for solace." Id. at 998; see also Sharrar v. Felsig,

128 F.3d 80, 821 (3rd Cir. 1997) (affirming the district court's decision to grant summary judgment

as plaintiff was unable to identify which police officers were responsible for his alleged abuse, and

thus, there was no evidentiary basis upon which the named defendants could be held liable for the

alleged violation of plaintiff's rights).[10]

---

[10]    Further consider Panaderia La Diana, Inc. v. Salt Lake City Corp., 342 F.Supp.2d 1013 (D. Utah 2004), a Utah District Court case which is also instructive. In that case, owners, employees and customers of a Latino-owned business brought a §1983 action against the city and police officers stemming from the execution of a narcotics related search warrant on the premises. Id. at 1052. The warrant was executed by at least 17 officers from the Salt Lake City Police Department and additional officers from Davis County, the INS, the DEA, and the FBI. Id. at 1016 & 1033. The officers wore masks during the raid for safety purposes. Id. at 1033.

The plaintiffs made an effort to identify the officers who participated in the warrant execution but were unable to match up their claims against specific officers. Id. at 1031. The district court recognized that this situation created a dilemma and posed the following question: "[i]f constitutional violations occurred, why should plaintiffs have no redress simply because the officers who committed the violations wore masks and could not be identified?" Id. at 1032. The district court, however, rejected the suggestion that it shift the burden to the defendants to identify the participants, reasoning as follows:

> If there were evidence that the identity of officers has been concealed for the purpose of preventing suit, this approach might be appropriate.

> * * *

> [Additionally,] [i]n a case of only one plaintiff and two defendants such an approach might be feasible. However, in this case we have 19 plaintiffs and at least 17 Salt Lake City officers. In addition, agents from Davis County, the FBI, the DEA, and the INS participated in the raid. Moreover, each of the [defendants] likely

### B.    APPLICATION OF THE TENTH CIRCUIT CASELAW REGARDING PERSONAL PARTICIPATION TO THE FACTS OF THIS CASE.

To establish the Defendant Officers' liability under § 1983, the children must show that each individually named Defendant personally participated in the alleged constitutional infraction. Specifically, the children must demonstrate that Officers Wasson, Goodluck and Estrada were the individuals who violated their constitutional rights. See Jenkins, 118 F.3d at 1423. In this case, there is no admissible evidence which supports the children's claim that the Defendant Officers seized them in violation of the Fourth Amendment. See Anderson, 477 U.S. 242, 251 (1986) (scintilla of evidence inadequate to withstand summary judgment). Instead, the undisputed material facts demonstrate that the Defendant Officers did not have any physical or verbal contact with the children and did not personally participate in the decisions or actions related to the children. See

---

encountered more than one plaintiff and each plaintiff likely encountered more than one of the defendants during the raid. It is simply impracticable to shift the burden in this case. More important, it was made clear in the pleadings and during oral arguments that the plaintiffs did not do everything they could have during discovery to discover the identities of individual officers. The plaintiffs, for example, could have deposed the officers with the plaintiffs present and asked the plaintiffs to attempt to identify which officers they had contact with. Plaintiffs could also have requested discovery earlier in the process.

\* \* \*

In this case, there is no evidence of any policy intentionally designed to thwart the identification of officers for the purpose of avoiding suit. The SWAT team does wear masks, but this is a common practice for all SWAT teams and apparently has safety purposes. Moreover, as was noted above, the court cannot say that the plaintiffs made a sufficient attempt to identify the officers individually.

Id. at 1032-33. Based on the foregoing, the court granted summary judgment in favor of the defendant officers. Id. at 1034; see also Smith v. Barber, 316 F.Supp.2d 992, 1012 (D.Kan. 2004) ("[plaintiffs] alleged only that [the defendant officer] was present while the home was searched. However, [the defendant officer] cannot be found liable for his mere presence at their home; rather, [plaintiffs] must show that he personally participated in the search that allegedly violated their Fourth Amendment rights.").

generally, **Exhibit K**, 04:57-22:55 (showing that Officer Goodluck had no contact with the children); **Exhibit L**, 04:37-17:20 (showing that Officer Wasson had no contact with the children); **Exhibit M**, 13:21-20:25 (showing that Officer Estrada had no contact with the children); **Exhibit C1**, 43:17-44:10 (Officer Wasson stating that after he took cover behind the police vehicle at the back of the house, he met with his sergeant, answered general safety questions and was transported to the police department to commence an officer-involved shooting investigation); **Exhibit E**, 34:14-35:11 (same for Officer Goodluck); **Exhibit D**, 38:41-39:05 and 54:39-56:28 (Officer Estrada stating that after he assisted in clearing the first floor of the residence, he exited the residence, awaited instructions from the on-scene supervisors, was assigned a companion officer, and transported to the police department where he was processed by NMSP). Even Officer Estrada, who entered the residence to assist in clearing the home of any additional threats, did not go upstairs or have any contact with the children. He also did not personally participate in any decisions or actions related to the children. See **Exhibit M**, 13:21-20:25 (showing that, although he entered the residence, Officer Estrada did not go upstairs, have any contact with the children, or personally participate in any of the decisions or actions related to the children). Rather, the statement of undisputed material facts, supra, demonstrates that other FPD and NMSP personnel, who are not named Defendants in this case, are the individuals who had contact with the children and made the decisions related to the children remaining upstairs, being subsequently escorted out of the home, transported to the police station, and interviewed by the NMSP. By the time contact was made with the children, supervisory personnel was already on scene and exercising control over the situation. See **Exhibit T**, 03:40-07:27 and 36:27-37:13 (demonstrating that, upon arrival, Sgt. LaMonica took control of communications with the female resident and showing Sgt. LaMonica discussing how

