IN THE UNITED STATE DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

ERNEST PADILLA, PERSONAL REPRESENTATIVE
OF THE ESTATE OF ROBERT DOTSON, DECEASED;
KIMBERLY DOTSON,
INDIVIDUALLY AND AS PARENT AND NEXT FRIEND
OF JULIA
DOTSON; AND ZACHARY-MORA DOTSON,

      Plaintiffs,

vs.                                                                    Case No. 1:23-cv-00790-MLG-KK

CITY OF FARMINGTON, NEW MEXICO;
DANIEL ESTRADA; DYLAN GOODLUCK;
AND WAYLON WASSON,

      Defendants.

---

**CITY DEFENDANTS' MOTION FOR PARTIAL SUMMARY
JUDGMENT No. II: DISMISSAL OF THE ESTATE OF ROBERT DOTSON'S
FOURTH AMENDMENT UNREASONABLE SEIZURE CLAIM AGAINST THE
OFFICERS BASED ON THE APPLICATION OF QUALIFIED IMMUNITY**

     Defendants, the City of Farmington, Daniel Estrada, Dylan Goodluck, and Waylon Wasson

(collectively "City Defendants"), through their attorneys, Robles, Rael and Anaya, P.C. (Luis Robles),

state the following for their Motion for Partial Summary Judgment No. II: Dismissal of the Estate of

Robert Dotson's Fourth Amendment Unreasonable Seizure Claim Against the Officers Based on the

Application of Qualified Immunity ("Motion for Partial Summary Judgment No. II"):[1]

---

[1]    As required by D.N.M.LR-Civ. 7.1(a), defense counsel contacted Plaintiffs' counsel
on March 9, 2024 to determine Plaintiffs' position on this motion. Plaintiffs oppose it.

## INTRODUCTION

This case arises from the April 5, 2023 officer-involved shooting by Farmington Police Department ("FPD") Officers Waylon Wasson ("Officer Wasson"), Dylan Goodluck ("Officer Goodluck"), and Daniel Estrada ("Officer Estrada") (collectively "the Officers" or "Defendant Officers"). The Officers, dressed in uniform, were dispatched to a domestic violence call at 5308 Valley View Avenue, but mistakenly went to 5305 Valley View Avenue, the wrong address. Officer Wasson repeatedly knocked and announced the officers' presence at the well-lit front door of the residence at 5305 Valley View Avenue which was also equipped with a video doorbell system. After repeatedly knocking and announcing their presence, Officer Wasson heard the sound of a firearm slide being racked on the other side of the door, indicating someone within the house was feeding a round of ammunition into the firing chamber of a gun. Within three (3) seconds of Officer Wasson hearing this sound, a male, subsequently identified as Robert Dotson ("Mr. Dotson"), aggressively opened the front door armed with a gun. Despite being ordered to put his hands up, Mr. Dotson took hold of the firearm with both hands and raised it in a shooting stance, aiming in Officer Wasson's and Officer Estrada's direction. The Officers were forced to use deadly force to stop the imminent threat of death or great bodily harm posed by Mr. Dotson, which they did by firing their service weapons.

Plaintiffs allege that each named Defendant deprived Mr. Dotson of his Fourth Amendment right to be free of unreasonable seizures. See *Plaintiffs' First Amended Original Complaint*, p. 5, ¶20 (filed Jan. 23, 2024) [Doc. No. 27] ("*Amended Complaint*"). However, the Officers are entitled to qualified immunity because their use of deadly force was objectively reasonable and constitutional. Alternatively, the Officers are also entitled to qualified immunity because the law was not clearly established at the time of the incident. Therefore, the Court should grant summary judgment in favor of the Officers on the Estate's Fourth Amendment claim.

## UNDISPUTED MATERIAL FACTS

As allowed by D.N.M.LR-Civ. 7.1(a), the Officers hereby incorporate by reference paragraphs 1-97, 132, 135-137 and 146-147 of the Statement of Undisputed Material Facts set forth in their *Motion for Partial Summary Judgment No. I*, pp. 4-39 (filed Feb. 19, 2024) [Doc. No. 35], as though fully set forth herein.

## LEGAL ARGUMENT

The Officers are entitled to qualified immunity because their use of deadly force was objectively reasonable or, alternatively, the law was not clearly established at the time of the incident. Qualified immunity "is an *immunity from suit* rather than a mere defense to liability." Mitchell v. Forsyth, 472 U.S. 511, 526 (1985) (emphasis in original). Qualified immunity "balances two important interests–the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." Pearson v. Callahan, 555 U.S. 223, 231 (2009). "After a defendant asserts a qualified immunity defense, the burden shifts to the plaintiff," Holland ex rel. Overdorff v. Harrington, 268 F.3d 1179, 1185 (10th Cir. 2001), to show that: (1) the defendant violated a constitutional or statutory right; and (2) the right was clearly established at the time of the alleged violation, Lincoln v. Maketa, 880 F.3d 533, 537 (10th Cir. 2018) (citations omitted). "If the plaintiff fails to satisfy either part of the [heavy] two-part inquiry, the court must grant the defendant qualified immunity." Medina v. Cram, 252 F.3d 1124, 1128 (10th Cir. 2001).

By aiming a firearm in the Officers' direction, Mr. Dotson posed an imminent threat of death or great bodily harm to them. Additionally, other residences were in Mr. Dotson's line of fire and those also potentially posed an imminent threat or great bodily harm to neighbors. Thus, the Officers reasonably used deadly force to stop this threat. Even if Mr. Dotson's Fourth Amendment rights were

violated, they were not clearly established at the time of the challenged conduct. In either case, the Officers are entitled to qualified immunity.

I.    **THE OFFICERS' SEIZURE OF MR. DOTSON WAS LAWFUL UNDER THE FOURTH AMENDMENT BECAUSE IT WAS OBJECTIVELY REASONABLE UNDER THE TOTALITY OF THE CIRCUMSTANCES.**

"[A]ll claims that law enforcement officers have used excessive force – deadly or not – [] should be analyzed under the Fourth Amendment and its 'reasonableness' standard[.]" Graham v. Connor, 490 U.S. 386, 397 (1989). The precise question asked in an excessive force case is "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." Id. Reasonableness is evaluated under a totality of the circumstances approach, which requires the Court to consider and balance the following factors: "[1] the severity of the crime at issue, [2] whether the suspect poses an immediate threat to the safety of the officers or others, and [3] whether he is actively resisting arrest or attempting to evade arrest by flight." Id. at 396.

