## IN THE UNITED STATE DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

**ERNEST PADILLA, PERSONAL REPRESENTATIVE**
**OF THE ESTATE OF ROBERT DOTSON, DECEASED;**
**KIMBERLY DOTSON,**
**INDIVIDUALLY AND AS PARENT AND NEXT FRIEND**
**OF JULIA**
**DOTSON; AND ZACHARY-MORA DOTSON,**

     Plaintiffs,

vs.                                                    Case No. 1:23-cv-00790-MLG-KK

**CITY OF FARMINGTON, NEW MEXICO;**
**DANIEL ESTRADA; DYLAN GOODLUCK;**
**AND WAYLON WASSON,**

     Defendants.

## CITY DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT No. III: DISMISSAL OF KIMBERLY DOTSON'S FOURTH AMENDMENT UNREASONABLE SEIZURE CLAIM AGAINST THE OFFICERS BASED ON THE APPLICATION OF QUALIFIED IMMUNITY

Defendants, the City of Farmington, Daniel Estrada, Dylan Goodluck, and Waylon Wasson

(*hereinafter* referred to as "City Defendants"), through their attorneys, Robles, Rael and Anaya, P.C.

(Luis Robles), state the following for their Motion for Partial Summary Judgment No. III: Dismissal

of Kimberly Dotson's Fourth Amendment Unreasonable Seizure Claim Against the Officers Based

on the Application of Qualified Immunity ("Motion for Partial Summary Judgment No. III"):[1]

## INTRODUCTION

This case arises from April 5, 2023 officer-involved shooting by Farmington Police

---

[1]    As required by D.N.M.LR-Civ. 7.1(a), defense counsel contacted Plaintiffs' counsel on March 9, 2024 to determine Plaintiffs' position on this motion. Plaintiffs oppose it.

Department ("FPD") Officers Waylon Wasson ("Officer Wasson"), Dylan Goodluck ("Officer Goodluck") and Daniel Estrada ("Officer Estrada") (collectively "Officers"). These uniformed Officers were dispatched to a domestic violence call at 5308 Valley View Avenue but mistakenly went to 5305 Valley View Avenue, the wrong address. Officer Wasson repeatedly knocked and announced the Officers' presence at the well-lit front door of the residence which was also equipped with a video doorbell security system. After repeatedly knocking and announcing their presence, Officer Wasson heard the sound of a firearm slide being racked on the other side of the door, indicating someone within the house was feeding a round of ammunition into the firing chamber of a gun. Within three (3) seconds of Officer Wasson hearing this sound, a male, subsequently identified as Robert Dotson ("Mr. Dotson"), aggressively opened the front door and screen door armed with a gun. Mr. Dotson instantly took hold of the firearm with both hands, raised it in a shooting stance and aimed it in Officer Wasson's and Officer Estrada's direction. The Officers were forced to use deadly force to stop the imminent threat of death or great bodily harm posed by Mr. Dotson. Mr. Dotson was struck and fell into the residence. The Officers tactically retreated from the backyard, over the waist-high decorative iron fence topped with ornamental spikes that enclosed the yard, and into the alleyway adjacent to the residence.

Just as the final officer climbed over the fence into the alley, a female, subsequently identified as Kimberly Dotson ("Mrs. Dotson"), appeared at front door of the residence armed with a gun and instantly fired at least one round in the Officers' direction. To stop the imminent lethal threat posed by Mrs. Dotson, Officers Wasson and Estrada returned fire. Mrs. Dotson was not struck, and she retreated back into her residence. Officer Goodluck did not return fire because, although he saw a gun appear from the threshold of the doorway, he did not have a clear line of sight to the female holding the gun from where he was positioned. Other non-defendant FPD officers

2

arrived on scene and eventually persuaded Mrs. Dotson to exit the residence unarmed. As non-defendant FPD officers escorted Mrs. Dotson to a patrol car, Officer Estrada verbally directed them to handcuff her.

The Amended Complaint alleges "Defendants, and each of them," deprived Mrs. Dotson of her Fourth Amendment right to be free of unreasonable seizures. See *Plaintiffs' First Amended Original Complaint*, p. 5, ¶20 (filed Jan. 23, 2024) [Doc. No. 27] ("*Amended Complaint*"). The Amended Complaint does not specify the factual basis for Mrs. Dotson's Fourth Amendment claim nor does it specify whether her claim is based on the Officers' use of deadly force, an arrest without probable cause, or both. Construing the Amended Complaint generously, the Officers surmise Mrs. Dotson is asserting: (1) Officers Wasson and Estrada used excessive force by shooting at her; and (2) Officer Estrada participated in her arrest without probable cause by verbally directing non-defendant FPD officers to handcuff her after she was persuaded to exit the residence without a weapon. However, even affording Mrs. Dotson this generous construction of her vaguely pled Fourth Amendment claim, the Officers are entitled to qualified immunity for their respective actions.

With regard to Mrs. Dotson's excessive force claim, Officers Wasson and Estrada did not "seize" Mrs. Dotson when they returned fire because none of their bullets physically touched her. Moreover, to the extent these Officers' use of deadly force is considered a show of authority, it does not constitute a seizure because Mrs. Dotson did not submit to this specific show of authority. Because she was not seized by their use of force under either theory, Mrs. Dotson's excessive force claim against Officers Wasson and Estrada necessarily fails. Alternatively, the law was not clearly established as of Aril 5, 2023 that these Officers' use of deadly force under these circumstances would constitutes a seizure for purposes of a Fourth Amendment.

With regard to Mrs. Dotson's unlawful arrest claim, the Officers had probable cause to arrest

Mrs. Dotson for committing one or more violent felony crimes based on her firing a gun in their direction. The Fourth Amendment, therefore, authorized Officer Estrada to direct non-defendant officers to place Mrs. Dotson in handcuffs to effect her arrest. Even if his probable cause assessment was mistaken, Officer Estrada nonetheless had arguable probable cause to arrest Mrs. Dotson and is therefore entitled to qualified immunity on her claim that she was arrested without probable cause.

Finally, the undisputed material facts demonstrate that the third individually named Defendant, Officer Goodluck, did not shoot at Mrs. Dotson and had no role in taking her into custody. Since Officer Goodluck did not personally participate in any of the actions that form the basis of Mrs. Dotson's Fourth Amendment claim, Officer Goodluck did not violate her constitutional rights. Similarly, Officer Wasson did not personally participate in taking Mrs. Dotson into custody after she exited the residence and, thus, he did not violate her Fourth Amendment rights on this basis. Alternatively, the law was not clearly established at the time of the incident that Officer Goodluck's or Officer Wasson's presence outside the residence was sufficient to violate Mrs. Dotson's Fourth Amendment rights. For the foregoing reasons, the Court should grant summary judgment in the Officers' favor on Mrs. Dotson's Fourth Amendment unreasonable seizure claim on the basis of qualified immunity.