to get the children out of the house). The Defendant Officers' presence outside the Dotson residence or inside the first floor of the residence *before* the children were contacted, as in Officer Estrada's case, is insufficient to establish the Defendant Officers' personal participation in the children's alleged seizure. See Jenkins, 81 F.3d at 995 ("Essentially, the Jenkinses' arguments with respect to the liability of Agent Wood amount to a claim that he should be held liable because he was in the home when the alleged deprivations occurred. Such conclusory allegations are not sufficient to avoid summary judgment in a case of alleged constitutional violation.").[11]  Therefore, Defendant Officers are entitled to summary judgment on Julia Dotson and Zachary Mora-Dotson's Section 1983 Fourth Amendment claim because the Defendant Officers did not personally participate in the allegedly unconstitutional actions taken against the children.

## II.    ALTERNATIVELY, THE DEFENDANT OFFICER'S ACTIONS DID NOT VIOLATE CLEARLY ESTABLISHED LAW.

If the facts alleged do not establish a constitutional violation, there is no need to proceed to the second step of the qualified immunity analysis. Saucier, 533 U.S. at 201.  That is the case here. However, if the Court finds that the Defendant Officers violated the children's constitutional rights, "[t]he plaintiff carries the burden of convincing the court that the law was clearly established" at the time of the violation. Pueblo Neighborhood Health Centers, Inc. v. Losavio, 847 F.2d 642, 645 (10th Cir. 1988).  To be clearly established, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right."  Anderson v.

---

[11] See also Schroeder v. Kochanowski, 311 F. Supp. 2d 1241, 1258 & n. 63 (D. Kan. 2004) ("Although Investigator Rudy Deines was allegedly present during some of the questioning, his mere presence is not sufficient to create liability.") (citing Jenkins, 81 F.3d at 994).

Creighton, 483 U.S. 635, 640 (1987).

The Supreme Court has repeatedly reiterated that the clearly established prong is a fact-intensive inquiry. White v. Pauly, 580 U.S. 73, 79 (2017). Clearly established law should not be defined "at a high level of generality." Id. "Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." Currier v. Doran, 242 F.3d 905, 923 (10th Cir. 2001). Where the "case presents a unique set of facts and circumstances," "[t]his alone [is] an important indication" that the right is not "clearly established." White, 580 U.S. at 80.

Here, City Defendants research has not revealed a Supreme Court or Tenth Circuit decision on point, or clearly established weight of authority from other courts that would support a finding that the Defendant Officers personally participated in the alleged seizure of the children. Thus, the facts that the Defendant Officers were confronted by, considered in light of the Tenth Circuit's decision in Jenkins, show that no clearly established law would have attributed the children's alleged seizure to the Defendant Officers. Accordingly, the Defendant Officers are entitled to qualified immunity for other police personnel's alleged seizure of the children, and this Court should dismiss Julia Dotson and Zachary Mora-Dotson's Fourth Amendment unreasonable seizure claims against Officers Wasson, Goodluck and Estrada.

## CONCLUSION

After their encounters with Robert and Kimberly Dotson, Defendant Officers did not personally participate in the alleged seizure of the children. The Defendant Officers did not have any contact with the children nor did they participate in the decisions or actions related to the

children.  Alternatively, the law was not clearly established at the time of the incident that the Defendant Officers' encounters with the parents would render them liable for the subsequent alleged detention of the children by other police personnel.  The Defendant Officers are therefore entitled to summary judgment on Plaintiffs Julia Dotson and Zachary Mora-Dotson's Fourth Amendment unreasonable seizure claims on the basis of qualified immunity.

**WHEREFORE,** City Defendants respectfully request that this Court grant their Motion for Partial Summary Judgement No. I and dismiss Julia Dotson and Zachary Mora-Dotson's Fourth Amendment unreasonable seizure claims against the Defendant Officers with prejudice, award City Defendants their attorney's fees and costs, and for all other relief this Court deems just and proper.

Respectfully submitted,

**ROBLES, RAEL & ANAYA, P.C.**

By:    /s/ Luis Robles
Luis Robles
Attorney for City Defendants
200 3rd St., NW, Suite 500
Albuquerque, New Mexico 87102-3334
(505) 242-2228
(505) 242-1106 (facsimile)
luis@roblesrael.com

I hereby certify that the foregoing was
electronically filed through the CM/ECF
on this 19th day of February 2024, which will
cause service to all counsel of record.

 /s/ Luis Robles
Luis Robles

48