The second Graham factor, "whether the suspect poses an immediate threat to the safety of the officer or others" is further evaluated using "the four nonexhaustive Larsen factors." Palacios v. Fortuna, 61 F.4th 1248, 1258 (10th Cir. 2023) (citing Estate of Larsen ex re. Sturdivan v. Murr, 511 F.3d 1255, 1260 (10th Cir. 2008)). "These factors are (1) whether the suspect was given orders and the suspect's compliance with the orders; (2) whether any hostile motions were made toward the officers; (3) the physical distance between the officers and the suspect; and (4) the manifest intentions of the suspect." Id.

So long as the force actually used by an officer is reasonable, the Fourth Amendment's "reasonableness standard does not require that officers use 'alternative "less intrusive" means.'"

Medina, 252 F.3d at 1133 (quoting Illinois v. Lafayette, 462 U.S. 640, 647-48 (1983)).[2] Similarly, the Fourth Amendment does not require a police officer to retreat when a subject threatens the officer or others with violence.[3]

Although "the precise moment of the shot is a critical factor, . . . the tense, uncertain, and rapidly evolving events leading up to that moment [are] extremely relevant in the totality of the circumstances approach." Thomson v. Salt Lake County, 584 F.3d 1304, 1318 (10th Cir. 2009) (internal quotations omitted). "[I]n the end the inquiry is always whether, from the perspective of a reasonable officer on the scene, the totality of the circumstances justified the use of force." Larsen, 511 F.3d at 1260 (internal citation omitted). Therefore, courts analyze excessive force claims from the perspective "of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Plumhoff v. Rickard, 572 U.S. 765, 775 (2014). Further, a use of force analysis under Graham "turns on the objective legal reasonableness of the action, assessed in light of the legal rules that were clearly established at the time it was taken." Pearson, 555 U.S. at 244 (internal citation omitted). Based on

---

[2] See Blossom v. Yarbrough, 429 F.3d 963, 968 (10th Cir. 2005) (quoting Medina, 252 F.3d at 1133) ("It is well settled that the 'reasonableness standard does not require that officers use alternative, less intrusive means' when confronted with a threat of serious bodily injury."); Jiron v. City of Lakewood, 392 F.3d 410, 414 (10th Cir. 2004) (in a police shooting case, the Tenth Circuit stated "officers are not required to use alternative, less intrusive means if their conduct is objectively reasonable.").

[3] See, e.g., Reed v. Hoy, 909 F.2d 324, 331 (9th Cir. 1989), cert. denied, 501 U.S. 1250 (1991) ("[plaintiff] has not cited to this court a single case from any jurisdiction suggesting that police officers have the same duty to retreat as ordinary citizens. In our view, such a duty may be inconsistent with police officers' duty to the public to pursue investigations of criminal activity."); Plakas v. Drinski, 19 F.3d 1143, 1148 (7th Cir. 1994) ("[t]here is no precedent in this Circuit (or any other) which says that the Constitution requires law enforcement officers to use all feasible alternatives to avoid a situation where deadly force can justifiably be used."); see also generally Romero v. Board of Cnty. Comm'rs, 60 F.3d 702, 704-05 (10th Cir. 1995), cert. denied, 516 U.S. 1073 (1996) (in a deadly force case, court rejected plaintiff's argument that an officer assumed a "constitutional duty to protect" decedent from the consequences of his own actions).

the Graham factors, the force the Officers used against Mr. Dotson was objectively reasonable.

   A.    **Graham Factor 1: The Officers Had Probable Cause to Believe Mr. Dotson Committed One or More Violent Felonies by Aiming His Gun in the Direction of Officers Wasson and Estrada.**

The Tenth Circuit's "binding precedent indicates the first Graham factor weighs against the plaintiff when the crime at issue is a felony, irrespective of whether that felony is violent or nonviolent." Vette v. K-9 Unit Deputy Sanders, 989 F.3d 1154, 1170 (10th Cir. 2021). Here, the Officers had probable cause[4] to believe Mr. Dotson committed one or more violent felonies when he aimed his gun in the direction of Officers Wasson and Estrada.

The Officers had probable cause to believe Mr. Dotson committed the violent felony crime of aggravated assault upon a peace officer when he took his gun in both hands in a shooting stance and aimed in the direction of Officers Wasson and Estrada, both of whom were in full uniform and investigating a report of domestic violence.[5] The Officers also had probable cause to believe Mr. Dotson knew they were police officers for numerous reasons: they were in full FPD uniforms; the porch was well illuminated; there was a full moon making it brighter than normal outside; the residence was equipped with an operational video doorbell system; Officers Wasson and Goodluck were positioned at the front door and in view of the video doorbell and living room window; Officer Wasson knocked and loudly announced their presence three (3) separate times; and Officer Wasson

---

   [4]    "'[P]robable cause' to justify an arrest means facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." Michigan v. DeFillippo, 443 U.S. 31, 37 (1979). Moreover, "probable cause requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." Illinois v. Gates, 462 U.S. 213, 243 n. 13 (1983).

   [5]    See NMSA 1978, § 30-22-22(A)(1) ("Aggravated assault upon a peace officers consists of ... unlawfully assaulting or striking at a peace officer with a deadly weapon while he is in the lawful discharge of his duties[.]").

issued a standard police order to Mr. Dotson to put his "hands up" when he opened the front door armed with a gun. See [Doc. No. 35], UMF Nos. 38, 39, 43, 44-45, 48-69, 82; see also State v. Nozie, 2009-NMSC-018, ¶ 30, 207 P.3d 1119, 1128 (stating that "knowledge of the victim's identity as a peace officer is an essential element of ... aggravated assault upon a peace officer."). Additionally or alternatively, the Officers had probable cause to believe that, by aiming his gun at Officers Wasson and Estrada, Mr. Dotson intended to kill them and, thus, had committed the crime of assault with intent to commit a violent felony upon a peace officer.[6]

Even assuming Mr. Dotson did not know police were at his door, the officers had probable cause to believe he committed the violent felony crime of aggravated assault. See NMSA 1978, § 30-3-2(A) ("Aggravated assault consists of ... unlawfully assaulting ... another with a deadly weapon."). Based on the foregoing, the Officers each witnessed Mr. Dotson commit one or more violent felonies before using force against him. Therefore, the first Graham factor weighs in the Officers' favor.[7]

**B.    Graham Factor 2: Mr. Dotson Posed an Immediate Threat of Serious Physical Harm to the Officers and Others.**

The second Graham factor "is undoubtedly the most important and fact intensive factor in determining the objective reasonableness of an officer's use of force[.]" Pauly v. White, 874 F.3d 1197, 1216 (10th Cir. 2017) (internal quotation marks and citation omitted)). A police officer may reasonably use deadly force where he "has probable cause to believe that the suspect poses a threat

---

[6]    See NMSA 1978, § 30-22-23(A) ("Assault with intent to commit a violent felony upon a peace officer consists of any person assaulting a peace officer while he is in the lawful discharge of his duties with intent to kill the peace officer.").