## UNDISPUTED MATERIAL FACTS

1.      As allowed by D.N.M.LR-Civ. 7.1(a), the Officers hereby incorporate by reference paragraphs 1-137 of the Statement of Undisputed Material Facts ("UMF") set forth in their *Motion for Partial Summary Judgment No. I: Dismissal of Julia Dotson and Zachary Mora-Dotson's Fourth Amendment Illegal Seizure Claims Against the Officers Based on the Application of Qualified Immunity*, pp. 4-36 (filed Feb. 19, 2024) [Doc. No. 35] ("*MPSJ No. I*"), as though fully set forth herein.

2.      Kimberly Dotson was not struck by any of Officer Wasson's or Officer Estrada's rounds. <u>See</u> Sergeant Christopher LaMonica's body worn camera video (April 5-6, 2023), 11:29-12:01, attached as **Exhibit T** to City Defendants' *MPSJ No. I* [Doc. No. 35] and attached to *City Defendants' Notice of Filing Media Exhibits to City Defendants' MPSJ No. I* [Doc. No. 36] (showing Mrs. Dotson exiting the residence uninjured after Officers Wasson and Estrada returned fire); <u>see</u> <u>also</u> <u>generally</u> Farmington Police Case Report Detail, Case Number 2023-00019241, p. 2, attached as **Exhibit U** to City Defendants' *MPSJ No. I* [Doc. No. 35-14] (Officer B. Lin's narrative describing his contact with Mrs. Dotson after she exited the residence and there being no indication of any gunshot wounds to her person).

## LEGAL ARGUMENT

The Officers are entitled to qualified immunity for Kimberly Dotson's unreasonable seizure claim. "[Q]ualified immunity is an immunity from suit rather than a mere defense to liability." <u>Brown v. Montoya</u>, 662 F.3d 1152, 1162 (10th Cir. 2011) (citing <u>Mitchell v. Forsyth</u>, 472 U.S. 511, 526 (1985)). Qualified immunity "balances two important interests–the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." <u>Pearson v. Callahan</u>, 555 U.S. 223, 231 (2009). The qualified immunity doctrine "'gives ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the law.'" <u>Hunter v. Bryant</u>, 502 U.S. 224, 229 (1991) (quoting <u>Malley v. Briggs</u>, 475 U.S. 335, 343 (1986)).

"After a defendant asserts a qualified immunity defense, the burden shifts to the plaintiff." <u>Holland ex rel. Overdorff v. Harrington</u>, 268 F.3d 1179, 1185 (10th Cir. 2001). Accordingly, the plaintiff must meet the following two-part burden: "the first inquiry must be whether a constitutional

right would have been violated on the facts alleged; second, assuming the violation is established, the question whether the right was clearly established must be considered ... ." <u>Saucier v. Katz</u>, 533 U.S. 194, 200 (2001). The <u>Saucier</u> procedure is no longer mandatory, and courts may address either prong of the <u>Saucier</u> test first. <u>Pearson</u>, 555 U.S. at 236. "[T]he record must clearly demonstrate the plaintiff has satisfied his heavy two-part burden; otherwise, the defendants are entitled to qualified immunity." <u>Medina v. Cram</u>, 252 F.3d 1124, 1128 (10th Cir. 2001).

Here, Officers Wasson and Estrada did not unreasonably seize Mrs. Dotson by returning fire because she was not struck and did not submit to this show of authority. Further, Officer Estrada had probable cause to believe that Mrs. Dotson had committed one or more violent felony crimes by firing her gun in the Officers' direction and was, therefore, justified in directing non-defendant FPD officers to handcuff her to effect her arrest after she exited the residence. Finally, Officer Goodluck did not return fire, and Officers Goodluck and Wasson did not take Mrs. Dotson into custody. Nor did they unreasonable seize Mrs. Dotson by there mere presence at the scene while these actions took place. Alternatively, the clearly established Fourth Amendment case law did not bar Officer Wasson's and Officer Estrada's respective actions nor did it render Officer Goodluck and Officer Wasson's respective lack of participation sufficient to violate Mrs. Dotson's Fourth Amendment rights.

**I.     OFFICERS WASSON AND ESTRADA ARE ENTITLED TO SUMMARY JUDGMENT ON MRS. DOTSON'S FOURTH AMENDMENT UNREASONABLE SEIZURE CLAIM BASED ON THEIR USE OF DEADLY FORCE BECAUSE THEIR BULLETS DID NOT STRIKE HER AND SHE DID NOT SUBMIT TO THIS SHOW OF AUTHORITY.**

To the extent Mrs. Dotson asserts she was unreasonably seized when Officer Wasson and Officer Estrada returned fire in her direction, such a claim fails. A valid Fourth Amendment excessive-force claim requires a plaintiff to show "both that a seizure occurred and that the seizure

was unreasonable." Bond v. City of Tahlequah, 981 F.3d 808, 815 (10th Cir. 2020) (internal quotation marks omitted). If, and only if, the plaintiff is seized should the court analyze whether the seizure was reasonable. See County of Sacramento v. Lewis, 523 U.S. 833, 845 n. 7 (1998) (citing Hodari D., 499 U.S. at 646) ("Attempted seizures of a person are beyond the scope of the Fourth Amendment."); see also Jones v. Norton, 809 F.3d 564, 575 (10th Cir. 2015) ("[W]ithout a seizure, there can be no claim for excessive use of force."). Here, Mrs. Dotson was not seized, undermining her excessive force claim based on the officers' use of deadly force.

"The Fourth Amendment prohibits unreasonable seizures to safeguard the right of the people to be secure in their persons." Torres v. Madrid, 592 U.S. 306, 309 (2021) (internal quotation marks and alterations omitted). However, "not all police-citizen encounters implicate the Fourth Amendment." United States v. King, 990 F.2d 1552, 1556 (10th Cir. 1993). "'An arrest requires *either* physical force ... *or*, where that is absent, *submission* to the assertion of authority.'" Torres, 592 U.S. at 311 (quoting California v. Hodari D., 499 U.S. 621 626 (1991)) (emphasis in original). In other words, a seizure occurs only when a person is physically touched by police or when a person submits to a show of authority by police. See Hodari D., 499 U.S. at 626-27; see also Torres, 592 U.S. at 311, 313-314 (explaining that "[t]he touching of the person – frequently called a laying of hands – was enough" to establish an arrest even if the suspect eluded the officer, but a "show of authority, such as an order for a suspect to halt" "does not become an arrest unless and until the arrestee complies with the demand."); Lemery v. Beckner, 323 F. App'x 644, 649 (10th Cir. 2009) (unpublished decision concluding the plaintiff was seized when he was momentarily stopped after being struck in the eye by a pepper ball shot by the officer); Latta v. Keryte, 118 F.3d 693, 700 (10th Cir. 1997) (holding no seizure occurred because, "while the pursuit constituted an assertion of authority, the pursuit did not cause [the suspect] to submit to the authority or succeed in stopping

him"). This same analysis applies in cases where, instead of "laying hands," the police use firearms to seize a suspect. <u>Torres</u>, 592 U.S. at 315-316 (in discussing law enforcement's use of bullets to effect an arrest, the Court stated "we see no basis for drawing an artificial line between grasping with a hand and other means of applying physical force to effect an arrest" and "the Fourth Amendment preserves personal security with respect to methods of apprehension old and new.").