[7]    Although the Officers had probable cause to believe Mr. Dotson committed one or more felony crimes, "it would be insignificant whether he ... was not even a criminal suspect if it reasonably appeared that he was about to shoot a gun at an officer from close range." Est. of Valverde v. Dodge, 967 F.3d 1049, 1061 (10th Cir. 2020).

of serious physical harm, either to the officer or to others." Tennessee v. Garner, 471 U.S. 1, 11 (1985). The degree of threat facing the Officers may be evaluated using the following nonexhaustive Larsen factors:

        **1.**     **Larsen Factor 1: Mr. Dotson failed to comply with Officer Wasson's order to put his hands up.**

"If a suspect was given orders and did not comply, [the first Larsen factor] weighs in the officers' favor." Palacios, 61 F.4th at 1259. However, officers are not required to give a warning before using deadly force if it is not feasible to do so. See Garner, 471 U.S. at 11-12; see also Thomson, 584 F.3d at 1321 ("A warning is not invariably required even before the use of deadly force ... ."); Est. of Smart v. City of Wichita, 951 F.3d 1161, 1175 (10th Cir. 2020) (acknowledging there is no relevant authority requiring officers to give a warning when "faced with rapidly evolving circumstances involving deadly threats."). Additionally, an officer is not required to specifically warn a suspect that they will be shot if they do not stop. See Est. of George v. City of Rifle, Colo., 85 F.4th 1300, 1317 (10th Cir. 2023) (citing Palacios, 61 F.4th at 1259; see also Valverde, 967 F.3d at 1061–62 ("[W]hen the suspect is not holding a gun when the confrontation begins, officers can do little more than what they did in this case: order the suspect to raise his hands and get to the ground."); Redd v. City of Oklahoma City, 2021 WL 3909982, *12 (10th Cir. 2021) (unpublished opinion) (holding that the command "don't do it" used "in the context of a person armed with and apparently drawing a gun" and in the context of the officer unholstering his firearm, "sufficiently warned [the subject] that lack of compliance might be met with deadly force."). Further, when an officer reasonably perceives the subject is drawing a firearm on him and the officer's delay in using deadly force "could result in his own death or serious injury, his decision to fire without allowing [the subject] further time to comply [is] reasonable." Redd, 2021 WL 3909982 at *12.

In Redd, the Tenth Circuit also addressed the reasonableness of the officer's failure to identify himself as a police officer when the subject moved to draw his firearm:

> We do not discount the possibility that Officer Galyon could have defused the situation by identifying himself when Mr. Simms moved suddenly as though to draw the firearm, thus making clear the commands came from law enforcement. But *given the speed with which the events precipitated, Officer Galyon's failure to do so was reasonable.* See Plumhoff[], 572 U.S. at 775 [] (explaining that in excessive force cases, courts must "allo[w] for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation") (alteration in original) (quoting Graham[], 490 U.S. 386, 396–97[]).

Id. at *12 n. 8 (emphasis added).

The reasoning in Redd is applicable to the instant case. Here, Officer Wasson knocked and announced their presence three separate times. See [Doc. No. 35], Undisputed Material Fact ("UMF") Nos. 48-63. After Officer Wasson heard the sound of a firearm slide being racked on the other side of the door, the Officers repositioned themselves and unholstered their service weapons in preparation for whatever threat came from inside the residence. See id., UMF Nos. 71-75. Within approximately three (3) seconds of hearing the firearm being racked, Mr. Dotson aggressively opened the front door and screen door. See id., UMF No. 77. Within approximately one second of Mr. Dotson opening the doors, Officer Wasson called out "Hey." See id., UMF Nos. 78-79. Approximately one second later, the Officers observed that Mr. Dotson was brandishing a firearm in his right hand and was beginning to raise it. See id., UMF Nos. 79-81. Officer Wasson immediately issued the following order to Mr. Dotson: "Hands up!" See id., UMF No. 82. Mr. Dotson disregarded Officer Wasson's command and in less than a second took hold of the firearm with both hands, raised it in a shooting stance, and aimed in the direction of Officers Wasson and Estrada. See id., UMF Nos. 82-83.

As the totality of the circumstances is crucial to a reasonableness inquiry, Thomson, 584 F.3d at 1318, it is important to note that these events rapidly unfolded. Approximately three (3) seconds

passed from the time Mr. Dotson opened the doors to the time he aimed the firearm in direction of

Officers Wasson Estrada, ignoring the command to put his hands up. See [Doc. No. 35], UMF Nos.

77-83. Thus, Mr. Dotson not only failed to comply with Officer Wasson's command to put his hands

up but, given the tense, uncertain, and rapidly evolving circumstances, it was reasonable that the

Officers did not issue different or additional commands, identify themselves for a fourth time, or give

Mr. Dotson additional time to potentially comply. The Officers' lives were at risk and they had to

make a split-second decision to defend themselves. See Redd, 2021 WL 3909982 at *12 n 8. The first

Larsen factor, therefore, weighs in the Officers' favor.

> ### 2. Larsen Factor 2: Mr. Dotson made a hostile motion with a handgun toward the Officers.

The second Larsen factor requires the court to examine "whether any hostile motions were

made with the weapon towards the officers[.]" 511 F.3d at 1260. In Valverde, the Tenth Circuit stated:

> Assuming that the suspect was drawing a gun to fire at an officer only a few feet away, those factors support the officer's use of deadly force. The second, third, and fourth [Larsen factors] would obviously be satisfied. Drawing the gun to fire at an officer is a hostile motion with hostile intent and presents a lethal threat when the officer is close by.

967 F.3d at 1061.

Here, video evidence unequivocally demonstrates that Mr. Dotson took hold of the firearm

with both hands and raised it in a shooting stance, aiming in the direction of Officers Wasson and

Estrada. See [Doc. No. 35], UMF Nos. 71, 77-83, 85, 88 and 91; see also Scott v. Harris, 550 U.S.

372, 380 (2007) (the court may rely upon video evidence and disregard one party's factual assertion

where the video evidence "blatantly contradicts" that party's assertion such "that no reasonable jury

could believe it."). As such, Mr. Dotson made a hostile motion with his handgun toward Officers

Wasson and Estrada. Thus, the second Larsen factor weighs in the Officers' favor.