In <u>Hodari D.</u>, 499 U.S. 621, 624-27, the Supreme Court stated that a seizure occurs only when a person is physically touched by police or when he or she submits to a show of authority by police. Examining <u>Hodari D.</u> and a decision from the Eighth Circuit applying <u>Hodari D.</u>, the Tenth Circuit agreed that, when law enforcement officers shoot at a suspect, a seizure occurs only if the shot strikes the person or if the shot causes the person to submit to this show of authority. <u>Bella v. Chamberlin</u>, 24 F.3d 1251, 1255-1256 (10th Cir. 1994), <u>cert.</u> <u>denied</u>, 513 U.S. 1109 (1995) (citing <u>Hodari D.</u>, 499 U.S. 621, 626-27 and <u>Cole v. Bone</u>, 993 F.2d 1328, 1332-33 (8th Cir. 1993)); <u>see</u> <u>Farrell v. Montoya</u>, 878 F.3d 933, 937-39 (10th Cir. 2017) (determining that, where a suspect fails to submit to a police officer's show of authority and instead flees from the officer, no seizure has occurred even if the officer uses deadly force against that suspect.).

Here, of the three (3) individual Defendant Officers, only two (2) of them – Officer Wasson and Officer Estrada – returned fire against Mrs. Dotson. <u>See</u> [Doc. No. 35], UMF Nos. 113-114.[2] By returning fire against Mrs. Dotson, Officers Wasson and Estrada attempted to seize her. However, none of the rounds these Officers fired struck Mrs. Dotson. <u>See</u> [Doc. No. 35], UMF Nos. 113, 128. Instead, she retreated back into the house. <u>See</u> <u>id.</u> Therefore, these Officers' attempted seizure of Mrs. Dotson does not implicate the Fourth Amendment for two reasons. First, the bullets

---

[2] When Mrs. Dotson discharged her weapon, Officer Goodluck did not return fire because, although he saw a gun appear from the threshold of the doorway, he did not have a clear line of sight to the female holding the gun. <u>See</u> [Doc. No. 35], UMF No. 114.

did not physically touch Mrs. Dotson. See Hodari D., 499 U.S. at 626-27; see also Torres, 592 U.S. at 311, 313-314. Thus, Officer Wasson's and Officer Estrada's unsuccessful attempt to apply physical force to Mrs. Dotson does not constitute a seizure. Second, to the extent Officer Wasson's and Officer Estrada's use of deadly force can be considered a show of authority, Mrs. Dotson did not submit to this show of authority; instead, she fled back into the residence. Therefore, Officers Wasson and Goodluck are entitled to summary judgment on Mrs. Dotson's Fourth Amendment unreasonable seizure claim to the extent it is based on their act of returning fire against her.

## II.   ALTERNATIVELY, THE LAW WAS NOT CLEARLY ESTABLISHED THAT MRS. DOTSON WOULD BE SEIZED FOR PURPOSES OF THE FOURTH AMENDMENT WHEN OFFICERS WASSON AND ESTRADA RETURNED FIRE BUT THEIR BULLETS DID NOT STRIKE HER AND SHE DID NOT SUBMIT TO THIS SHOW OF AUTHORITY.

As there was no constitutional violation here, there is no need to proceed to the second step of the qualified immunity analysis to the extent Mrs. Dotson's unreasonable seizure claim is based on Officer Wasson's and Officer Estrada's act of returning fire against her. See Saucier, 533 U.S. at 201. However, if the Court finds Officer Wasson or Officer Estrada seized Mrs. Dotson by returning fire, "[t]he plaintiff carries the burden of convincing the court that the law was clearly established" when the alleged violation occurred. Pueblo Neighborhood Health Centers, Inc. v. Losavio, 847 F.2d 642, 645 (10th Cir. 1998). To be clearly established, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Anderson v. Creighton, 483 U.S. 635, 640 (1987). Specifically, "existing precedent must have placed the statutory or constitutional question *beyond debate*." Mullenix v. Luna, 577 U.S. 7, 12 (2015) (emphasis added and citation and internal quotation marks omitted).

The Supreme Court has repeatedly reiterated that the "clearly established" analysis is a fact-intensive inquiry. See White v. Pauly, 580 U.S. 73, 79 (2017). "[T]his inquiry 'must be undertaken

in light of the specific context of the case, not as a broad general proposition.'" Brosseau v. Haugen, 543 U.S. 194, 198 (2004) (quoting Saucier 533 U.S. at 201); see White, 580 U.S. at 79 (stating that clearly established law should not be defined "at a high level of generality."). Attention to the specific facts of the case is "especially important in the Fourth Amendment context, where the Court has recognized that it is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts." Mullenix, 577 U.S. at 12 (internal quotations marks and alterations omitted). In this context, qualified immunity operates "to protect officers from the sometimes hazy border between excessive and acceptable force." Saucier, 533 U.S. at 206 (internal quotation marks omitted).

Specifically, "in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." Torres v. Madrid, 60 F.4th 596, 603 (10th Cir. 2023); Currier v. Doran, 242 F.3d 905, 923 (10th Cir. 2001); Truman v. Orem City, 1 F.4th 1227, 1235 (10th Cir. 2021) (same); Pauly v. White, 874 F.3d 1197, 1222 (10th Cir. 2017) ("For a right to be clearly established there must be Tenth Circuit or Supreme Court precedent close enough on point to make the unlawfulness of the officers' actions apparent.") (citation and internal quotation marks omitted). The relevant precedent is "considered on point if it involves *materially similar* conduct or applies with *obvious clarity* to the conduct at issue." Irizarry v.Yehia, 38 F.4th 1282, 1294 (10th Cir. 2022) (emphasis in original and citation omitted)). Where the "case presents a unique set of facts and circumstances," "[t]his alone [is] an important indication" that the right is not "clearly established." White, 580 U.S. at 80.

### A.    Consider Bella v. Chamberlin, 24 F.3d 1251, 1255-1256 (10th Cir. 1994).

In Bella, while in mid-flight, a helicopter pilot was taken hostage at gunpoint by the

passenger who "ordered him to fly to the New Mexico State Penitentiary to assist in the escape of

some inmates." 24 F.3d at 1253. The pilot followed his captor's orders. Id. Subsequently, an officer

fired shots from the ground, one of which struck the helicopter. Id. However, the pilot did not land

the helicopter until almost an hour later, at which point he was taken into custody. Id. The Tenth

Circuit held the shots fired by the officer did not constitute a seizure because they did not strike the

pilot and, although the shots constituted an assertion of authority, they did not cause the pilot to

submit by stopping the helicopter. Id. at 1255-1256. The Tenth Circuit also disagreed with the pilot's

claim that pre-seizure conduct (i.e., all the officer's efforts to stop the helicopter before it finally

landed and the pilot was taken into custody) should be examined to determine whether the seizure

was reasonable. Id. at 1256 . The court  reasoned as follows:

> We do not look to events that occurred approximately one hour prior to [the pilot's]
> actual seizure to determine if the seizure was reasonable. A seizure is a single act,
> and not a continuous fact. It must be remembered that the Fourth Amendment
> prohibits unreasonable seizures, not unreasonable or ill-advised conduct in general.
> Consequently, we scrutinize only the seizure itself, not the events leading to the
> seizure, for reasonableness under the Fourth Amendment. Because [the pilot] does
> not challenge his "actual" seizure at the Albuquerque International Airport, we
> conclude that his complaint fails to state a claim against [the] Officer [] for a
> violation of the Fourth Amendment.