      **3.**     **<u>Larsen</u> Factor 3: Mr. Dotson was close to Officers Wasson and Estrada, who were without cover, when he aimed his gun in their direction.**

The third <u>Larsen</u> factor is "the distance separating the officers and the suspect[.]" 511 F.3d at 1260. In <u>Valverde</u>, the Tenth Circuit stated that this <u>Larson</u> factor would "obviously be satisfied" if the suspect draws a gun to fire at the officer, and the officer is "only a few feet away" or "close by." 967 F.3d 1049, 1061. In <u>Est. of Taylor v. Salt Lake City</u>, the Tenth Circuit found that an officer who was 10 to 12 feet from a suspect who made a motion consistent with drawing a gun, particularly where the officer was exposed and lacked immediately accessible cover, supported the objective reasonableness of the officer's use of deadly force. 16 F.4th 744, 769–70 (10th Cir. 2021). More recently, the Tenth Circuit again concluded that when a suspect is armed with a gun and the distance between him and the officer is 15-20 feet and the officer is without cover, this factor weighs in favor of the officer. <u>Palacios</u>, 61 F.4th at 1260; <u>see</u> <u>Redd</u>, 2021 WL 3909982, at *13 (finding the third <u>Larson</u> factor favored the officer where he was within range of the subject's weapon); <u>Leyba v. City of Santa Fe</u>, 2017 WL 4534839, *2-3 (D.N.M. Feb. 8, 2017) (where a police officer, investigating a home burglary alarm call, shot the man who came to the doorway after the man drew a gun and pointed it at the officer who was 10-15 feet away and in an exposed, uncovered location, the Honorable Robert Lynch opined that "the distance between the parties seems to be less important when the suspect has a high-powered weapon instead of a knife or club.").

Here, Officers Wasson and Estrada were both within five (5) yards of the front door when Mr. Dotson took a shooting stance and aimed his gun in their direction. <u>See</u> [Doc. No. 35], UMF Nos. 85, 88. This is a smaller distance than several cases finding reasonable uses of force. Further, Officers Wasson and Estrada were positioned in the open front yard, without any immediately accessible cover, and their ability to quickly retreat was hampered by the waist-high, decorative iron fence with

ornamental spikes on top. See id., UMF Nos. 30, 85-86, 88. The courts consider an officer's lack of cover relevant in supporting the reasonableness of a use of force. Based on the foregoing, Officers Wasson and Estrada were clearly within range of Mr. Dotson's handgun and without cover.

The third officer, Officer Goodluck, was positioned approximately 6 yards away from the front door, to the right of Officer Estrada and behind an approximately 12 inch by 12 inch front porch pillar. See id., UMF Nos. 58, 91. While Mr. Dotson did not point his gun in this officer's direction, Officer Goodluck nonetheless believed that Mr. Dotson posed an imminent threat of death or great bodily harm to Officer Wasson. See id., UMF Nos. 89-90. Regardless, Officer Goodluck was also within close range of Mr. Dotson's firearm. Finally, it is also notable that this confrontation took place in a residential neighborhood and their were other homes behind Officers Wasson and Estrada that may have been within Mr. Dotson's line of fire. See id., UMF No. 132; see also Brosseau v. Haugen, 543 U.S. 194, 198 (2004) (the Court was not concerned with the actual absence or presence bystanders, but with the officer's reasonable belief that bystanders might be nearby.). Based on the foregoing, the third Larsen factor weighs in the Officers' favor.

###    4.    Larsen Factor 4: Mr. Dotson's manifest intentions indicate he posed a lethal threat to Officers Wasson and Estrada.

####    a.    The law explaining the fourth Larsen factor.

The fourth Larsen factor is concerned with "the manifest intentions of the suspect." 511 F.3d at 1260. In evaluating a subject's manifest intentions, the Tenth Circuit looks to whether a reasonable officer would have perceived the subject's actions as threatening. See Taylor, 161 F.4th at 770; Valverde, 967 F.3d at 1062 ("the facts must be viewed from the perspective of the officer."). Importantly, the officer's assessment of threat of harm "need not be correct ... as long as it is reasonable." Tenorio v. Pitzer, 802 F.3d 1160, 1164 (10th Cir. 2015). In Taylor, the Tenth Circuit

explained:

> [A] key lesson here is that "the focus of the inquiry is not on ... what Mr. Taylor *subjectively* intended"—be it "with his hand movements" or otherwise. [citation omitted]. Accordingly, our inquiry's focus is on how a reasonable officer on the scene would have assessed the manifest indicators of Mr. Taylor's intentions—that is, Mr. Taylor's actions.

Taylor, 16 F.4th at 770 (emphasis in original).  Under this standard, the Taylor court concluded that "even viewing the facts in the light most favorable to Plaintiffs, the record indicates that Mr. Taylor's hand gestures immediately before he was shot were consistent with drawing a gun against Officer Cruz or the other officers ... that is, his conduct reflected bad intentions." Id. at 771. Likewise in Valverde, the court stated: "Assuming that the suspect was drawing a gun to fire at an officer only a few feet away ... [t]he ... fourth [Larsen factor] would obviously be satisfied." 967 F.3d at 1061.

### b.    Application of the fourth Larsen factor to the instant case favors the Officers.

The fourth Larsen factor, the manifest intention of the suspect, also weighs in the Officers favor.  The Officers were dispatched to a domestic violence call. See [Doc. No. 35], UMF Nos. 1-2. The dispatcher advised there was lots of yelling, the male was bleeding, argumentative with dispatch and "pretty aggressive," and the call was disconnected. Id., at UMF Nos. 4-5, 7.[8] The Officers

---

[8]    Domestic violence calls are among the most unpredictable and dangerous for officers to handle. See, e.g., Lee v. Tucker, 904 F.3d 1145, 1151 (10th Cir. 2018) ("Law-enforcement officers know that domestic-violence calls present safety risks"). In Mattos v. Agarano, 661 F.3d 433, 450 (9th Cir. 2011), the Ninth Circuit stated:

> We have observed that "[t]he volatility of situations involving domestic violence" makes them particularly dangerous. United States v. Martinez, 406 F.3d 1160, 1164 (9th Cir. 2005). "When officers respond to a domestic abuse call, they understand that violence may be lurking and explode with little warning. Indeed, more officers are killed or injured on domestic violence calls than on any other type of call." Id. (internal quotation marks and citation omitted).