Bella, 24 F.3d at 1256 (internal citations, quotation marks and footnote omitted). Thus, shots fired

without impact to the actual person or the person submitting to be taken into custody does not equate

to a Fourth Amendment violation.

### B.    Consider Farrell v. Montoya, 878 F.3d 933 (10th Cir. 2017).

In Farrell, a police officer pulled a woman over for speeding. 878 F.3d at 934. As the police

officer walked back to his patrol car to communicate with dispatch, the woman "slowly pulled [her

vehicle] onto the road, continuing down the highway at a normal speed." Id. at 935. The officer

pursued the woman in his car with his siren on, which led the woman to pull over again. Id. An

altercation ensued, which included the officer unsuccessfully reaching into the vehicle to pull the woman out of the driver's side door and the officer pointing his Taser into the vehicle, which resulted in the woman's minor children, who were in the vehicle, "screaming and jumping in and out of the minivan." Id. Two other patrol cars arrived; one officer got out of his car and drew his gun while the original officer broke the vehicle's rear passenger window with his baton. Id. at 936. At this point, "the minivan began to drive away at a moderate speed," at which point the arriving officer "aimed his gun in the direction of the minivan and fired three shots," which did not hit the minivan and did not slow or stop the minivan. Id. The officers returned to their vehicles and pursued the minivan, which eventually stopped at a hotel parking lot, at which point the woman surrendered to police. Id. The woman and her family sued the police officers, claiming that the arriving officer used excessive force when he fired the three shots at the minivan. Id.

The Tenth Circuit reversed the district court's denial of summary judgment in favor of the arriving officer, finding that no seizure had occurred. Id. at 939. The court reasoned that the woman was not seized because she did not submit when the officer fired his gun at her vehicle. Id. at 937. The Tenth Circuit also rejected the plaintiffs' argument that the woman had submitted to the police officers' authority when she momentarily halted before the officer fired his gun, because "a momentary pause is not submission." Id. at 938. The court stated that "to comply with an order to stop – and thus to become seized – a suspect must do more than halt temporarily; he must submit to police authority, for there is no seizure without actual submission." Id. (quoting United States v. Salazar, 609 F.3d 1059, 1066 (10th Cir. 2010)); see also United States v. Martin, 613 F.3d 1295, 1300 (10th Cir. 2010) ("A submission to a show or assertion of authority requires that a suspect manifest compliance with police orders.") (quotation omitted).

**C.     Mrs. Dotson Cannot Meaningfully Distinguish <u>Bella</u> and <u>Farrell</u> Nor Can She Demonstrate That the Tenth Circuit's Analyses in These Cases Is No Longer Valid.**

To defeat Officers Wasson and Estrada's qualified immunity defense on the basis of <u>Bella</u> and <u>Farrell</u>, Mrs. Dotson must show either (1) that these Officers' conduct was materially different from officers' conduct in <u>Bella</u> and <u>Farrell</u> or (2) that "controlling authority" or a "robust consensus of cases of persuasive authority" has subsequently emerged, giving fair notice to these Officers that shooting at a subject would constitute a Fourth Amendment seizure even though none of the bullets struck the subject and the subject did not submit to their show of authority. <u>See Plumhoff v. Rickard</u>, 572 U.S. 765, 779-80 (2014) (internal quotation marks and citations omitted). Mrs. Dotson cannot meaningfully distinguish the circumstances in <u>Bella</u> and <u>Farrell</u> from those in the instant case. Moreover, neither controlling authority nor a robust consensus of cases of persuasive authority has emerged since the Tenth Circuit's decisions in <u>Bella</u> and <u>Farrell</u> that would have given fair notice to these Officers that Mrs. Dotson was seized under the circumstances of this case.

**1.     Mrs. Dotson cannot meaningfully distinguish the circumstances in <u>Bella</u> and <u>Farrell</u> from those in the instant case.**

The instant case, <u>Bella</u>, and <u>Farrell</u> have fundamental similarities. In all three cases, the officers fired upon the subjects, but none of the officers' bullets struck the subjects and the subjects did not submit to this particular show of authority by the officers. <u>See</u> <u>Torres</u>, 592 U.S. at 311, 313-314 (explaining that "[t]he touching of the person ... was enough" to establish a seizure even if the suspect eluded the officer, but a "show of authority, such as an order for a suspect to halt" "does not become an arrest unless and until the arrestee complies with the demand."). The foregoing comparison of the circumstances in the instant case to those in <u>Bella</u> and <u>Farrell</u> "squarely demonstrates that no clearly established law precluded [the Officers'] conduct at the time in question." <u>Plumhoff</u>, 572 U.S. at 779.

13

**2.    Neither controlling authority nor a robust consensus of cases of persuasive authority has emerged since the Tenth Circuit's decisions in <u>Bella</u> and <u>Farrell</u> that would have given fair notice to Officers Wasson and Estrada that they would be seizing Mrs. Dotson when they returned fire but their bullets did not strike her and she did not submit to this show of authority.**

Plaintiffs are therefore left with no option but to show that the Tenth Circuit's analysis in <u>Bella</u> and <u>Farrell</u> is out of date. However, there is no emergent controlling authority or robust consensus of cases of persuasive authority that indicate Officers Wasson and Estrada had fair notice they would be seizing Mrs. Dotson under the circumstances in the instant case. Neither the Supreme Court nor an en banc panel of the Tenth Circuit has overruled <u>Bella</u> or <u>Farrell</u>. Indeed, in a 2021 decision, the United States Supreme Court reaffirmed the fundamental principles articulated in <u>Bella</u> and <u>Farrell</u>. <u>See</u> <u>Torres</u>, 592 U.S. at 311, 313-314. Undersigned counsel surveyed decisions regarding the circumstances necessary to establish a Fourth Amendment seizure and there is no case close enough on point to place the asserted unlawfulness of Officer Wasson's and Officer Estrada's actions beyond debate. Accordingly, Officers Wasson and Estrada are entitled to qualified immunity on Mrs. Dotson's Fourth Amendment unreasonable seizure claim to the extent it is based on their act of returning fire against her.

**III.    HAVING ESTABLISHED PROBABLE CAUSE TO BELIEVE MRS. DOTSON COMMITTED ONE OR MORE CRIMES, OFFICER ESTRADA'S QUALIFIED IMMUNITY DEFENSE DEFEATS HER FOURTH AMENDMENT UNLAWFUL ARREST CLAIM.**

City Defendants also construe the Amended Complaint as Plaintiffs asserting Mrs. Dotson was unreasonably seized – arrested – when Officer Estrada directed other non-defendant FPD officers to handcuff her. This claim fails because Officer Estrada had probable cause or arguable probable cause to believe she had committed one or more violent felony crimes. Therefore, he could lawfully direct that she be handcuffed incident to her arrest.