acknowledge they mistakenly went to the wrong address. See [Doc. No. 35], UMF No. 32. However, at the time of the incident, they did not know they were at the wrong address. See id., UMF Nos. 22-23, 25, 33-36, 64-68. Thus, the Officers believed they were at the residence where a domestic violence incident had been reported.  Additionally, at the moment Mr. Dotson aggressively emerged from the residence, and aimed a gun at Officers Wasson and Estrada, it was reasonable for the Officers to believe Mr. Dotson: (1) heard Officer Wasson's repeated knocks and announcements, particularly the third time which occurred seconds before he came to the door; (2) also knew that police were at his door because the officers were dressed in uniform and positioned at the front door, the porch was well-lit, the full-moon made it brighter than usual, the home was equipped with a video doorbell security system, there was a large window next to the front door, and Mr. Dotson did not ask who was outside or threaten to call police; (3) had a loaded gun given that the sound of a firearm slide could be heard from the other side of the front door a mere 3 seconds before he opened the door; (4) saw the illuminated flashlight Officer Estrada shined at the front door and thus, at a minimum, was aware of this officer's location; (5) heard Officer Wasson's command to put his hands up; (6) refused to comply with Officer Wasson's command; and (7) instead took hold of his firearm in both hands in a shooting stance, aiming in the direction of Officers Wasson and Estrada. See id., UMF Nos. 37-45, 48-83. Under these tense, uncertain and rapidly evolving circumstances, it was reasonable for the Officers to conclude that Mr. Dotson's manifest intentions were hostile toward the officers and necessitated a split-second decision on their part.[9]

Perhaps Mr. Dotson did not know police were at his residence and did not intend to actually fire his gun, but "[o]fficers cannot be mind readers and must resolve ambiguities immediately."

---

[9]    Further, Mr. Dotson was intoxicated as substantiated by postmortem toxicology, which revealed the presence of alcohol. See [Doc. No. 35], UMF Nos. 146-147.

<u>Valverde</u>, 967 F.3d at 1062 (also stating, "[p]erhaps a suspect is just pulling out a weapon to discard it rather than to fire it. But waiting to find out what the suspect planned to do with the weapon could be suicidal."). "Qualified immunity does not require that the police officer know what is in the heart or mind of his assailant. <u>Wilson v. Meeks</u>, 52 F.3d 1547, 1553 (10th Cir. 1995), <u>abrogated on other grounds by</u> <u>Saucier v. Katz</u>, 533 U.S. 194 (2001). Here, no reasonable officer would believe that the Officers in this case took any action that would make Mr. Dotson believe he needed to protect his home from being invaded, contrary to the facts in <u>Pauly</u>, 874 F.3d 1219, where the residents repeatedly asked who was outside, indicating they did not know police were outside, and officers repeatedly threatened to invade the residence. Therefore, the fourth <u>Larsen</u> factor weighs in the Officers' favor.

Given that all the <u>Larsen</u> factors weigh in the Officers' favor, the second <u>Graham</u> factor, which is "the most important" factor in determining the objective reasonableness of an officer's use of force, weighs in the Officers' favor.

### C.    <u>Graham</u> Factor 3: It Was Reasonable for the Officers to Believe That Mr. Dotson Was Actively Resisting Arrest.

The third <u>Graham</u> factor – active resistance or evasion of arrest – weighs in the Officers' favor. As discussed <u>supra</u>, the Officers had probable cause to arrest Mr. Dotson for one or more felony crimes the moment they observed him begin to raise his gun in their direction. Further, he actively resisted by ignoring Officer Wasson's command to put his hands up and then by taking the gun in both hands in a shooting stance. <u>See</u> [Doc. No. 35], UMF Nos. 80-83. Even assuming this Court finds the third <u>Graham</u> factor weighs in the Estate's favor, it would not be significant in the instant case. Instead, "the second factor – whether there is an immediate threat to safety – is undoubtedly the most important ... factor in determining the objective reasonableness of an officer's use of force." <u>Taylor</u>,

16 F.4th at 763 (citations and internal quotation marks omitted). "This is particularly true in a deadly force case, because deadly force is justified only if a reasonable officer in the officer's position would have had probable cause to believe that there was a threat of serious physical harm to himself or others." Reavis v. Frost, 967 F.3d 978, 985 (10th Cir. 2020) (citation and internal quotation marks omitted); see also Est. of Lopez ex rel. Lopez v. Gelhaus, 871 F.3d 998, 1005-06 (9th Cir. 2017) (observing that, while the first and third Graham factors weigh in plaintiff's favor, the "'most important' factor," and the determinative one in a deadly force case, was "whether the suspect posed an 'immediate threat to the safety of the officers or others'") (quoting George v. Morris, 736 F.3d 829, 838 (9th Cir. 2013)). Therefore, the undisputed material facts demonstrate Mr. Dotson was actively resisting arrest, satisfying the third Graham factor, but even if the Court determines otherwise, the second Graham factor is satisfied and the totality of circumstances supports the Officers.

**D.**    **Under the Totality of the Circumstances, the Officers' Use of Deadly Force Against Mr. Dotson was Objectively Reasonable.**

In sum, all three Graham factors favor the Officers, including the most important factor, that the Officers had probable cause to believe that Mr. Dotson posed an imminent threat of death or serious physical harm to themselves or others. See Valverde, 967 F.3d at 1062 ("the decisive question is whether [the officer] was reasonable in believing that [the subject] was going to fire his gun at [the officer or others]."). To stop the lethal threat posed my Mr. Dotson, the Officers fired their service weapons for approximately 1-2 seconds. They immediately ceased fire when Mr. Dotson fell into the house and no longer appeared to pose an immediate threat. See [Doc. No. 35], UMF Nos. 92-95. Therefore, the Officers' use of deadly force against Ms. Dotson was objectively reasonable, and they are entitled to qualified immunity.

### E.    The Officers' Pre-Seizure Conduct Did Not Unreasonably Precipitate Their Need to Use Deadly Force.

The Estate may argue that the threat posed by Mr. Dotson, which would normally justify the use of deadly force, was unreasonably precipitated by the Officers going to the wrong address and not adequately identifying themselves. Therefore, the Estate may claim that, taking these circumstances into consideration, the Officers' use of deadly force was unreasonable. As discussed in turn below, such arguments do not alter the reasonableness of the Officer's actions.

Tenth Circuit "precedent recognizes that the reasonableness of the use of force depends not only on whether the officers were in danger at the precise moment that they used force, but also on whether the officers' own reckless or deliberate conduct during the seizure unreasonably created the need to use such force." Pauly, 874 F.3d at 1219 (citations, brackets and internal quotation marks omitted); Thomson, 584 F.3d at 1320 (same). "Mere negligen[ce]" will not suffice. Sevier, 60 F.3d at 699 n.7. Further, the Tenth Circuit will only "consider an officer's conduct prior to the suspect's threat of force if the conduct is 'immediately connected' to the suspect's threat of force." Allen v. Muskogee, Okl., 119 F.3d 837, 840 (10th Cir. 1997) (quoting Romero, 60 F.3d at 705 n.5).