14

"A Fourth Amendment claim based on an unreasonable seizure has two indispensable elements: (I) there must have been a seizure, i.e., an arrest or some other use of physical force or a show of authority that in some way restrain[s] the liberty of [a] person, and (ii) the seizure must have been unreasonable, which means, in the case of a full-blown arrest, that the officers making the arrest must have lacked probable cause." Thompson v. Clark, 596 U.S. 36, 49 (2022) (internal citations and quotation marks omitted). "[A] policeman's on-the-scene assessment of probable cause provides legal justification for arresting a person suspected of a crime, and for a brief period of detention to take the administrative steps incident to arrest." Gerstein v. Pugh, 420 U.S. 103, 113-114 (1975).

## A. The Legal Standard for Probable Cause is Generous to Officers.

Probable cause means "facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed ... an offense." Michigan v. DeFillippo, 443 U.S. 31, 37 (1979). The Supreme Court has stated that "'[t]he substance of all the definitions of probable cause is a reasonable ground for belief of guilt,' and that the belief of guilt must be particularized with respect to the person to be ... seized." Maryland v. Pringle, 540 U.S. 371 (2003) (quoting and citing Brinegar v. United States, 338 U.S. 160, 175 (1949).

Moreover, "probable cause requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." Illinois v. Gates, 462 U.S. 213, 243 n. 13 (1983). "In dealing with probable cause, . . . as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent people, not legal technicians, act." Gates, 462 U.S. at 231 (quoting Brinegar, 338 U.S. at 175). "Probable cause is a fluid concept--turning on the assessment of probabilities in particular

15

factual contexts--not readily, or even usefully, reduced to a neat set of legal rules." Gates, 462 U.S. at 232. Instead, the analysis of probable cause requires a review of the totality of the circumstances. Id. at 238.

To determine whether Officer Estrada had probable cause to arrest Mrs. Dotson, this Court should "examine the events leading up to the arrest, and then decide 'whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to' probable cause." Pringle, 540 U.S. at 371 (quoting Ornelas v. United States, 517 U.S. 690, 696 (1996)). When determining whether probable cause exists, a police officer "is entitled to assess the facts in light of his experience . . .." United States v. Brignoni-Ponce, 422 U.S. 873, 885 (1975). In many cases a police officer, familiar with the salient characteristics of a particular type of criminal activity, may be able to "perceive and articulate meaning in given conduct which would be wholly innocent to the untrained observer." Brown v. Texas, 443 U.S. 47, 52 n. 2 (1979).

Further, "where law enforcement authorities are cooperating in an investigation, [], the knowledge of one is presumed shared by all." Illinois v. Andreas, 463 U.S. 765, 771 (1983) (citing Whiteley v. Warden, 401 U.S. 560, 568 (1971)). Accordingly, the Tenth Circuit has adopted the "fellow officer rule." See, e.g., Karr v. Smith, 774 F.2d 1029, 1031-32 (10th Cir. 1985). "Under the 'fellow officer' rule, 'probable cause is to be determined by the courts on the basis of the collective information of the police involved in the arrest, rather than exclusively on the extent of the knowledge of the particular officer who may actually make the arrest.'" Id. at 1031 (quoting United States v. Troutman, 458 F.2d 217, 220 (10th Cir. 1972)).[3] Even if an officer possesses no first-hand

---

[3]     An officer may rely on information from another law enforcement officer or other reliable police channels to establish probable cause. See, e.g., Whiteley, 401 U.S. at 568 (in a case where a police officer relied upon a police bulletin to make an arrest, "[c]ertainly police officers called upon to aid other officers in executing arrest warrants are entitled to assume that the officers requesting aid offered the magistrate the information requisite to support an independent judicial
(continued...)

knowledge of the factual basis for an arrest, "it is well established [in the Tenth Circuit] that the police may 'pool their information' to establish probable cause." United States v. Corral, 970 F.2d 719, 725 fn. 4 (10th Cir. 1992) (quoting United States v. Espinosa, 771 F.2d 1382, 1407 (10th Cir.), cert. denied, 474 U.S. 1023 (1985)).

Lastly, if the arrest is supported by probable cause, the Fourth Amendment also allows an officer to make a warrantless arrest of a suspect in a public place for a felony or a misdemeanor committed in the officer's presence. United States v. Watson, 423 U.S. 411, 424 (1976); Atwater v. Lago Vista, 532 U.S. 318, 354 (2001) (stating that "[i]f an officer has probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender"). The United States Supreme Court and Tenth Circuit have repeatedly held that handcuffing a suspect incident to a lawful arrest is reasonable and does not violate the Fourth Amendment. See, e.g., Atwater, 532 U.S. at 354-55 (where officer "had probable cause to believe that [female suspect] committed a crime in his presence," handcuffing her, placing her in squad car and taking her to local police station were "inconvenient and embarrassing ... but not so extraordinary as to violate the Fourth Amendment."); A.M. v. Holmes, 830 F.3d 1123, 1156 (10th Cir. 2016) ("we hold that the then-extant clearly established law would not have apprised a reasonable officer in Officer Acosta's position that F.M.'s minor-child status should have negated his *time-honored right to use handcuffs in effecting F.M.'s arrest*.") (emphasis added); Fisher v. City of Las Cruces, 584 F.3d 888, 896-97 (10th Cir. 2009)

---

[3](...continued)
assessment of probable cause"); United States v. Ventresca, 380 U.S. 102, 111 (1965) ("[o]bservations of fellow officers of the Government engaged in a common investigation are plainly a reliable basis for a warrant applied for by one of their number) (footnote omitted); United States v. Morgan, 936 F.2d 1561, 1569 (10th Cir. 1991), cert. denied, 502 U.S. 1102 (1992)) (applying the fellow officer rule, the Tenth Circuit imputed the knowledge of a superior officer, who received information from a citizen witness, and other reliable police channels to the arresting officer).

("[I]n nearly every situation where an arrest is authorized ... handcuffing is appropriate...."); compare Manzanares v. Higdon, 575 F.3d 1135, 1150 (10th Cir. 2009) (stating "any reasonable officer would understand that it is unconstitutional to handcuff someone absent probable cause or an articulable basis to suspect a threat to officer safety combined with reasonable suspicion.").[4]

**B.      Qualified Immunity Further Protects Police Officers Who Reasonably but Mistakenly Conclude That Probable Cause Is Present to Justify an Arrest.**

In addition to the deference accorded to officers in assessing probable cause, "[t]he qualified immunity standard 'gives ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the law.'" Hunter, 502 U.S. at 229 (quoting Malley, 475 U.S. at 341). "When a warrantless arrest is the subject of a § 1983 action, the arresting officer is 'entitled to immunity if a reasonable officer could have believed that probable cause existed to arrest' the plaintiff." Romero v. Fay, 45 F.3d 1472, 1476 (10th Cir. 1995) (quoting Hunter, 502 U.S. at 228). In other words, "[e]ven law enforcement officials who 'reasonably but mistakenly conclude that probable cause is present' are entitled to immunity." Hunter, 502 U.S. at 227 (quoting Anderson, 483 U.S. at 641). Moreover, "a police officer who acts 'in reliance on what proves to be the flawed conclusions of a fellow police officer' may nonetheless be entitled to qualified immunity as long as the officer's reliance was 'objectively reasonable.'" Babtiste v. J.C. Penney Co., 147 F.3d 1252, 1260 (10th Cir. 1998) (quoting Rogers v. Powell, 120 F.3d 446, 455 (3rd Cir. 1997)).