### 1.    As a matter of law, the Officers did not violate the Fourth Amendment by going to the wrong address.

The Estate may argue that, because the Officers were at the wrong address, Mr. Dotson was entitled to arm himself because he purportedly did not know who was at his door late in the evening. Even though they went to the wrong address, the uniformed Officers lawfully approached the residence by the front path, knocked on the well-illuminated front door, announced their presence, and waited to be received as any private citizen would. See [Doc. No. 35], UMF Nos. 31, 37-44, 48-64; see also Kentucky v. King, 563 U.S. 452, 469 (2011) ("[W]hen law enforcement officers who are not armed with a warrant knock on a door, they do no more than any citizen might do."); Florida v.

<u>Jardines</u>, 569 U.S. 1, 8 (2013) (like any other visitor, an officer may "approach the home by the front path, knock promptly, wait briefly to be received, and then (absent invitation to linger longer) leave."). Such conduct does not violate the Fourth Amendment. <u>See</u> <u>United States v. Carloss</u>, 818 F.3d 988, 997 (10th Cir. 2016) (concluding that "the officers did not violate the Fourth Amendment when they went onto the porch and knocked on the front door of the house in which [the Defendant] lived."). Because the Officers reasonably set the stage for what should have been a lawful, consensual encounter outside of or at the door of a house, their pre-seizure conduct did not unreasonably incite Mr. Dotson into posing a threat. Thus, as a matter of law, the Officers did not violate the Fourth Amendment by going to the wrong address and knocking on the front door.

### 2. The Officers' adequately identified themselves.

Although "Mr. Dotson believed that he heard a knock," *Amended Complaint,* ¶ 10, the Estate may additionally argue the Officers failed to adequately identify themselves because their police vehicles were parked down the street without their lights on, and Officer Wasson's announcements were not loud enough to be heard upstairs. The Estate may further argue that, when Mr. Dotson opened his front door, "he was blinded by police flashlights," the Officers "did not announce themselves [again]," and Mr. Dotson "did not know who was in his yard." <u>Id.</u>, at ¶ 12. These arguments lack merit.

Here, the Officers were dispatched to a domestic violence call. For safety reasons, the Officers parked their patrol vehicles down the street and out of sight of the residence and did not activate their lights or sirens. When responding to a domestic violence call, this tactic is not considered reckless. <u>See</u>, <u>e.g.</u>, <u>Martinez v. United States</u>, 822 F. App'x 671, 674-675, 679 (10th Cir. 2020) (stating it was reasonable for police officers' to use blackout approach when approaching a house at 3:30 a.m. to investigate a domestic violence report, meaning the officers kept quiet, wore dark uniforms, and

parked out of sight); Johnson v. City of Roswell, No. CV 15-1071 GBW/CG, 2017 WL 4083568, at

*9 (D.N.M. Sept. 13, 2017), aff'd, 752 F. App'x 646 (10th Cir. 2018) (where plaintiff asserted the

police officers' pre-seizure conduct was reckless because they did not adequately identify themselves,

the court disagreed: "Certainly the mere failure to use bullhorns or sirens prior to approaching [the

residence] cannot transform an approach to a home as 'clandestine' or sneaky.").

Further, the undisputed video evidence here indicates Officer Wasson firmly knocked and

announced the Officers' presence three (3) separate times. See [Doc. No. 35], UMF Nos. 48-63.

Under these circumstances, it was reasonable for the officers to assume that anyone who heard the

knock on the door also heard the announcement "Farmington Police," particularly the third time,

seconds before Mr. Dotson opened the door. This assumption is supported by case law with similar

facts. See Johnson v. City of Roswell, 752 F. App'x 646, 651 (10th Cir. 2018) (where officers

dispatched to conduct a welfare check "knocked and twice announced their presence," the court found

that the officer "could properly assume that anyone who heard the knock on the door also heard him

announce 'Roswell Police,' particularly the second time, just before the door was opened.").

Even assuming Officer Wasson's three announcements were not loud enough for Mr. Dotson

to hear upstairs as alleged in the Amended Complaint, it does not render Officer Wasson's conduct

reckless. In Johnson, the Tenth Circuit concluded: "While there may have been safer ways [than

knocking on the front door and announcing their presence] to contact Johnson, no reasonable jury

could find that the officers recklessly or deliberately created the need to shoot him. At most, the

officers may have been negligent, but that is not a constitutional violation." 752 F. App'x at 651-652

(citing Jiron, 392 F.3d at 415). Moreover, it was not reckless for Officer Estrada to use his flashlight

to illuminate the front door given the rapidly unfolding events and the following circumstances:

Officer Wasson had already announced their presence three times, the Officers had no indication Mr.

Dotson did not hear those announcements given that the home was equipped with a video doorbell system, the Officers were in full uniform and still in close proximity to the front door, the porch area was well-lit, the full moon made it brighter than normal, and Officer Wasson ordered Mr. Dotson to put his hands up. See [Doc. No. 35], UMF Nos. 37-64, 69-83. Courts do not like to second-guess split-second judgments, made in tense, uncertain, and rapidly evolving' circumstances "using the 20/20 hindsight found in the comfort of a judge's chambers," and this Court should also decline to engage in second guessing here. Valverde, 967 F.3d at 1064 (citations and internal quotation marks omitted). Likewise, as fully discussed supra, the Officers did not exhibit recklessness by not identifying themselves a fourth time immediately prior to the shooting. For the foregoing reasons, the Officers actions – in going to the wrong address and identifying themselves in the manner in which they did – were not reckless and did not unreasonably precipitate their need to use deadly force. Therefore, under the totality of the circumstances, the Officers' use of deadly force was reasonable, and they are entitled to qualified immunity.

## III.    ALTERNATIVELY, THE OFFICERS' USE OF DEADLY FORCE AGAINST MR. DOTSON DID NOT VIOLATE THE CLEARLY ESTABLISHED LAW.

As there was no constitutional violation here, there is no need to proceed to the second step of the qualified immunity analysis. Saucier, 533 U.S. at 201. However, if the Court finds that Officer Wasson, Officer Goodluck and/or Officer Estrada violated Mr. Dotson's Fourth Amendment rights, the Estate still "carries the burden of convincing the court that the law was clearly established" when the alleged violation occurred. Pueblo Neighborhood Health Centers, Inc. v. Losavio, 847 F.2d 642, 645 (10th Cir. 1998).