---

[4]      Mrs. Dotson's claims are vaguely pled. However, even if Mrs. Dotson asserted that being handcuffed constituted excessive force, such a claim would fail given that Officer Estrada had probable cause to lawfully arrest her. See Graham v. Connor, 490 U.S. 386, 396 (1989) ("Our Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it."); Atwater, 532 U.S. at 354-55 (2001) (handcuffing incident to a lawful arrest is "not so extraordinary as to violate the Fourth Amendment."); A.M., 830 F.3d at 1155 (stating "we confidently conclude here that a reasonable officer in Officer Acosta's position would have understood Atwater's general acceptance of handcuffing incident to a lawful arrest to indicate that, in the ordinary course, handcuffing any arrestee—absent some injury specifically caused by the application of the cuffs—is lawful.").

**C.     Pooling the Officers' Information to Establish Probable Cause, Officer Estrada Had Probable Cause to Believe Mrs. Dotson Had Committed the Crimes of Aggravated Assault on a Peace Officer, Assault with Intent to Commit a Violent Felony upon a Peace Officer, And/Or Aggravated Assault.**

The Officers pooled their information and thus collectively knew facts and circumstances sufficient to warrant a prudent person in believing that Mrs. Dotson had committed the violent felony crimes of aggravated assault on a peace officer,[5] assault with intent to commit a violent felony upon a peace officer[6] and/or aggravated assault.[7]

---

[5]      "Aggravated assault upon a peace officers consists of ... unlawfully assaulting or striking at a peace officer with a deadly weapon while he is in the lawful discharge of his duties[.]" NMSA 1978, § 30-22-22(A)(1); see also UJI 14-2201 through 14-2203 (setting forth the essential elements of the crime of aggravated assault on a peace officer with a deadly weapon under different theories ). An "[a]ssault upon a peace officer consists of: (1) an attempt to commit a battery upon the person of a peace officer while he is in the lawful discharge of his duties; or (2) any unlawful act, threat or menacing conduct which causes a peace officer while he is in the lawful discharge of his duties to reasonably believe that he is in danger of receiving an immediate battery." NMSA 1978, § 30-22-21(A). For purposes of the Criminal Code, "'deadly weapon' means any firearm ... ." NMSA 1978, § 30-1-12(B). Further, the "'[u]se' of a deadly weapon during an assault means the following: 1. A deadly weapon was present at some point during the encounter; 2. [The officer] knew ... that the defendant had a deadly weapon; and 3. The Defendant intentionally used the presence of the weapon to facilitate the assault." UJI 14-135. Finally, New Mexico law provides that "knowledge of the victim's identity as a peace officer is an essential element of ... aggravated assault upon a peace officer." State v. Nozie, 2009-NMSC-018, ¶ 30, 207 P.3d 1119, 1128.

[6]      "Assault with intent to commit a violent felony upon a peace officer consists of any person assaulting a peace officer while he is in the lawful discharge of his duties with intent to kill the peace officer." NMSA 1978, § 30-22-23(A). Circumstantial evidence may be used to prove intent. State v. Allen, 2000–NMSC–002, ¶ 65, 994 P.2d 728; see State v. Demongey, 2008-NMCA-066, ¶ 27,187 P.3d 679 (finding that evidence was sufficient to support district court's determination that defendant committed offense of assault with intent to commit a violent felony on a peace officer where defendant rapidly accelerated his vehicle toward officer after officer had gotten out of his car, and officer testified that defendant's vehicle came within five feet of him, that defendant pointed a rifle or a shotgun at the officer, and that defendant had already fired three shots at him); see also  State v. Reed, 2005-NMSC-031, ¶ 36, 120 P.3d 447 (stating that the defendant's act of pointing a loaded weapon at the victim with the knowledge that it could fire would support an inference that the defendant intended to kill the victim or created a strong probability of death or great bodily harm).

[7]      "Aggravated assault consists of ... unlawfully assaulting ... another with a deadly weapon." NMSA 1978, § 30-3-2 (A). "[T]he mens rea element necessary to establish aggravated
(continued...)

First, based on the Officers' collective information, Officer Estrada had probable cause to believe Mrs. Dotson committed the crime of aggravated assault on a peace officer. See NMSA 1978, § 30-22-22(A)(1). Here, the Officers were in uniform, on duty, and attempting to investigate a domestic violence call to which they had been dispatched. See [Doc. No. 35], UMF Nos. 1-97. Mrs. Dotson irrefutably flung open the front screen door armed with a gun and instantly aimed and fired at least one round in the direction of the Officers who were in the alley and not behind cover. See id., UMF Nos. 106-107, 109, 111. Officers Wasson and Estrada both believed they were going to be shot. See id., UMF Nos. 108-109, 113. Specifically, Officer Wasson saw the muzzle flash and felt the bullet "zip" past to the left of him. See id., UMF No. 109.

Further, it was objectively reasonable, even if mistaken, for the Officers to believe Mrs. Dotson knew they were peace officers given that they were in full FPD uniforms, the porch was well illuminated, there was a full moon making it brighter than normal outside, the residence was equipped with a video doorbell security system, Officers Wasson and Goodluck were initially positioned at the front door and in view of the video doorbell camera and front window, Officer Wasson knocked and loudly announced their presence three (3) separate times, her husband came to the door within seconds of the third announcement, Officer Wasson issued a standard police order to her husband to put his "hands up" when he opened the front door armed with a gun, Officer Wasson also ordered her to put her "hands up" seconds before she aimed her gun at them, and Officer Goodluck had turned his flashlight on and illuminated the front door. See id., UMF Nos. 37-106, 112. Regardless, being reasonably mistaken about probable cause does not defeat qualified immunity. Moreover, prior to firing at the Officers, Mrs. Dotson had not made any audible verbal

---

[7](...continued)
assault is general criminal intent, i.e., conscious wrongdoing." State v. Ramirez, 2018-NMSC-003, ¶ 23, 409 P.3d 902.

statements or otherwise given any manifest indications to the Officers that she did not know police were outside. See generally [Doc. No. 35], UMF Nos. 37-106.

Second, Officer Estrada also had probable cause to believe Mrs. Dotson committed the crime of  assault with intent to commit a violent felony upon a peace officer. See NMSA 1978, § 30-22-23(A).  In addition to the facts described above and based on the circumstantial evidence, a reasonable officer would believe that Mrs. Dotson intended to murder the Officers given that she aimed and discharged at least one round in their direction.