### A.    Legal Standard for the "Clearly Established Law" Prong of the Qualified Immunity Analysis.

To be clearly established, "[t]he contours of the right must be sufficiently clear that a

reasonable official would understand that what he is doing violates that right." Anderson v. Creighton, 483 U.S. 635, 640 (1987); see also Mullenix v. Luna, 577 U.S. 7, 12 (2015) (stating that "existing precedent must have placed the statutory or constitutional question beyond debate.") (citation and internal quotation marks omitted). The Supreme Court has repeatedly reiterated that the "clearly established" analysis is a fact-intensive inquiry. See White v. Pauly, 580 U.S. 73, 79 (2017). "[T]his inquiry 'must be undertaken in light of the specific context of the case, not as a broad general proposition.'" Brosseau, 543 U.S. at 198 (quoting Saucier 533 U.S. at 201); see White, 580 U.S. at 79 (stating clearly established law should not be defined "at a high level of generality.").

Attention to the specific facts of the case is "especially important in the Fourth Amendment context, where the Court has recognized that it is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts." Mullenix, 577 U.S. at 12 (internal quotations marks and alterations omitted). In this context, qualified immunity operates "to protect officers from the sometimes hazy border between excessive and acceptable force." Saucier, 533 U.S. at 206 (internal quotation marks omitted). Specifically, "in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." Currier v. Doran, 242 F.3d 905, 923 (10th Cir. 2001); Truman v. Orem City, 1 F.4th 1227, 1235 (10th Cir. 2021) (same); see Pauly, 874 F.3d at 1222 ("For a right to be clearly established there must be Tenth Circuit or Supreme Court precedent close enough on point to make the unlawfulness of the officers' actions apparent.") (citation and internal quotation marks omitted). Where the "case presents a unique set of facts and circumstances," "[t]his alone [is] an important indication" that the right is not "clearly established." White, 580 U.S. at 80.

**B.    Consider <u>Wilson v. Meeks</u>, 52 F.3d 1547 (10th Cir. 1995), Which Is Clearly Established Law Supporting the Officers Actions.**

In the Tenth Circuit' published decision that is most on point, the Court held the officer's use of deadly force was objectively reasonable as a matter of law. See <u>Wilson</u>, 52 F.3d 1547. On December 7, 1990, Officer Meeks followed Mr. Wilson's truck to his home to investigate a reported altercation between Mr. Wilson and another motorist. <u>Id.</u> at 1549. Upon arriving at his home, Mr. Wilson went inside, retrieved an unloaded .357 magnum revolver, and stood by his porch with his gun concealed behind his leg. <u>Id.</u> After approaching Mr. Wilson, Officer Meeks suspected Mr. Wilson was holding a weapon and asked to see the Mr. Wilson's hands. When Mr. Wilson brought his hand forward holding a gun, the officer fired twice. See <u>id.</u> at 1549-50.

Acknowledging that "perhaps Mr. Wilson intended to surrender," <u>id.</u> at 1553, the Tenth Circuit nevertheless held there was no constitutional violation, stating "it is hard to imagine that pointing a .357 magnum in any direction would not cause a reasonable police officer to fear for someone's life – if not his own, then the life of a bystander or the gunman himself." <u>Id.</u> The Tenth Circuit also stated:

> "the inquiry here is not into Mr. Wilson's state of mind or intentions, but whether, from an objective viewpoint and taking all factors into consideration, Officer Meeks reasonably feared for his life. Qualified immunity does not require that the police officer know what is in the heart or mind of his assailant. It requires that he react reasonably to a threat. Officer Meeks did so.

<u>Id.</u>, at 1553–54.

To defeat the Officers' qualified immunity defense on the basis of <u>Wilson</u>, the Estate in the instant case must show either (1) that the Officers' conduct was materially different from the conduct in <u>Wilson</u> or (2) that "controlling authority" or a "robust consensus of cases of persuasive authority" has subsequently emerged that would have given fair notice to the Officers that it was unconstitutional to shoot a subject who was pointing a loaded firearm in the direction of officers who were close by

and without cover. The Estate can do neither.

      **1.**    **The Estate cannot meaningfully distinguish the circumstances in <u>Wilson</u> from those in the instant case.**

The instant case and <u>Wilson</u> have fundamental similarities. In both cases, the officers were lawfully in front of the subjects' residences attempting to speak with them about reported crimes. In both cases, the officers were in close proximity to the subjects but without immediate access to cover. Moreover, the subjects in both cases brought their guns forward toward the officers.

The Estate may argue that the instant case differs from <u>Wilson</u> because Officer Meeks was at the correct address and Mr. Wilson was aware of Officer Meeks' presence, while here, as alleged in the Amended Complaint, the Officers were at the wrong address and, though Mr. Dotson heard knocking, he allegedly did not hear Officer Wasson's repeated announcements. Thus, he allegedly did not know who was at his front door. These differences are not material to the qualified immunity inquiry before the Court. As discussed <u>supra</u>, United States Supreme Court and Tenth Circuit precedent make it abundantly clear that, even without a warrant or reasonable suspicion, a police officer has an implied license to enter a home's curtilage to knock on the front door, seeking to speak with the home's occupants. Also, even if it is true that Mr. Dotson did not know who was knocking on his front door, it was reasonable for the Officers to believe Mr. Dotson *did* know given he answered the door in response to their knocking. Based on the foregoing, the Estate cannot meaningfully distinguish <u>Wilson</u>.

      **2.**    **<u>Wilson v. Meeks</u>' analysis is not outdated and remains binding precedent supporting the Officers' actions.**

Plaintiffs are therefore left with no option but to show that <u>Wilson</u>'s analysis is outdated. <u>Wilson</u> has not been has overruled. Indeed, the Tenth Circuit still relies on <u>Wilson</u> in examining other unreasonable seizure claims. <u>See</u>, <u>e.g.</u>, <u>Valverde</u>, 967 F.3d at 1062-1063; <u>Jiron</u>, 392 F.3d at 415. The

Estate may refer the Court to Pauly, 874 F.3d 1197, but that decision can be meaningfully distinguished.

In Pauly, two officers, investigating an earlier road rage incident late at night, went to one of the driver's rural home in a wooded area, where the driver lived with his brother  See 874 F.3d at 1203-04. When the officers arrived, it was dark and raining very hard. Id. at 1204; see Pauly v. N.M. Dept. of Public Safety, 2014 WL 12694140, *4 (D.N.M. 2014) (stating that the "rain was coming in sideways"). The officers approached the home on foot using flashlights intermittently but did not knock. 874 F.3d at 1204. The driver and his brother saw two flashlights but could not tell who was holding them because of the dark and rain. Id. at 1204. The driver feared the officers were intruders related to the prior road rage incident and the brothers repeatedly yelled, "Who are you?" and "What do you want?" See id. The officers responded, "Hey, (expletive), we've got you surrounded. Come out or we're coming in." Id.  One of the officers also shouted, "Open the door, State Police, Open the door," while another officer shouted, "Open the door, open the door." Id.