Third, even assuming it was not objectively reasonable for Officer Estrada to believe Mrs. Dotson knew they were peace officers, he nonetheless had probable cause to believe she committed the crime of aggravated assault based on the above described circumstances. See NMSA 1978, § 30-3-2 (A). It was reasonable for Officer Estrada to believe Mrs. Dotson consciously came to the front door, leaned out armed with a handgun, and used this deadly weapon to fired at least one round in their direction. Based on these facts it was also reasonable for the Officers to fear of an immediate battery – being shot and possibly killed or seriously injured.

Notably, the Officers did not know they were at the wrong address at time of these events. However, even assuming *arguendo* that the Officers knew they were at the wrong address, this would not negate probable cause for any of the three crimes discussed above because their actions would still be lawful. [8] Also, while Mrs. Dotson may claim she was acting in self-defense and never

---

[8]     Even though it was late in the evening, the Officers approached the residence by the front path, knocked on the front door, announced their presence, and waited to be received as any private citizen would. See Kentucky v. King, 563 U.S. 452, 469 (2011) ("[W]hen law enforcement officers who are not armed with a warrant knock on a door, they do no more than any citizen might do."); Florida v. Jardines, 569 U.S. 1, 8 (2013) (like any other visitor, an officer may "approach the home by the front path, knock promptly, wait briefly to be received, and then (absent invitation to linger longer) leave."); State v. Mosley, 2014-NMCA-094, ¶ 25, 335 P.3d 244, 251 (agreeing with the Jardines Court's reliance on social norms to illustrate that it is reasonable for police to approach a private citizen's home and knock on the door just as a private citizen might do."); United States

(continued...)

charged with a crime, this does not negate probable cause. See Givings v. Ackerman, No. CIV-17-001-R, 2018 WL 4183220, at *3 (W.D. Okla. Aug. 31, 2018) ("Plaintiff's contention that she acted in self-defense and was never charged with assault does not nullify probable cause.").

Based on the Officers' pooled information, Officer Estrada knew facts and circumstances sufficient to warrant a prudent person to believe that Mrs. Dotson had committed one or more of the foregoing crimes.  Even if the existence of probable cause is a close question, Officer Estrada is entitled to qualified immunity because a reasonable officer in the same situation as Officer Estrada could have believed probable cause existed to arrest Mrs. Dotson and to effect the arrest by having her handcuffed. The act of her being handcuffed is of not distinction here. Therefore, Officer Estrada's qualified immunity defense warrants the grant of summary judgment in his favor on Mrs. Dotson's Fourth Amendment unlawful arrest claim.

IV.    **OFFICER GOODLUCK IS ENTITLED TO SUMMARY JUDGMENT ON MRS. DOTSON'S FOURTH AMENDMENT CLAIM BECAUSE HE DID NOT PERSONALLY PARTICIPATE IN ANY OF THE ACTIONS WHICH ALLEGEDLY RESULTED IN HER UNREASONABLE SEIZURE, AND OFFICER WASSON IS SIMILARLY ENTITLED TO SUMMARY JUDGMENT ON MRS. DOTSON'S UNREASONABLE SEIZURE CLAIM TO THE EXTENT IT IS BASED ON HER BEING TAKEN INTO CUSTODY BECAUSE HE DID NOT PERSONALLY PARTICIPATE IN HER ARREST.**

"If the Court is to hold [a government official] personally liable for violating a citizen's constitutional rights, the Court needs the evidence to provide a sound basis for concluding that the [official] is the one who violated the Constitution." Sisneros v. City of Albuquerque, No. Civ. 02-1035 JB/KBM, slip op. at 14 (D.N.M. filed Nov. 7, 2003) [Doc. No. 35] (dismissing excessive force

---

[8](...continued)
v. Carloss, 818 F.3d 988, 997 (10th Cir. 2016) (concluding that "the officers did not violate the Fourth Amendment when they went onto the porch and knocked on the front door of the house in which [the Defendant] lived."). The Officers' approach was not furtive, and the residence was equipped with a security system and large living room window that would have easily allowed any resident to determine who was knocking without having to open the front door.

claim against certain officers and stating that plaintiff "cannot prove, what, if anything, any of the officers did to him.") (citations omitted). The law is clear in the Tenth Circuit that "[i]ndividual liability under §1983 must be based on personal involvement in the alleged constitutional violation." Foote v. Spiegel, 118 F.3d 1416, 1423 (10th Cir. 1997); see also Mitchell v. Maynard, 80 F.3d 1433, 1441 (10th Cir. 1996) (same). This is an essential element of proof. Id.; see Scull v. New Mexico, 236 F.3d 588, 599 (10th Cir. 2000) (stating that "none of the BCDC Appellees was involved in the delay" and "[c]onsequently, Mr. Reed has no § 1983 claims against the BCDC Appellees, regardless of the lawfulness of the detention."). Indeed, it is not enough for a plaintiff to merely allege a violation of his constitutional rights. Panaderia La Diana, Inc. v. Salt Lake City Corp., 342 F.Supp.2d 1013, 1031 (D. Utah 2004).

## A. The Tenth Circuit Precedent Regarding Section 1983's Personal Participation Requirement.

Consider Jenkins v. Wood, 81 F.3d 988 (10th Cir. 1996), a Tenth Circuit case addressing a situation relevant to the one before this Court. Agents with the Kansas Bureau of Investigation ("KBI") and officers with the City of Topeka Police Department executed a search warrant and used a "flash bang" while making entry. Id. at 991. Upon hearing the commotion and not knowing who was in his home, James Jenkins ran to grab a shotgun that was kept downstairs. Id. Mr. Jenkins was met by two law enforcement officers who told him to drop the gun, get on the floor, and put his hands behind his back. Id. The officers handcuffed him face-down on the floor at gunpoint and asked him questions about the location of his son. Id. One of the officers was a member of the Topeka Police Department and the other was a KBI agent. Id. According to Mr. Jenkins, the KBI agent was a slender, white man of medium height in his mid-forties. Id. Otherwise, Mr. Jenkins could not identify the agent. Id.

Another officer met Mr. Jenkins' wife, Lula Jenkins, at gunpoint and ordered her down the

stairs. Id. That officer ordered Mrs. Jenkins to lay on the floor in a spread-eagle position. Id. Mrs.

Jenkins was not handcuffed but was held at gunpoint, prostrate on the floor, for about twenty

minutes. Id. at 992. At one point, a second officer walked up to Mrs. Jenkins, pointed his gun at her

head and threatened to shoot her if she did not tell him where her son was located. Id. Other than to

say that this officer was a "'real big guy . . . kind of casually dressed,'" Mrs. Jenkins could not

identify him. Id. While lying on the floor, Mrs. Jenkins pleaded with officers to let her help her

younger daughter with her inhaler as she suffered from asthma and was having difficulty breathing.

Id. An officer told her "if she didn't shut her 'goddamn mouth . . . he was going to slap the shit out

of her.'" Id.