The driver did not hear anyone say "State Police." Id. Around this time, an additional officer, Officer White, arrived. Id. The driver and his brother armed themselves and one of them announced, "We have guns." Id. at 1205. In response, an officer shouted, "open the door, come outside." Id. Officer White took cover behind a stone wall fifty feet from the front of the house. Id. The driver then fired two warning shots out of the back door. Id. at 1205. The driver's brother opened a front window and pointed a handgun in Officer White's direction. Id. Officer White then shot and killed the driver's brother. Id.

The Tenth Circuit held the officers' reckless conduct – including approaching the suspect's home "while it was *dark and raining* and, *without knocking on the door*, *ma[king] threatening comments about intruding into the home*," id. at 1215 (emphasis added) – understandably caused the

[driver] and his brother to arm themselves, and therefore unreasonably created the need to use deadly force, id. at 1211, 1213, 1221. The court concluded that the threat "made by the brothers, which would normally justify an officer's use of force, was precipitated by the officers' own" reckless actions, and that therefore the use of deadly force was unreasonable. Id. at 1221. The Tenth Circuit nevertheless held the officers were entitled to qualified immunity "[b]ecause there is no case close enough on point to make the unlawfulness of [the shooting officer's] actions apparent." Id. at 1223.

The facts in Pauly are materially distinguishable from those in the instant case. Here, it was not raining and the full moon made it brighter than normal outside. See [Doc. No. 35], UMF. No. 43. In Pauly, the officers did not knock on the front door. Here, Officer Wasson knocked and announced the Officers' presence three separate times. Officers Wasson and Goodluck also stood directly in front of the well-lit front door of the home, in view of the home's video doorbell system and large living room window. Crucially, in Pauly, the brothers repeatedly yelled, "Who are you?" and "What do you want?" – indicating they did not know police were outside their home – and, in response, the officers repeatedly made threatening statements about intruding into the home. Here, however, Mr. Dotson gave no indication he did not know police were at his front door and the Officers made no threatening statements of any kind, only announcing their presence. See [Doc. No. 35], UMF Nos. 48-63. Once Mr. Dotson appeared at the door brandishing a gun, Officer Wasson issued a standard police command of "hands up." Id., UMF Nos. 77-82. Further, in Pauly, Officer White was approximately 50 feet away and behind the cover of a stone wall, while here, Officers Wasson and Estrada were only approximately 5 yards from the front door without cover. Id., UMF Nos. 84-86, 88. Therefore, Pauly is not "close enough on point to make the unlawfulness of the officers' actions apparent." Pauly, 874 F.3d at 1222.

The facts of this case are instead more akin to those in the Tenth Circuit's 2018 unpublished

decision in <u>Johnson</u>, 752 F. App'x 646, further demonstrating the law was not clearly established in the Estate's favor. <u>See</u> <u>Grissom v. Roberts</u>, 902 F.3d 1162, 1168 (10th Cir. 2018) ("If we make the collegial, and quite legitimate, assumption that panels of this court render reasonable decisions, we would be hard pressed to say that a proposition of law was clearly established at a time when an unpublished opinion by a panel of this court said the opposite."). In <u>Johnson</u>, police officers were called to conduct a welfare on Richard Johnson who had been involved in a domestic dispute earlier with his brother-in-law that involved firearms. <u>Id.</u> at 648. Upon arrival at his apartment, Officer Lannoye knocked and announced "Roswell Police." <u>Id.</u> The officer could hear a male and female approaching the door and yelling. <u>Id.</u> Officer Lannoye again knocked and announced their presence. <u>Id.</u> The apartment door then "opened quickly" and Johnson exited the apartment, walking toward Officer Lannoye with a metallic object in his right hand. <u>Id.</u> Officer Lannoye backed up, realized the object was a firearm, and saw Johnson raise it in the officers' general direction. <u>Id.</u> Fearing for his and the other officers' lives, Officer Lannoye shot Johnson five times, seriously wounding him. <u>Id.</u>

Johnson argued the officer's use of deadly force was unreasonable because he was not a criminal suspect, did not know it was police at his door, and, instead, though it was his brother-in-law who had returned to hurt him some more. <u>Id.</u> at 651. The Tenth Circuit disagreed, reasoning: (1) Johnson's arguments "fail to account for [Officer] Lannoye's perspective;" (2) Officer Lannoye "could properly assume that anyone who heard the knock on the door also heard him announce 'Roswell Police,' particularly the second time, just before the door was opened;" and (3) it was reasonable for Officer Lannoye to believe that, by Johnson quickly stepping out and carrying a gun in the low ready position, he "posed a deadly threat and that the application of deadly force was necessary." <u>Id.</u> Johnson also suggested the officers unreasonably precipitated the use of deadly force, in part, because they did not give adequate notice. <u>Id.</u> at 651. The court quickly dismissed this argument, stating "[w]hile there

26

may have been safer ways to contact Johnson, no reasonable jury could find that the officers recklessly or deliberately created the need to shoot him." Id. at 652.

As in Johnson, Officers Wasson and Estrada were out in the open without cover and in close proximity to a subject who aimed a gun in their general direction. See [Doc. No. 35], UMF Nos. 84-86, 88. Moreover, as in Johnson, the Officers here had no indication that Mr. Dotson did not hear Officer Wasson's announcements, particularly the third announcement that occurred seconds before Mr. Dotson opened the door. See id., UMF No. 71, 77. Thus, after surveying decisions regarding the reasonableness of lethal force against a subject who responds to an officer's efforts to make contact by aiming a gun in the officers' general direction, it is clear that this is an area of law, in which the result depends very much on the facts of each case, there is no case close enough on point to place the unlawfulness of the Officers' actions beyond debate. Accordingly, the Officers are entitled to qualified immunity because the law was not clearly established on April 5, 2023 that their actions were unreasonable.

**WHEREFORE,** City Defendants respectfully request this Court grant their Motion for Partial Summary Judgement No. II and dismiss the Estate's Fourth Amendment unreasonable seizure claim against the Officers with prejudice.

Respectfully submitted,

**ROBLES, RAEL & ANAYA, P.C.**

By:    /s/ Luis Robles
        Luis Robles
        Attorney for City Defendants
        200 3rd St., NW, Suite 500
        Albuquerque, New Mexico 87102-3334
        (505) 242-2228
        (505) 242-1106 (facsimile)
        luis@roblesrael.com

I hereby certify that the foregoing was
electronically filed through the CM/ECF
on this 11th day of March 2024, which will
cause service to all counsel of record.

 /s/ Luis Robles
Luis Robles