The Tenth Circuit affirmed the dismissal of Mr. and Mrs. Jenkins' excessive force claims

against defendant, Agent Sabel, who was upstairs when the above described conduct occurred,

concluding:

> the evidence is not sufficient to implicate Agent Sabel as a personal participant in the
> alleged violations. First, Mr. and Mrs. Jenkins have brought forward no evidence
> indicating Agent Sabel participated in the use of excessive force against them
> personally ... . Though Mr. and Mrs. Jenkins have detailed some disturbing behavior
> to support claims of excessive force, their allegations relate to the time period when
> they were held-face-down on the floor at gunpoint ... . [T]here is no logical or
> evidentiary support for the proposition that Agent Sabel participated in what
> happened before he came downstairs . . .. As with Agent Wood, neither Mr. nor Mrs.
> Jenkins identified Agent Sabel as one of the officers who subjected them personally
> to excessive force.

Id. at 995. The court further stated: "Essentially, the Jenkinses' arguments with respect to the

liability of Agent Wood amount to a claim that he should be held liable because he was in the home

when the alleged deprivations occurred. Such conclusory allegations are not sufficient to avoid

summary judgment in a case of alleged constitutional violation." Id.[9]

---

[9]     See also Sharrar v. Felsig, 128 F.3d 80, 821 (3rd Cir. 1997) (affirming the district
court's decision to grant summary judgment as plaintiff was unable to identify which police officers
(continued...)

**B.      Application of Tenth Circuit Precedent Regarding Personal Participation to Officer Goodluck's and Officer Wasson's Actions in this Case.**

To establish Officer Goodluck's liability under Section 1983, Mrs. Dotson must show that he personally participated in the alleged constitutional infractions. Specifically, Mrs. Dotson must demonstrate that Officer Goodluck was one of the individuals who violated her constitutional rights. In this case, there is no admissible evidence supporting the claim that Officer Goodluck seized her in violation of the Fourth Amendment. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251 (1986) (scintilla of evidence inadequate to withstand summary judgment). Instead, the undisputed material facts demonstrate Officer Goodluck did not discharge his weapon at Mrs. Dotson nor did he participate in taking her into custody. See generally, [Doc. No. 35], UMF Nos. 113-114, 116-118, 125-131. Rather, the undisputed facts demonstrate that Officers Wasson and Estrada were the only officers to return fire at Mrs. Dotson. See id., UMF Nos. 113-114.  Further, Officer Estrada and other non-defendant FPD officers were the individuals who participated in taking Mrs. Dotson into custody. Officer Goodluck's presence behind a patrol car that was parked on the street behind the Dotson residence while Mrs. Dotson was taken into custody at the front of the residence is insufficient to establish his personal participation in Mrs. Dotson's alleged seizure. The Tenth Circuit in Jenkins explicitly declined to accept a conclusory argument regarding mere presence when

---

[9](...continued)
were responsible for his alleged abuse, and thus, there was no evidentiary basis upon which the named defendants could be held liable for the alleged violation of plaintiff's rights); Smith v. Barber, 316 F.Supp.2d 992, 1012 (D. Kan. 2004) ("[plaintiffs] alleged only that [the defendant officer] was present while the home was searched.  However, [the defendant officer] cannot be found liable for his mere presence at their home; rather, [plaintiffs] must show that he personally participated in the search that allegedly violated their Fourth Amendment rights."); Schroeder v. Kochanowski, 311 F. Supp. 2d 1241, 1258 & n. 63 (D. Kan. 2004) ("Although Investigator Rudy Deines was allegedly present during some of the questioning, his mere presence is not sufficient to create liability.") (citing Jenkins, 81 F.3d at 994).

affirming summary judgment of a similar claim. Therefore, Officer Goodluck is entitled to summary judgment on Mrs. Dotson's Fourth Amendment claim because he did not personally participate in any of the allegedly unconstitutional actions taken against her.

The Court should similarly grant summary judgment in Officer Wasson's favor on Mrs. Dotson's unlawful arrest claim. There is no admissible evidence that Officer Wasson personally participated in taking Mrs. Dotson into custody. See id., UMF Nos. 116-131. Rather, the statement of undisputed material facts demonstrates Officer Estrada and other non-defendant FPD officers were the individuals who participated in taking Mrs. Dotson into custody. Officer Wasson's presence behind a patrol car that was parked on the street behind the Dotson residence while Mrs. Dotson was taken into custody at the front of the residence is insufficient to establish his personal participation in Mrs. Dotson's alleged seizure. Therefore, Officer Wasson is entitled to summary judgment on Mrs. Dotson's Fourth Amendment unlawful arrest claim because he did not personally participate in taking her into custody.

### C.   Alternatively, Officer Goodluck and Officer Wasson's Actions Did Not Violate Clearly Established Law.

If the facts alleged do not establish a constitutional violation, there is no need to proceed to the second step of the qualified immunity analysis. Saucier, 533 U.S. at 201. That is the case here. However, if the Court finds that Officer Goodluck and/or Officer Wasson violated Mrs. Dotson's constitutional rights, "[t]he plaintiff carries the burden of convincing the court that the law was clearly established" at the time of the violation. Losavio, 847 F.2d at 645. Here, City Defendants' research has not revealed a Supreme Court or Tenth Circuit decision on point, or clearly established weight of authority from other courts that would support a finding that Officer Goodluck personally participated in any of the actions underlying Mrs. Dotson's alleged unreasonable seizure, or that Officer Wasson personally participated in taking Mrs. Dotson into custody after she was persuaded

to exit the residence. Thus, considering the undisputed material facts in light of the Tenth Circuit's decision in <u>Jenkins</u>, there is no clearly established law that would have attributed Mrs. Dotson's alleged seizure to Officer Goodluck given that he did not return fire at her nor did he participate in taking her into custody. For the same reason, there is no clearly established law that would have attributed Mrs. Dotson's arrest to Officer Wasson given that he did not participate in taking her into custody. Accordingly, Officer Goodluck is entitled to qualified immunity from Mrs. Dotson's Fourth Amendment excessive force and unlawful arrest claims. Officer Wasson is entitled to qualified immunity from Mrs. Dotson's Fourth Amendment unlawful arrest claim.

## CONCLUSION

For all the reasons outlined in this Motion for Partial Summary Judgment No. III, Officer Wasson, Officer Estrada and Officer Goodluck are entitled to qualified immunity on Mrs. Dotson's Fourth Amendment excessive force and unlawful arrest claims and summary judgment on these claims in favor of the Officers is appropriate.

**WHEREFORE,** City Defendants respectfully request that this Court grant their Motion for Partial Summary Judgement No. III and dismiss Kimberly Dotson's Fourth Amendment unreasonable seizure claim against the Defendant Officers with prejudice.

Respectfully submitted,

**ROBLES, RAEL & ANAYA, P.C.**


By:    /s/ Luis Robles
   Luis Robles
   Attorney for City Defendants
   200 3rd St., NW, Suite 500
   Albuquerque, New Mexico 87102-3334
   (505) 242-2228
   (505) 242-1106 (facsimile)
   luis@roblesrael.com

I hereby certify that the foregoing was
electronically filed through the CM/ECF
on this 11th day of March 2024, which will
cause service to all counsel of record:


 /s/ Luis Robles
Luis Robles