IN THE UNITED STATES DISTRICT COURT

DISTRICT OF NEW MEXICO

ERNEST PADILLA, PERSONAL REPRESENTATIVE
OF THE ESTATE OF ROBERT DOTSON, DECEASED;
KIMBERLY DOTSON,
INDIVIDUALLY AND AS PARENT AND NEXT FRIEND
OF JULIA
DOTSON; AND ZACHARY-MORA DOTSON,

       Plaintiffs,

vs.

CITY OF FARMINGTON, NEW MEXICO;
DANIEL ESTRADA; DYLAN GOODLUCK;
AND WAYLON WASSON

      Defendants.

Case No. 1:23-cv-00790-MLG-KK

---

**PLAINTIFFS' RESPONSE TO CITY DEFENDANTS' MOTION FOR PARTIAL
SUMMARY JUDGMENT 2: DISMISSAL OF THE ESTATE OF ROBERT DOTSON'S
FOURTH AMENDMENT UNREASONABLE SEIZURE CLAIM AGAINST THE
OFFICERS BASED ON THE APPLICATION OF QUALIFIED IMMUNITY**

---

Plaintiffs, for their Response to City Defendants' Motion for Partial Summary Judgment

2: Dismissal of The Estate of Robert Dotson's Fourth Amendment Unreasonable Seizure Claim

against the Officers based on the application of Qualified Immunity, state the following:

## **INTRODUCTION**

(1) The Motion for Summary Judgment #2 should be denied because genuine disputes of

material fact exist, and Summary Judgment is therefore inappropriate under Rule 56.

(2) The two primary disputes in this case center on: (1), the conduct of the Defendant police

officers in going to the wrong address and remaining there, thus creating the situation and the risk

which led directly to the use of excessive force by the Officers who killed Robert Dotson in his doorway; and (2) the unreasonable use of excessive force by the Officers which resulted in Mr. Dotson's death. (References to exhibits by letter are to Defendant's exhibits; by number to Plaintiff's exhibits.)

(3) The actual facts of the sad event are quite simple. The police responded to a domestic violence call at the wrong address. They were dispatched to 5308 Valley View Lane, but instead went to 5305 Valley View Lane, the Dotson's residence, which is on the opposite side of the street and approximately 3 houses down from 5308 (Exhibits "A1", "C1", "E"). Officer Goodluck knew that they were at the wrong address. (Exhibit "E", "K") Officer Estrada, according to his statements, paid no attention to the address. Officer Watson claims to have been unable to tell the difference between an 8 and a 5, if indeed he even looked at the address on the Dotson garage. (Exhibit "C1") A question of fact exists as to whether he did.  (Exhibit "K") If he did, he ignored the fact that the Officers were at the wrong address. Officer Wasson even scolded Officer Goodluck when Goodluck pointed out that they were supposed to be at 5308. (Exhibit "K", "L") Officer Watson's explanation that his GPS failed or directed him to the wrong side of the street is convenient, but unsupported. A simple search of Google Maps of 5308 Valley View Lane clearly demonstrates without question that 5308 is on the opposite side of the street from 5305. ("Exhibit "E")

(4) Officer Wasson knocked on the door and announced three different times "Farmington police". Mr. and Mrs. Dotson were upstairs. They did not hear the announcement, and only Mr. Dotson even heard the knocking. (Exhibit "1", Declaration of Kimberly Dotson) Mr. Dotson went downstairs and carried a pistol to the door, not knowing who was outside his house. The police cars were parked down the street. No police lights were on. Mr. Dotson could not see through the

front door to determine who was in his yard. (Exhibit "1") When he opened the door, none of the police officers announced that they were police officers nor said Farmington police. (Exhibit "K", "L", "M", "P") He could not see who was outside. Defendants Estrada's flashlight was shining in Mr. Dotson's face. Once Officer Wasson saw Mr. Dotson's gun, however, he fired at him. This occurred less than a second from the time that the door was opened. (Exhibit "K", "L", "M", "P")

(5) Mr. Dotson was killed. Twelve bullets were fired into his body. All three officers fired at him without announcing themselves. Officer Wasson clearly acted more emotionally than deliberately, and the other two officers followed him.

(6) The officers should not ever have been at 5305 Valley View. They should never have encountered Robert Dotson that night. It was no violation of the law for Robert Dotson to carry his gun with him when he opened the door. He was defending his own property and exercising his Second Amendment rights.

(7) The evidence shows that Mr. Dotson did not aim his gun intentionally at anyone. He did not know he was encountering the police; he could not see who was in his yard because he was blinded by the light of police flashlights, and no policeman told him who they were. He did not take a "shooter's stance". He did not have the time to, and the videos do not reflect that he did. (Exhibit "K", "L", "M", "P")

(8) The evidence from the officers comes after the fact, with time for reflection and a likely determination of what they needed to say in order to protect themselves and the City from liability. Interestingly, and not surprisingly, that is exactly what they have done. In truth, however, the facts show a material dispute on the reasonableness of the Officer's actions on April 5, 2023. Clearly established law in the 10th Circuit, which should have been known by the Officers, told them that killing a man just because he has a gun, without reasonable fear for their own safety, when they

are not at an address to arrest or investigate a crime, without announcing who they are so that they can be heard, is illegal. Likewise, killing a man in his doorway when the police should not be at the address and acted recklessly and deliberately in going to the wrong address and staying at the wrong address led to the tragic death of Robert Dotson and was unreasonable and inexcusable.

(9) All of the reasonable inferences must be taken in favor of the Plaintiff. Those inferences include: (1) Mr. Dotson did not know there were police officers in his yard; (2) Mr. Dotson held a gun to protect himself from possible unknown danger; (3) Mr. Dotson did not take any hostile steps toward the deputies; (4) the police are not excused from not knowing the difference between 5308 Valley View and 5305 Valley View.

(10) In an interview with a television program hosted by Dan Abrams, Steve Hebbe, the police chief of the Farmington Police, when asked whether Mr. Dotson did anything wrong, answered "no". (Exhibit "4") This is an admission from a party opponent. Chief Hebbe must be presumed to have had all the information he needed to answer that question. He did not refuse to answer it, nor did he say that he needed more information. He said Mr. Dotson did nothing wrong. That alone demonstrated disputes of material fact on the cities' claims of a shooting stance, aiming at the officers, or committing a crime in the officers' presence.

## **ARGUMENT**

Defendants contend that Partial Summary Judgment should be granted against the Estate on its Fourth Amendment Claims against them based on their assertion of qualified immunity. The Court should deny Defendants' Motion because: (1) Defendants' actions violated Robert Dotson's constitutional rights under the Fourth Amendment and were objectively unreasonable; (2) Defendants' conduct prior to what they claim was Mr. Dotson's threat of force was reckless and immediately connected to and created the conditions for Mr. Dotson's actions and, therefore, was

unreasonable in violation of Mr. Dotson's Fourth Amendment rights; and (3) the law was clearly established that Defendants' conduct was unconstitutional, in violation of Mr. Dotson's rights.

The framework under which the Court analyzes Defendants' Motion is familiar. Once a governmental official asserts qualified immunity at summary judgment, the plaintiff must show that: "(1) the defendant violated a constitutional right and (2) the constitutional right was clearly established." *Martinez v. Beggs*, 563 F.3d 1082, 1088 (10th Cir. 2009 (citing *Pearson v. Callahan*, 555 U.S. 223, 232 (2009)). The Court must view the evidence in the light most favorable to the plaintiff. *See Weigel v. Broad*, 544 F.3d 1143, 1147 (10th Cir. 2008). In this regard, the Court must not simply accept "what may be a self-serving account by the police officer" since the victim of the deadly force is unable to testify and contradict the officer's story. *Pauly v. White*, 874 F.3d 1197, 1218 (10th Cir. 2017) (citing *Abraham v. Raso*, 183 F.3d 279, 294 (3rd Cir. 1999) and quoting *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994)). Rather, the Court must view all of the evidence, including inconsistencies between the officer's position and other available evidence, and recognize that a jury will have to judge the credibility of the witnesses and that credibility determinations should not be made at the summary judgment stage. *Id.* at 1217-18. If, when viewed under this light, a reasonable jury could find facts supporting a constitutional violation, summary judgment must be denied. *See Gutierrez v.* Cabos, 841 F.3d 895, 900 (10th Cir. 2016); *Allen v. Muskogee*, 119 F.3d 837, 841 (10th Cir. 1997). While qualified immunity is intended to provide some grace for governmental officials performing discretionary functions, it does not shield from liability those who violate clearly established constitutional rights of which a reasonable person would have been aware. *See Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

**A.    Mr. Dotson's seizure by Defendants violated the Fourth Amendment as it was not objectively reasonable under the totality of the circumstances.**

The Court's focus in determining whether Defendants' conduct was reasonable under the Fourth Amendment "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively attempting to evade arrest by flight." *Graham v. Connor*, 490 U.S. 386, 396 (1989).   In considering these factors, the Court must determine "whether the officers' own 'reckless or deliberate conduct during the seizure unreasonably created the need to use such force.'" *Pauly,* 874 F.3d at 1219-20 (quoting *Sevier v. City of Lawrence*, 60 F.3d 695, 699 (10th Cir. 1995).   If, when viewing the evidence in the light most favorable to the plaintiff, the threat of violence by the suspect used to justify the officer's use of force was precipitated by the officer's own actions, the use of force is unreasonable.  *Id.* at 1221.

     **1.**     **The first *Graham* factor, severity of the crime, greatly favors Mr. Dotson.**

Defendants concede they were at the wrong house.  There had been no call or report to the police about the Dotsons and the Dotsons had not committed and were not even suspected of committing any crime. (Exhibit "A1") Defendants were aware they were at the wrong house before Mr. Dotson opened the door to his house.  They ignored numbers on the home which clearly read 5305, not 5308. (Exhibit "E", "K", "L") Additionally, Officer Goodluck knew 5308 was on the other side of the street and that he told Officer Wasson they were at 5305 rather than 5308. (Exhibit "K", "L") So at the time Mr. Dotson answered the door, Defendants knew that they had no reason to be at his house and no reason to suspect that any criminal activity had occurred or was occurring.

Defendants attempt to circumvent these undisputed facts by accusing Mr. Dotson of committing "one or more violent felonies when he aimed his gun in the direction of Officers Wasson and Estrada."  (Defendants' Motion at 6). That is disputed by Officer Goodluck who reported Mr. Dotson's gun to be at a 45-degree angle, pointed at the ground, when he was shot by

Officer Wasson. (Exhibit "E") Although variations of this fact pattern have appeared in a number of cases in this Circuit, Plaintiffs can locate no case in which a court has ever accepted Defendants position.

The relevant inquiry for the first *Graham* factor is the crime to which the officers were responding. *See, e.g., Arnold v. City of Olathe, Kan.*, 35 F.4th 778, 792 (10th Cir. 2022) (focusing on officer's reason for encountering the suspect); *Est. of Taylor v. Salt Lake City*, 16 F.4th 744, 763 (10th Cir. 2021) (Court analyzed first *Graham* factor based on the fact that the officer "was responding to a report that an unidentified male 'flashed' a gun" which "could have been a misdemeanor or a felony [or] no crime at all" and not taking into account the officer's belief on the scene that the suspect was drawing a gun); *Estate of Valverde v. Dodge*, 967 F.3d 1049, 1061 (10th Cir. 2020) (the fact that officer is responding to minor crime is "relevant to whether the officer was reasonable in evaluating ambiguous conduct to assess the threat"); *Pauly*, 874 F3d at 1215 (under circumstances where officers "did not have enough evidence or probable cause to make an arrest" the first *Graham* factor weighed in favor of plaintiffs despite fact that plaintiffs later pointed a gun in the direction of the officers after being confronted by them).

Indeed, to accept Defendants' formulation of a crime by Mr. Dotson under these circumstances would essentially eviscerate the first *Graham* factor. The vast majority of Fourth Amendment cases involving the use by an officer of lethal force involve the officer claiming some provocation that justified it. If that provocation can also be the crime that satisfies the first *Graham* factor then the factor is meaningless. It is also unbelievable that Officer Wasson, in about one second, could decide that Mr. Dotson was committing a felony. The first *Graham* factor clearly weighs entirely in favor of Mr. Dotson. Worthy of note is that the police were still listing Robert Dotson as a suspect on April 17, 2023, eleven days after Mr. Dotson died. (Exhibit "U")

2. **The second *Graham* factor weighs in favor of Mr. Dotson as he did not pose an immediate threat of serious physical harm.**

The second Graham factor is the most fact intensive and important factor in determining reasonableness under the Fourth Amendment. *Pauly*, 874 F.3d at 1216. *Estate of Larsen v. Murr*, 511 F.3d 1255, 1260 (10th Cir. 2008) established a four component test used in analyzing this factor: "(1) whether the officers ordered the suspect to drop his weapon, and the suspect's compliance with police commands; (2) whether any hostile motions were made with the weapon towards the officers; (3) the distance separating the officers and the suspect; and (4) the manifest intentions of the suspect." *Id.*

a. **The first *Larsen* factor weighs in favor of Mr. Dotson.**

Defendants concede, and the videos confirm, that they did not ever order Mr. Dotson to drop his weapon and did not, from the time Officer Wasson alleges he heard the sound of a firearm slide being racked on the other side of the door until they shot and killed Mr. Dotson, identify themselves as police officers or command him to drop his weapon. (Exhibit "K", "L", "M", "P") *See Pauly*, 874 F.3d at 1216. Defendants attempt to justify these failures by claiming it was not feasible to do so. When considering the totality of the evidence and the holes in Defendants' theory, it becomes clear this is neither accurate nor reasonable.

Defendants contend that approximately six (6) seconds elapsed from the moment Officer Watson allegedly heard a round being chambered while the door was still closed until the time Mr. Dotson was shot and killed. The actual time from the videos is five (5) seconds. It is crucial to remember that at this moment, Defendants were aware they were at the wrong address and had no reason to suspect Mr. Dotson of anything. According to Defendants, in those five (5) seconds, Defendants repositioned themselves, unholstered their service weapons, and just before shooting Mr. Dotson Officer Wasson said "hey," and "hands up." Saying "Farmington Police, drop your

weapon" would take much less time – less than one (1) second.  *See Gutierrez-Rodriguez v.*
*Cartagena*, 882 F.2d 553, 557, 559-61 (1st Cir. 1989) (upholding a jury verdict when four officers
in an unmarked car and without uniforms approached another vehicle with guns drawn and,
without identifying themselves, fired when the other vehicle drove away).  Defendants seem to
contend that they did not notice the weapon in Mr. Dotson's right hand until he started to raise it,
less than a second before he was shot and killed after he had been commanded to raise his hands.
This has to be an issue on which the credibility of the witness needs to be determined by a jury, as
Defendants also contend that all of the actions taken by them in the preceding five (5) seconds
were taken because they knew he had a firearm with a chambered round.  *See, e.g., Pauly*, 874
F.3d at 1216 (reasonable jury could find that five second interval was sufficient time to at least yell
"State Police, drop your weapon," making defendants' actions constitutionally unreasonable);
*Tenorio v. Pitzer*, 802 F.3d 1160, 1163 (10th Cir. 2015) (reasonable jury could find that suspect did
not refuse to comply because he was shot within two or three seconds of the officer commanding
him to "put the knife down" and, therefore, was not given sufficient time to comply).  As will be
discussed below, a reasonable jury could conclude that Mr. Dotson had no idea that the people
knocking on his door in the middle of the night were law enforcement officers, nor that they were
in his yard shining lights in his face.  Defendants had ample opportunity to prevent this tragedy by
taking the simplest step prescribed by *Larsen*, but failed to do so.  Instead, they exacerbated the
situation by concealing themselves in the darkness, blinding Mr. Dotson, and shouting aggressively
at a man who had no reason to believe he was doing anything other than protecting his home from
intruders.[1]  The first *Larsen* factor weighs in favor of Mr. Dotson.

---

[1] It is important to remember that not only did Defendants have no reason to suspect Mr. Dotson of any crime, none,
in fact, had been committed.  The only reasonable conclusion to draw, and a conclusion that could be reached by a
reasonable jury, is that Mr. Dotson brought a weapon with him to the front door because he feared who was outside.

**b.      The second *Larsen* factor weighs in favor of Mr. Dotson.**

Defendants contend that the video "unequivocally demonstrates that Mr. Dotson took hold of the firearm with both hands and raised it in a shooting stance, aiming in the direction of Officers Wasson and Estrada." (Defendants' Motion at 10). To the contrary, this is an issue upon which there is a genuine issue of material fact. The only instruction given by Defendants to Mr. Dotson was "hands up!" A reasonable jury could conclude that he was doing nothing more than complying with the instructions given to him. It is undisputed that Mr. Dotson did not fire a round. Officer Wasson told him to put his hands up, he started to do so, and was almost immediately killed.[2]

In making this determination, the Court must view all conflicts in the evidence in the light most favorable to Mr. Dotson. *See, e.g., Est. of Taylor*, 16 F.4th at 756). Defendants ordered Mr. Dotson to raise his hands and he was doing so when he was shot. Had Defendants ordered him to drop his weapon and he instead raised his hands with the gun, the determination of whether their "mistaken perception" of Mr. Dotson's action was reasonable might be simpler. *See Est. of Smart v. City of Wichita*, 951 F.3d 1161, 1171 (10th Cir. 2020). But in this circumstance, viewing the evidence in the light most favorable to Mr. Dotson, the evidence is not clear and unambiguous that Mr. Dotson was making a hostile motion toward Defendants or that their alleged perception of a hostile motion was reasonable. *Id.*

**c.      The third *Larsen* should be considered neutral, not favoring either Plaintiffs or Defendants.**

---

He had nothing to fear from police, and had he known it was law enforcement at his front door, no weapon would have been necessary.

[2] Without saying it, Defendants seem to imply that merely pointing a gun in the direction of an officer, whether known to be an officer or not, satisfies *Larsen*. This is not the case. The circumstances surrounding the incident must be analyzed. *See Pauly*, 874 F.3d at 1217; *Allen*, 119 F.3d at 840-41; *Sledd v. Lindsay*, 102 F.3d 282, 288 (7th Cir. 1996); *Yates v. City of Cleveland*, 941 F.2d 444, 445, 449 (6th Cir. 1991).

A dispute exists on whether Mr. Dotson was drawing a gun to fire at Defendants, as opposed to simply answering the front door of his residence with a gun in his hand, in response to an unknown threat, or trying to comply with a command. While the officers may have been within the range of his weapon, a question of fact exists as to whether Mr. Dotson brandished the weapon, or even pointed it at anyone. Additionally, Mr. Dotson, blinded by the flashlight in his eyes would not have been able to see the officers, who had the advantage of the cover of darkness. Finally, a reasonable jury could calculate that rather than raising the gun to aim and fire at the officers, Mr. Dotson was attempting comply with Officer Wasson's command to raise his hands, an action for which he was immediately killed in his own doorway.[3]

### d.      The fourth *Larsen* factor favors Mr. Dotson.

The fourth *Larsen* factor focuses on the "manifest intentions of the suspect." *Est. of Larsen*, 511 F.3d at 1260.  Defendants begin their analysis of this factor by referencing the domestic violence call to which they were initially dispatched that occurred on the other side of Valley View Avenue.  (Defendants' Motion at 13).  However, as discussed above, by the time Mr. Dotson opened the door Defendants knew, or at the very least a reasonable jury could conclude that they knew, that the alleged domestic violence did not occur at the Dotsons' residence.  Defendants' assertion to the contrary is dubious and an issue that would require a jury to weigh the credibility of the witnesses, making determination of this fact at this point inappropriate.  *Pauly,* 1217-18. Therefore, viewing the evidence in the light most favorable to Mr. Dotson, Defendants knew they

---

[3] Defendants also contend in support of this point that the fact that this incident occurred in a residential neighborhood support finding in their favor on the third *Larsen* factor.  This is not correct.  This Circuit has held that the "mere possibility" that a suspect "might have presented a threat to the general public" does not weigh heavily on the officer's side.  *Est. of Ceballos v. Husk,* 919 F.3d 1204, 1218 (10th Cir. 2019).  There must be evidence of others in the vicinity who could have been in danger.  *See Cordova v. Aragon*, 569 F.3d 1183, 1190 (10th Cir. 2009).

were not at the house to which they were dispatched and that no crime of any sort had been reported at that address.

On the three occasions Defendants knocked on the Dotsons' door and announced themselves, the Dotsons were upstairs in their bedroom. *See* Declaration of Kimberly Dotson (Exhibit 1"). Contrary to Defendants' assertion, a reasonable jury could conclude that they did not hear the announcements. Also, contrary to Defendants' assertions, the police officers were not positioned at Mr. Dotson's front door when he opened the door as the concede they were approximately fifteen feet away from the door. Mr. Dotson could not have seen that they were in uniform as he was on a lighted porch looking out into the dark with a flashlight shining in his eyes.[4] There is simply no evidence that the presence of a video doorbell system or a large window near the front door were utilized or what they would have even shown in the middle of the night. *See* Declaration of Kimberly Dotson. What Mr. Dotson knew is that some unknown person was knocking on his front door in the middle of the night while his family was inside sleeping. A reasonable jury on this evidence when viewed in the light most favorable to Mr. Dotson could find that the manifest intention of Mr. Dotson was to protect his home and family from unknown dangers in the middle of the night. ("Exhibit "2", Declaration of Jeronimo Rodriguez)

As this Circuit recognized in *Pauly*, "the inherent right of self-defense has been central to the Second Amendment right" and that constitutional right must extend "to the home, where the need for defense of self, family, and property is most acute." *Pauly*, 874 F.3d at 1219 (quoting *District of Columbia v. Heller*, 554 U.S. 570, 628-29 (2008). Likewise, the Supreme Court in the

---

[4] Magistrate Yarbrough recently found that under facts in which a suspect was on his own property and someone he did not know was a police officer was yelling commands at him while shining a flashlight in his face, any reasonable officer would recognize that it would be reasonable for the suspect to resist the command. *Herrera v. Village of Angel Fire*, 2024 U.S. Dist. LEXIS 30688 *72, 2024 WL 706857, No. 1-21-CV-465-SCY-LF (D.N.M., Feb. 21, 2024, appeal pending). In that case, the defendant entered new evidence in the record that changed the Court's initial denial of qualified immunity, but it did not change its opinion on the scenario initially presented.

<u>District of Columbia v.</u> Heller, 554 U.S. 870, 628, 128 S.Ct. 2783, 171 L. Ed. 2d 637 (2008) held that "the need for defense of self, family and property is most acute in one's home." Finally the New Mexico Supreme Court has also recognized this right, stating that "[d]efense of habitation has long been recognized in New Mexico" and it "gives a person the right to use lethal force against an intruder when such force is necessary to prevent the commission of a felony in his or her home." *State v. Boyett*, 185 P.3d 335, 358 (N.M. 2008).

Taking all of the circumstances present into account and viewing the facts in the light most favorable to Mr. Dotson, a reasonable jury could conclude that he was merely attempting to protect his home, not knowing that his perceived assailants were law enforcement as they did not properly identify themselves despite ample opportunity to do so. *Pauly*, 874 F.3d at 1219.

Although the third *Larsen* factor should be weighed neutrally, the other three all weigh in favor of Mr. Dotson and considering the totality of the circumstances viewed in the light most favorable to Mr. Dotson, the second *Graham* factor favors Mr. Dotson as a whole.

### 3.    The third *Graham* factor weights in Mr. Dotson's defense as he was not actively attempting to evade arrest by flight.

At the time Mr. Dotson opened the front door to his house, Defendants had no evidence or probable cause to arrest him. As discussed above, Defendants knew they were at the wrong house and that there had been no report of a crime at the Dotsons' house. Because there was no crime and no cause to make an arrest, Mr. Dotson could not have been attempting to evade arrest by flight and this factor supports Plaintiff. *Pauly*, 874 F.3d at 1222 (citing *Graham,* 490 U.S. at 396.

### 4.    Defendants' reckless conduct during the seizure unreasonably created the need to use deadly force, rendering their conduct constitutionally unreasonable.

"The reasonableness of the use of force depends not only on whether the officers were in danger at the precise moment that they used force, but also on whether the officers' own 'reckless

or deliberate conduct during the seizure unreasonably created the need to use such force.'" *Jiron v. City of Lakewood*, 392 F.3d 401, 415 (10th Cir. 2004) (quoting *Sevier*, 60 F.3d at 699)).  It is appropriate to consider the officer's actions the preceded the suspect's threat of force if those actions are "immediately connected" to the threat of force. *Allen*, 119 F.3d at 840.

Defendants arrived at the wrong address.  Not just the wrong address, but an address on the opposite side of the street and two or three houses down from the house to which they were actually dispatched, 5308 Valley View.  It is fair to assume that every police officer (and the vast majority of drivers in general) know that street numbers ending in odd numbers are on the opposite side of the street from those ending in even numbers.  And, yet, Defendants went to the wrong address, on the wrong side of the street, and walked by (and even looked at according to Officer Wasson) a sign with the numbers 5305 on the Dotsons' residence.

Officer Goodluck knew they were at the wrong address, but failed to correct Wasson's mistake, although he told Wasson 5308 was the correct address. (Exhibit "K", "L") Furthering their reckless behavior, Defendants remained at Mr. Dotson's house and engaged in a violent confrontation after realizing they were at the wrong house.[5]  Despite have every opportunity to do so, Defendants did not announce their presence as police officers to Mr. Dotson either immediately before or immediately after he opened the door.  Instead, they removed themselves from the light of the front porch and receded into darkness, blinding him with a flashlight in his eyes. Defendants' vehicles were parked down the street and with Mr. Dotson not being able to see who was in the darkness in his front yard, there were no visible signs of the presence of law enforcement.

---

[5] Defendants contend that they were allowed to knock on the door and wait to be received as any private citizen would. (Defendants' Motion at 17).  While this abstract proposition of law is correct, at the time Mr. Dotson answered his door, Defendants knew they were at the wrong house and that there was no reason to be at the Dotsons' house. Defendants did not, therefore, have any right to subject Mr. Dotson to an investigative detention. *See, e.g., Walker v. City or Orem*, 451 F.3d 1139, 1148 (10th Cir. 2006).  Nonetheless, they surrounded his front door in the dark and shot him as soon as he moved.

Defendant Wasson contends that he heard Mr. Dotson chamber a round from behind the closed door but did not engage him verbally at all at that time. Telling Mr. Dotson that they were police at that moment or any moment before Mr. Dotson complied with the command that he raise his hands should have entirely averted the unnecessary death of an entirely innocent man. The only thing Mr. Dotson heard was "hey" and perhaps "hands up" from an unknown assailant in his front yard who was blinding him with a flashlight. This is recklessness at the very least – conscious indifference to the rights and safety of an innocent man. (Exhibit "2", Declaration of Jeronimo Rodriguez)

The inconsistencies in Defendants' arguments are compelling in this regard. For example, Defendants contend often that the porch was well lit and it was unusually bright that night due to a full moon, but also argue that Officer Estrada had to use his flashlight to illuminate the front porch, an act which only had the effect of blinding Mr. Dotson. Defendants contend they had no reason to believe Mr. Dotson did not know police officers were in his front yard, but also knew that they were at the wrong house and that no crime had been reported or suspected at the Dotsons' house. Why would Mr. Dotson, a completely innocent man, chamber a round before opening his front door if he knew that the people in his front yard were police officers? Defendants had a whole host of potential announcements and commands at their command, including announcing themselves as Farmington police or commanding that Mr. Dotson drop his weapon. But Officer Wasson instead commanded that Mr. Dotson raise his hands, knowing that he had a gun, and shot him immediately when he began to do so. Mr. Dotson's death was caused by Defendant's repeated reckless actions, the absence of any one of which would have prevented Mr. Dotson's completely unnecessary death.

**B.      Defendants' use of deadly force violated clearly established law.**

A right is clearly established if it is sufficiently clear to a reasonable officer that what he is doing violates that right. *See, e.g., Mullenix v. Luna*, 577 U.S. 7, 12 (2015). This standard does not require a case that is exactly the same in all particulars. *White v. Pauly*, 580 U.S. 73, 79 (2017). It does, however, require that the particular constitutional question has been placed beyond debate. *Id.* As this Circuit has recently held, even if there is no case with identical facts, a plaintiff does not have to produce "a court decision with identical facts to establish clearly that it is unreasonable to use deadly force when the force is totally unnecessary to restrain a suspect or to protect officers, the public, or the suspect himself." *Finch v. Rapp*, 38 F.4th 1234, 1243 (10th Cir. 2022) (quoting *Zia Trust Co. v. Montoya*, 597 F.3d 1150, 1155 (10th Cir. 2010)).

The law was clearly established that Defendants' actions were a violation of Mr. Dotson's rights under the Fourth Amendment to the Constitution on the night of his death. The most clear recitation of this principle is *Pauly v. White*, 874 F.3d 1197 (10th Cir. 2017). *See also Finch v. Rapp*, 38 F.3d 1234 (10th Cir. 2022); *Carr v. Castle*, 337 F.3d 1221 (10th Cir. 2003); *Allen v. Muskogee*, 119 F.3d 837 (10th Cir. 1997).

In *Pauly*, an officer was dispatched to an off-ramp on Interstate 25 in response to a complaint of reckless driving. *Id.* at 1203. The suspect about whom the complaint was made, Daniel Pauly, had already left the scene and there was no threat to anyone. *Id.* Despite agreeing there was no probably cause to arrest anyone, three officers decided to seek out Mr. Pauly to get his side of the story and to determine if he was intoxicated. *Id.* at 1203-04. When they arrived at the address listed for Mr. Pauly, they parked their police vehicles down the road and approached on foot. *Id.* at 1204. The officers activated their flashlights as they moved closer to the house and saw two males inside. *Id.* The brothers through the front window only saw two flashlights at chest level, five to seven feet apart, approaching their house. *Id.* The brothers did not suspect the

flashlights belonged to police officers and feared it could be intruders. *Id.* The brothers called out to see who was approaching their house. *Id.* One officer responded once by saying, "Open the door, State Police, open the door" and also shouted "we got you surrounded. *Id.* Come out or we're coming in." In addition one officer shouted "open the door, open the door. *Id.* Importantly, Mr. Pauly did not hear anyone say "State Police" until after the entire altercation was over. *Id.*

At that point, one of the officers yelled "we're coming in, we're coming in." *Id.* at 1205. The brothers armed themselves and yelled out to the unknown assailants, "we have guns." *Id.* One officer then demanded that the brothers "open the door, come outside." *Id.* Mr. Pauly then opened the back door and fired two warning shots while screaming loudly to scare away those who were approaching. *Id.* Mr. Pauly's brother then opened the front window and pointed a handgun in one of the officer's direction. *Id.* Four to five seconds later, that officer shot Mr. Pauly's brother. *Id.* The entire incident took less than five minutes. *Id.*

The trial court determined that there were genuine, material factual disputes as to whether the officers adequately identified themselves, whether the brothers could identify the officers by sight, and whether it was feasible for the officer who fired to weapon to warn Mr. Pauly's brother before shooting. *Id.* at 1206. The trial court found that the officers' actions were constitutionally unreasonable in violation of the Fourth Amended and stated:

> Furthermore, viewing the evidence in the light most favorable to Plaintiffs, a reasonable jury could find the following:  there were no exigent circumstances requiring the Officers to go to Daniel Pauly's house at 11:00 p.m.; Officers Truesdale and Mariscal purposefully approached the house in a surreptitious manner; despite the porch light and light from the house, the rain and darkness made it difficult for the brothers to see what was outside their house; the fact that the brothers' house is located in a rural wooded area would have heightened the brothers' concern about intruders; the Officers provided inadequate police identification by yelling out "State Police" once; the Officers' use of a hostile tone in stating, "we got you surrounded.  Come out of we're coming in" was threatening; statements by Officers Truesdale and Mariscal of "open the door" and other statements of "we're coming in" were, likewise, threatening; it would have been

reasonable for the Officers to conclude that Daniel Pauly could believe that persons were coming up to his house at 11:00 p.m. were connected to the road rage incident which had occurred a couple hours previously; that under those circumstances, the occupants of the house would feel a need to defend themselves and their property with the possible use of firearms; and the incident occurred in less than five minutes.

*Id.* at 1206. The 10th Circuit affirmed the trial court's denial of qualified immunity for the officers.

The Supreme Court granted a writ of certiorari and remanded the case based on its concern as to whether the shooting officer violated clearly established law but did not disturb the 10th Circuit's holding that the conduct of the officers constituted unreasonable constitutional violations. *White v. Pauly*, 580 U.S. 73 (2017). On remand, in an opinion published more than five years before the incident at issue, this Circuit confirmed that there was a fact issue precluding summary judgment on whether the officers' actions were constitutionally unreasonable in violation of the Fourth Amendment. *Id.* at 1222. The Court, however, ultimately granted the officers' summary judgment based on qualified immunity because at that time the law was not clearly established as to these violations. *Id.* at 1223.

Those violations have now been clearly established, however, by *Pauly*. It is no doubt true that all of the facts in this case are not identical to those in *Pauly*. But that is not required. *White*, 580 U.S. at 79. This particular constitutional question has been decided.

As in *Pauly*, genuine, material factual disputes exist as to whether the officers adequately identified themselves, whether Mr. Dotson could identify the officers by sight, and whether it was feasible for Defendants to warn Mr. Dotson before shooting. *Pauly*, 874 F.3d at 1206. Comparing the Court's findings that established a constitutional violation in *Pauly* the facts present here is striking. There were no exigent circumstances requiring Defendants to be at the Dotsons' house in the middle of the night – in fact there were no circumstances at all that even justified their presence; Defendants approached the house on foot with their patrol cars out of sight in a

surreptitious manner; despite the porch light and light from the house, the flashlight shining in Mr. Dotson's eyes made it impossible for him to see what was outside their house; the Officers provided inadequate police identification and the Dotsons did not know it was police knocking on their door; Defendants' commands, coming from unknown persons who were blinding him with a flashlight, were threatening; it would have been reasonable for Defendants to conclude that Mr. Dotson could believe that persons were coming to his house in the middle of the night to threaten him, his family, or his property; that under those circumstances, Mr. Dotson would feel a need to defend his family and their property with the possible use of firearms; and the incident occurred in less than 10 seconds from the time Mr. Dotson arrived downstairs at his front door.

The authority of <u>Pauly</u> is also bolstered by the 4th Circuit's decision in <u>Knibbs v. Momphard</u>, 30 F. 4th 200, (4th Cir. 2022). *Knibbs* is a similar case to this case. In that case, the racking of a shotgun was the excuse for the officer to shoot to kill. The Defendant's rely on the disputed fact of whether or not Mr. Dotson cocked his gun before opening the door. In <u>Knibbs</u> the Fourth Circuit held that "Racking a shotgun inside one's home without more, it is no more threatening than coming to the door with any loaded firearm. Indeed any reasonable officer would presume that an individual carrying a firearm has already loaded it." See also <u>McLaughlin v. United States</u>, 476 U.S. 16, 17, 106 S. Ct. 1677, 90 L.Ed. 2nd 15 (1986). The Court also held: "a reasonable officer would have perceived Mr. Dotson's decision to remain armed as a means of self-defense until he was able to ascertain whether the individual outside his home was in fact a law enforcement officer. *Knibbs Id.* at pg. 18. See also <u>Pauly v. White</u>, 874. F3d 1197, 1203-05, 1219 (10th Cir. 2017).

Defendants contend that the most closely analogous case is *Wilson v. Meeks*, 52 F.3d 1547 (10th Cir. 1995). It is, however, inapposite in many ways. The officer in *Wilson* was at the home of the suspect in the crime he was investigating. *Id.* at 1549. The suspect knew he was dealing with law enforcement. *Id.* And the officer in *Wilson* demanded several times that the suspect, who was hiding a gun behind his back, to show him the hand that was behind his back. *Id.* Unfortunately, the suspect then brought his hand forward with his gun and aimed it at the officer. *Id.* at 1550. The officer shot the suspect twice and the suspect dry fired his gun twice. *Id.*

To the extent Defendants contend *Wilson* stands for the proposition that anytime a suspect moves a gun in the general direction of a police officer that is obviously incorrect. *See Pauly*, 874 F.3d at 1216-17 (rejecting the proposition that the use of deadly force by an officer is always reasonable where someone aims a gun at an officer and specifically citing *Wilson*). Importantly, *Wilson* was decided before this Circuit's opinion in *Sevier v. City of Lawrence*, 60 F.3d 695, 699 (10th Cir. 1995), which recognized the propriety of analyzing an officer conduct, and whether recklessness during the seizure unreasonably created the need to use such force. The opinion in *Wilson* was filed on April 20, 1995, and the opinion in *Sevier* was filed on July 21, 1995. Therefore, the Court in *Wilson* did not consider the recklessness of the officer during the seizure while analyzing the constitutional violation.

The cornerstones of Defendants' constitutional violations in this case are the fact that Mr. Dotson did not know he was responding to law enforcement at the door, because of the actions of Defendants when he opened the door he did not have the opportunity to obtain that knowledge, and his actions were precipitated by those facts that were constitutional violations on their own and were reckless and the unreasonably created the need to use such force. *Wilson* does not address any of these issues and is not controlling here.

Defendants cite *Johnson v. City of Roswell,* 752 F. App'x 646 (10th Cir. 2018) and *Redd v. City of Oklahoma City*, 2021 U.S. App. LEXIS 26396, 2021 WL 3909982, Cause No. 20-6145 (10th Cir., Sept. 1, 2021) very often in their Motion. It is telling that the opinions that they apparently feel best support their contentions are unpublished and, therefore, not binding precedent. 10th Cir. R. 32.1 ("Unpublished decisions are not precedential, but may be cited for their persuasive value."). But even without regard to their lack of precedential value, both are easily distinguishable from the situation at bar.

In *Johnson*, Defendants correctly recite that the Court, while recognizing that the suspect may not have heard the initial announcement by the police as to their presence, upheld the district court's grant of summary judgment based on qualified immunity. *Id.* at 651-52. But that is not the whole story and *Johnson* is not this case. Although the Court does not break it down by seconds, the Court in *Johnson* says that the door opened quickly after the officer announced "Roswell Police" and that the announcement was "just before" the door opened. *Id.* at 648 & 651. In this case, more than thirty (30) seconds passed between the last knock and announcement by Defendants and Mr. Dotson opening the front door of his home. More than enough time for Mr. Dotson to come downstairs from his bedroom, where he could not hear the announcement, to determine what was going on in his front yard. In addition, in *Johnson*, whether or not the suspect heard the announcement, he opened his door and was looking at two Roswell police officers in the hallway of an apartment building. *Id.* at 648-49. There is nothing in the opinion to indicate that there were any obstructions or obstacles or interference with the suspect being able to clearly see that he was dealing with law enforcement upon opening the door to his apartment, yes the suspect did not cease his threatening behavior. *Id.* Again, that is very different from the circumstances at bar as described above. Finally, the Court in *Johnson* determined that no reasonably jury could

determine, under the totality of the circumstances including those described above, that the officers' conduct was reckless.  In this case, the conduct of Defendants is replete with recklessness.

*Redd* is also distinguishable in many ways.  First, the suspect was asleep and potentially intoxicated in an illegally parked vehicle in a public parking lot.  *Redd v. City of Oklahoma City*, 2021 U.S. App. LEXIS 26396 *4, 2021 WL 3909982, Cause No. 20-6145 (10th Cir., Sept. 1, 2021).  Mr. Dotson was in his home, a protected space in which the Second Amendment guarantees his right to self-defense with a firearm, and unknown people continued knocking on his door, blinded him with a flashlight when he opened it, and made commands that could have been perceived as threatening.  Second, while acknowledging that there was "some question as to whether" the suspect knew the officer was law enforcement, the Court did not identify any obstacles to the suspect seeing the officer and noted that the Officer was in "a police uniform when he repeatedly ordered Mr. Simms not to go for his gun." *Id.* *40-41.  In addition, the Court noted that the suspect, upon being contacted by the officer, "opened his eyes, looked at [the officer], and put his hand on the butt of the pistol." *Id.* at *5.  Again, that is not this case.  Third, the officer repeatedly told the suspect "don't do it" but the suspect continued to his gun and began to draw it. *Id.* at *5-6.  The Court in *Redd* rejected the argument this was ambiguous as it was clearly a command to the suspect to stop what he was doing – reaching for and drawing his gun. *Id.* at *34-35.  Defendants in this case gave one command in six seconds which was, at best, ambiguous while coming from an unknown source and Mr. Dotson was arguably attempting to comply with that command when he was shot dead.  Finally, the Court in *Redd*, considering the totality of the circumstances, determined that the officer's conduct was not reckless.  *Id.* at *39-41.  In contrast, the totality of the circumstances in this case can lead to no conclusion other than that Defendants' reckless conduct created the need for deadly force.

In a factual scenario very similar to this case, the 4th Circuit, in *Knibbs*, noted that the decedent of what occurred, "it can be easy to over value the narrative testimony of the deputy." 30 F. 4th at 27.

Plaintiffs have produced competent evidence that would allow a jury to find that nobody in the Dotson house knew that officers were at their door. Second, a reasonable jury could determine that Mr. Dotson was simply answering the door to protect his own home with a gun in his hand. Unfortunately, Mr. Dotson is not available to give his version of events because Wasson shot him to death in the doorway of his own home.

## <u>RESPONSE TO DEFENDANTS' ALLEGED UNDISPUTED FACTS</u>

Local Rule 56.1 (b) orders that the moving party in a Motion for Summary Judgment "must file with the Motion a written memorandum, containing a short concise statement of the reasons in support of the Motion with the list of authorities relied upon." The Memorandum "must set out a concise statement of all the material facts" on which movant contends no genuine issue exists. Defendants did not file such a memorandum, and their statement of what they claim to be undisputed material facts is anything but short and concise. It covers 147 separate items and 35 pages. Plaintiffs object to this failure on the part of Defendants to comply with the local rules and request that the Motions for Summary Judgment not be considered by the court until the Defendants have complied with the local rule, or alternatively that the Motions be dismissed for the failure to comply with Rule 56.1.

Plaintiffs' statement of genuine disputes of material facts (utilizing the numbering system contained in Defendants' so-called "undisputed" material facts) follows:

#9: A genuine dispute of material fact exists as to whether Officer Wasson clicked on the address function on the MDT. No competent evidence shows that he did.

#10: A genuine dispute of material fact exists as to whether the "pin drop" on the mapping function built into the MDT system showed Officer Wasson that 5308 Valley View Ave. was on the right side of the street. Exhibit "H" shows the pin drop in the *middle of the street*. No discovery has been conducted to test this claim. Wasson's statement to the contrary is not credible. Exhibit "C1" contains no motion of the alleged wrong pin drop. Exhibit "C2" us Wasson's attempt to excuse his blundering inaction. "C1" was taken April 20, 2023. On April 11, Wasson got his laptop back. He claims he looked at it on April 16 and found the pin drop left from when he last used it on April 6. He took a picture on his phone, he says. The original image is not in existence. Issues of fact exists on custody of the laptop, when it was opened, and used after April 11, and what happened to the original image, which can only be tested with discovery.

#19: A genuine dispute of material fact exists on police training. No police training materials have been produced in this case, because discovery has not been conducted yet. The only support for the statement is the unsworn statements contained in interviews from the three Defendant police officers, and genuine disputes of fact exist as to why Officer Wasson believed the residence he was approaching was 5308 Valley View Ave. Wasson's claim that he can't tell the difference between a 5 and an 8, is unbelievable. The mysterious pin drop which is in the middle of the street or the other side of the street cannot be tested or verified at this point because no discovery has been conducted.

#22: A genuine dispute of fact exists as to whether there was a pin drop on the MDT system that showed Officer Wasson on April 5 that 5308 Valley View Ave. was on the right side of the street. See discussion above. This is supported only by an unsworn statement made by Officer Wasson, and an attached supposed photo allegedly taken with his phone of the pin drop

from Officer Wasson's MDT eleven days after the killing, but his statement at this point cannot be tested nor verified because no discovery has been conducted, and Wasson's testimony raises more questions then it answers. We can't know whether the photograph is even authentic, and Exhibit "H" shows the pin drop in the middle of the street. He never mentioned this photo at his first interview on April 20th (C1) but brought it up at a second interview (C2) on April 27th.

#23 A genuine dispute of material facts exists as to whether Officer Wasson knew or should have known that he was not at 5308 Valley View Ave. when he was at 5305, and whether he even troubled himself to read the numbers on the Dotson house (5305) at all. Exhibit "K" shows Wasson walking with his head down past the numbers 5305 between 1:28 and 1:33. He does not appear to look at the number. It is unbelievable that Officer Wasson couldn't tell the difference between a 5 and an 8 on a night as bright as Defendants claim April 5 was,although that is his claim. The numbers are clearly 5305.

#24 Genuine disputes of material fact exist as to whether there was no need for the officer's flashlights to be turned on. The flashlights were turned on shortly after, right as Mr. Dotson opened the door. Ex. K, L, M, P.  Why? The unsworn statement from Officer Goodluck regarding the moon cannot be tested or verified at this stage in the proceedings without discovery.

#26: A genuine dispute of material fact exist as to whether Officer Estrada's "main focus" was to observe and evaluate his trainee. This is disputed, supported only by an unsworn statement in an interview, without discovery having been conducted to test this allegation, although it is contradicted by his lack of focus in not listening to Goodluck about the address. Estrada still had a duty to act as a reasonable police officer. Declaration of Jeronimo Rodriguez.

#27 Genuine disputes of material fact exist to whether Officer Estrada allowed Wasson and Goodluck to lead the way to the residence so that he could observe and evaluate his trainee, in walking! This is contradicted by Officer Goodluck in Exhibit "E".

#28: A genuine dispute of material fact exists as to why a street map accessed on February 12, 2024, of 5305 Valley View Ave is needed. It appears to be irrelevant.

#35:  A genuine dispute of material fact exists as to whether Officer Estrada "hurried" towards the yard to observe and evaluate Officer Goodluck, nor why that is relevant. Whether he did or did not hurry does not excuse his failure to verify the correct address.

#36: A genuine dispute of material fact exists as to whether Officer Estrada was confident in deferring to Officer Wasson's judgment that the officers were at the proper address, and whether that was reasonable. The source of this is again an unsworn interview without any discovery having been conducted to sort through and test what is true. According to the video evidence, the issue of being at the wrong address had not been raised as of this time, so the statement is unreliable and irrelevant.

#39: A genuine dispute of material fact exists as to whether Officer Wasson knew that the video doorbell camera next to the front door was motion activated or would alert the homeowner via cell phone. There is no foundation for Officer Wasson's claimed knowledge and what this doorbell and the camera were supposed to do. It is opinion evidence and is not undisputed. Officer Wasson had no idea whether the homeowner's cell phone was on or not. The doorbell is not mentioned by any Officer prior to the shooting.

#40 Disputed because the front door did not have a semi-circle of cleared glass near the top. It was frosted glass. See Declaration of Kimberly Dotson.

#43 A genuine dispute of material fact exists as to whether there was a full moon at the time these events were unfolding, or whether moon at the residence was "brighter than normal." No evidence exists to prove this, at the time in question, and Plaintiffs are entitled to reasonable inferences to the contrary. It is probably irrelevant because Officer Estrada's flashlights blinded Mr. Dotson, and the full moon did not help them see the number 5305 on the side of the house.

#45 A genuine dispute of material fact exists as to the distance Officer Goodluck was standing from the front door, there has been no discovery on this issue, no measurements taken, and the distance is merely an estimate, sourced from an unsworn statement made in a police interview.

#49 Genuine material disputes of fact exist as to whether Officer Wasson's tone in making an announcement was hostile or threatening in tone, or loud enough for someone inside, upstairs, to hear. The "loud enough" for someone to hear him inside does not help answer any question in this Motion because no one heard him and the term is far from precise. The videos are the better evidence on loudness and tone. See Ex. 1 Declaration of Kimberly Dotson.

#55: Genuine dispute of material fact exists as to whether Officer Wasson announced in a "slightly louder" tone. The source of this is an unsworn statement in the police interview and does not matter because no one inside heard him. See videos K, L, M, P. See Ex. 1 Declaration of Kimberly Dotson.

#58: A general dispute of material fact exists as to whether Officer Goodluck felt comfortable with his position or not, and that he repositioned himself as a result. This is supported only by an unsworn statement from a police interview and does not matter for the purposes of the Motion.

#59 A genuine dispute of material fact exists as to whether Officer Estrada tried to shine his flashlight into a window. If he did, it was only for a second or two. Exhibit "M".

#61: A genuine dispute exists as the whether Wasson "loudly" announced "Farmington Police". This is undefined. No one inside heard him. See Declaration of Kimberly Dotson.

#67: A genuine dispute of material fact exists as to the reason for the so-called banter with Officer Goodluck. This is supported only by Officer Wasson's unsworn statement. A reasonable inference is that Officer Wasson was exercising his authority and stubbornly refusing to listen to a subordinate trying to tell him that he was in fact at the wrong address.  See Declaration of Jeronimo Rodriguez.

#68: A genuine dispute of fact exists as to whether Wasson's belief that he was at the correct address was reasonable, or whether that would be even possible for him to believe he was. He had been corrected previously by Officer Goodluck and refused to do anything about being at the wrong address, such as even looking at or correctly reading the displayed house number, 5305. Ex. "K". He blames Goodluck for "confusion" in Exhibit "C1" and misstates what occurred. Goodluck told Wasson they were at 5305. Wasson pointed to the other side of the street when Goodluck told Wasson 5308 was the correct address. Exhibits K, L, M, E.

#69: A genuine dispute of material fact exists as to whether there were footsteps heard coming to the door. There is no proof that from where he was located, Wasson could have heard footsteps inside the house. No other Officer says that he heard footsteps, and the only source for this is the statement from Officer Wasson in his unsworn interview after the event. No discovery has been conducted on this issue.

#70: Genuine disputes of material fact exist as to whether Officer Estrada heard movement at the door. There is no evidence that Officer Estrada could have heard anything

inside the house from where he was located, and the source of this statement is unsworn in a police interview. The video evidence does not reflect this.

#71: Genuine issues of material fact exist as to whether what Officer Wasson heard could reasonably be considered to be the sound of a firearm slide being racked on the other side of the door, as opposed to someone merely lifting a dead bolt to open the door. There is no reason nor foundation to explain why it would be reasonable to assume that a round of ammunition was being fed into the firing chamber of a gun. The source of this is again an unsworn statement, 5 days after the event, from a prepared statement with time to make up a story, and the video claiming to contain the sound of the round being racked is equally well interpreted as the door bolt being moved. The videos are the best evidence. If he heard a gun the proper response was to announce " Farmington Police." See Declaration of Jeronimo Rodriguez.

#72: A genuine dispute of material fact exists as to why Officer Wasson retreated from the front door. It was not reasonable for him to be there to begin with. See Declaration of Jeronimo Rodriguez.

#73: A genuine dispute of material fact exists as to why Officer Goodluck moved behind the porch pillar and unholstered his own service weapon, kind of holding and at the low, ready position. The source of Officer Goodluck's possible reasons are merely his unsworn after the fact in police interview and no discovery has been conducted to test this.

#74: A genuine dispute of material fact exists as to whether Officer Estrada believed immediate danger was coming, since the only source for his supposed belief is his unsworn statement in a later police interview, not confirmed by video. What happened to his focus on Officer Goodluck is unknown.

#77: Genuine disputes of material fact exist on whether the door was "aggressively" opened, as well as the timing of the opening of the door from the time Officer Wasson claims to have thought that a firearm was being racked. The video is the best evidence of how the door was opened. The explanations and the editorial comments are unsworn statements from Officer Goodluck.

#80: A genuine dispute of material fact exists as to whether a firearm was "brandished" by Robert Dotson. It is undisputed that he was holding a firearm in his right hand, but the evidence does not show that he brandished a firearm, or purposely pointed it at anyone. He could not even see anyone in his yard, and did not know the police were there. His intent couldn't be determined as a matter of law. The statements of Officer Wasson that a firearm was brandished are his speculation and represent primarily his intent to protect himself and the city. Officer Estrada's and Goodluck's statements do not support the idea that the firearm was brandished. Likewise, the statement by Estrada that the front door was aggressively opened is disputed and is not supported by the video evidence. Officer Goodluck says the gun was pointed toward the ground. Exhibit "E".  See Ex.2 Declaration of Jeronimo Rodriguez, Ex. 1Declaration of Kim Dotson.

#81: A genuine dispute of material fact exists as to Mr. Dotson aiming the firearm in the direction of any Officer, much less "punch the firearm" in the direction of Officer Wasson. The video doorbell footage shows that Mr. Dotson was blinded by the flashlights, and he did not know who was in his yard and did not know police officers were there. See Ex.2 Declarations of Jeronimo Rodriguez and Ex. 1Kimberly Dotson.

#82: Genuine disputes of material fact exist as to whether the "hands up" statement was heard by Robert Dotson before he was shot. The shots immediately followed the statements.

Likewise, the statement that Mr. Dotson was beginning to "punch the firearm", in Officer Wasson's direction is not supported by the video. See Ex.2 Declaration of Jeronimo Rodriguez. Ex. K, L, M, P.

#83: The Summary Judgment evidence does not reflect that Robert Dotson raised his firearm in a shooting stance, aiming in the direction of Officer Wasson and Estrada. The Officers had still not identified themselves as police officers to Mr. Dotson. The screenshots and the video demonstrate that there are genuine issues of material fact as to whether Mr. Dotson was in a shooting stance or aiming his gun in any direction. The statements by Wasson and Estrada do not support the facts claimed in because they are unsworn and untested, in particular, Officer Wasson, in his explanation of why he used the command "hands up". Ex. K, L, M, P, Ex. 2 Declaration of Jeronimo Rodriguez.

#84: There is a genuine disputed material fact as to whether Officer Wasson believed Mr. Dotson was going to shoot him and whether that belief was reasonable, requiring deadly force. See Ex.2 Declaration of Jeronimo Rodriguez.

#85: Genuine disputes of material fact exist as to the distance of Officer Wasson from the front door, which cannot be determined either from his unsworn statement or the video evidence and has never been measured.

#87: Genuine disputes of material fact exist as to whether Mr. Dotson "raised the pistol and aimed it in Officer Estrada's direction". The video evidence does not support this. It shows at best the pistol being slightly raised. Mr. Dotson could not have aimed at anyone. He was blinded. Ex. "P", Ex. 2 Declaration of Jeronimo Rodriguez.

#88: Genuine disputes of material fact exist as to the distance of Officer Estrada from the front door, which cannot be determined from the video, nor from his unsworn account of unsupported statement and are unmeasured.

#90: A genuine dispute of material fact exists as to whether Officer Goodluck reasonably believed that Mr. Dotson posed an imminent threat of death or great bodily harm to Officer Wasson. He reported seeing Mr. Dotson's gun pointed toward the ground.

#91: Genuine disputes of material fact exist as to the distance from the front door where Officer Goodluck was standing. No measurements have been taken.

#92: Genuine disputes of material fact exist as to the time elapsed when Officer Wasson and Officer Estrada fired their weapons. It was actually less than a second from the muffled Wasson statement to raise your hands. See video evidence. Ex. K, L, M, P.

#93: A genuine dispute of material fact exists as to whether the firing occurred over one second or two seconds. The video evidence seems to indicate it was one second or less.

#96: A genuine dispute of material fact exists as to whether the slide to the gun was racked at all inside the residence, as set forth above. Therefore, the time frame may be inaccurate.

105: The video does not depict Officer Wasson loudly ordered anything. Nor does this portion of the video reflect that Mrs. Dotson (the person described as "the female") heard any statement from Officer Wasson. This is not undisputed.

106: The description that the screen door was "flung" open suddenly is not supported by the video and it is and is disputed. It is also disputed that she aimed her gun in the Officer's direction. She did not know there were Officers in her yard. They had still not announced themselves, and Plaintiffs, possibly after this Amended Complaint, concedes nothing. It states

the fact that Mrs. Dotson fired at whoever had shot her husband, an understandable response. Officer Watson's statement that "the female had already begun shooting at me" is also not supported by the video. She was shooting indiscriminately at whoever was in her yard, and that is the best the evidence shows. A genuine issue of material fact exists.

107: There's no evidence showing that this is actually a depiction of a muzzle flash. It is disputed.

108: Officer Estrada's supposed fear is not supported by anything except his own statement and the statements reflected in 108 are irrelevant, particularly when offered to say that Estrada was trying to announce their presence, when no announcement had been made at all since before Mr. Dotson came to the door.

117: Officer Goodluck's supposed announcement of" Farmington Police" was obviously not heard by Mrs. Dotson, who was trying to attend to her husband. No shots were fired after that supposed announcement at any events, in any event, so it is irrelevant.

At least the following disputes of genuine material fact exist, requiring that the motion be denied:

1. Whether the Officers should have been at the correct address

2. Whether it was reasonable for the officers to go to and stay at the wrong address

3. Whether Officer Goodluck should have corrected Wasson regarding correct address

4. Whether Officer Wasson should have paid better attention to the correct address and should have acknowledged that they were at the wrong address

5. Whether the lack of noise inside of the 5305 residence should have alerted the police that they were at the wrong address

6. Whether the police could reasonably assume that the Dotsons heard the announcements by Wasson

7. Whether announcement or command should have been given before or when Wasson retreated

8.  Whether Mr. Dotson's gun was aimed at Officer Wasson

9.  Whether the use of force by the police was reasonable

10. Whether the Wasson pinpoint directed him to the wrong side of the street

11. Whether Officer Wasson's statement regarding the pin drop and the circumstances of the photograph are credible

12. Whether the police conduct was reckless or deliberate

Attached to this Response are the following exhibits:

      1.  Declaration of Kimberly Dotson

      2.  Declaration of Jeronimo ("Jerry") Rodriguez

      3.  911 call made by Julia Dotson

      4.  Interview of Steve Hebbe with Dan Abrams

Respectfully submitted,

**THE PERRIN LAW FIRM**
Doug Perrin
369 Montezuma Ave., PMB #334
Santa Fe, New Mexico 87501
Telephone: (505) 989-8800
Facsimile: (214) 646-6117
Email:  dougperrin@perrinlaw.org
*/s/ Doug Perrin*

**CLARK & RUYLE,  LLC.**
Thomas M. Clark
432 Galisteo St.
Santa Fe, NM
87501
Telephone: (505) 820-1825
Facsimile: (505) 986-0475
Email:
tmclark@cjrlawsf.com
*/s/ Thomas M. Clark*
**ATTORNEYS FOR PLAINTIFFS**

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF NEW MEXICO

| | |
|---|---|
| ERNEST PADILLA, PERSONAL REPRESENTATIVE OF THE ESTATE OF ROBERT DOTSON, DECEASED; KIMBERLY DOTSON, INDIVIDUALLY AND AS PARENT AND NEXT FRIEND OF JULIA DOTSON; AND ZACHARY-MORA DOTSON, | Case No. 1:23-cv-00790-MLG-KK |

   Plaintiffs,

vs.

CITY OF FARMINGTON, NEW MEXICO;
DANIEL ESTRADA; DYLAN GOODLUCK;
AND WAYLON WASSON

   Defendants.

## DECLARATION OF KIMBERLY DOTSON

STATE OF NEW MEXICO

COUNTY OF SAN JUAN

Kimberly Dotson, under penalty of perjury, states the following:

1. I am Kimberly Dotson. I am one of the plaintiffs in this case. I am the widow of Robert Dotson. I have personal knowledge of the statements contained in this declaration, and the statements are true and correct.

2. Robert Dotson, deceased, and I were married approximately 11 years.

3. Robert and I lived at 5305 Valley View Lane in Farmington, New Mexico. I am intimately familiar with this house and property. I still live at this address.



4.   The house at 5305 Valley View Lane is two stories. The bedrooms are upstairs.

5.   On the evening of April 5, 2023, at approximately 11:30-11:45 PM, Robert and I were in our bedroom upstairs, the master bedroom. Our son Zach was in his room, and our daughter Julia was in her bedroom.

6.   Robert and I were preparing to go to bed when Robert said he thought he heard a knock at our front door and went downstairs to check on it. We have a ring camera installed at the front door. However, it is only activated if the doorbell is actually rung. The doorbell had not been rung, so nothing came up on my telephone to show who, if anyone, might be at the front door.

7.   There were heavy blinds on the windows in our bedroom, keeping out any light and preventing us from being able to see outside.

8.   Robert made his way downstairs and retrieved a pistol from the kitchen, which we always kept on top of the refrigerator in the kitchen on the first floor. We did not know who was at the front door.

9.   Neither Robert nor I had heard anyone outside say anything before he went downstairs. There was no announcement that we heard before Robert or I went downstairs that the Farmington police were at our front door.

10. Robert and I were strong supporters of the police. One of my sons is a police officer in Bloomfield, New Mexico, and was on April 5, 2023. If we had known the police were at the front door, Robert would not have taken a gun to the door with him.

11. The front door at 5305 Valley View does not have a peep hole, and the glass part on the top of the door is frosted, not clear. Robert would therefore not have been able to look

through any sort of window on the door to determine who, if anyone, was outside. He was not tall enough to see through the glass at the top of the door.

12. The window next to the door was blocked by a couch, preventing the ability to readily look out the window onto the front porch.

13. We also kept the deadbolt in the front door locked. It makes a metallic sound when it is turned to unlock it.

14. After Robert went downstairs, I heard the sound of gunfire coming from outside our house, and I came downstairs screaming, carrying another gun that we kept upstairs.

15. I did not know what had happened. I did not know who had fired shots. When I came downstairs, my husband was lying in our doorway in blood. It was clear to me someone had shot him.

16. I fired my pistol at whoever was in my front yard. Lights were shining in my face. I had no idea that the persons in the front yard were police officers nor that they had shot my husband.

17. I was not informed that it was the police who killed my husband until several hours later at police headquarters.

18. Whoever was in my front yard started firing at me. I was bent over by my husband in the doorway attempting to provide him with resuscitation. I am a registered nurse. At some point, someone told me that the police were outside, and I was relieved and told them that someone had shot my husband.

19. I was taken by police officers after the shooting in my bathrobe with nothing on underneath, to a police car, where I was handcuffed. I was taken to the police headquarters and kept there for several hours the rest of the night.

DECLARATION OF KIMBERLY DOTSON

**FURTHER, DECLARANT SAYETH NAUGHT.**



Kimberly Dotson

My name is Kimberly Dotson, my date of birth is June 8th, 1974, and my mailing address is 5305 Valley View Lane, Farmington, New Mexico. I declare under penalty of perjury that the foregoing is true and correct.

Executed in the State of New Mexico, County of San Juan on the 4th day of April 2024.

Kimberly Dotson

**CERTIFICATE OF SERVICE**

I hereby certify that the foregoing was electronically served through the CM/ECF on this 5th day of April 2024 to the following:

Luis Robles
Attorney for City Defendants
500 Marquette Ave., NW, Suite 700
Albuquerque, New Mexico 87102
(505) 242-2228
(505) 242-1106 (facsimile)
luis@roblesrael.com

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF NEW MEXICO

ERNEST PADILLA, PERSONAL REPRESENTATIVE
OF THE ESTATE OF ROBERT DOTSON, DECEASED;
KIMBERLY DOTSON,
INDIVIDUALLY AND AS PARENT AND NEXT FRIEND
OF JULIA
DOTSON; AND ZACHARY-MORA DOTSON,

     Plaintiffs,

vs.

CITY OF FARMINGTON, NEW MEXICO;
DANIEL ESTRADA; DYLAN GOODLUCK;
AND WAYLON WASSON

     Defendants.

Case No. 1:23-cv-00790-MLG-KK

---

## DECLARATION OF JERONIMO "JERRY" RODRIGUEZ

STATE OF FLORIDA

COUNTY OF <u>FLAGLER.</u>

    Jeronimo Rodriguez, under penalty of perjury, states the following:

1. My name is Jeronimo Rodriguez. I go by Jerry Rodriguez. I know the facts contained in
   this declaration from my review of certain records and documents arising out of and related
   to the shooting of Robert Dotson on April 5, 2023, by three Farmington, New Mexico
   police officers, Officer Wasson, Officer Estrada, and Officer Goodluck. The opinions
   stated in this affidavit are opinions reached and held by me based upon my review of the

---



materials listed in Exhibit "A" and upon my specialized training, skills, education, knowledge, and experience.

2. My curriculum vitae is attached as Exhibit "B," which explains my experience more thoroughly.

3. I began my policing career in the summer of 1986. I was an active police officer for 35 years and recently retired from active duty.

4. Since retiring as a law enforcement officer in 2021, I have reviewed and consulted on police and law enforcement practices as a private police consultant.

5. Since 2018, I have provided law enforcement training and management insight for various agencies throughout the United States. I have provided law enforcement training in the following areas:

- Investigation of critical incidents,
- Police involved in traffic collisions,
- Officer-involved shootings, uses of lethal force investigations,
- Managing the Internal Affairs function,
- Police discipline, criminal and administrative,
- Investigative procedures and supervision,
- Policy and procedure development,
- Vehicle Pursuit investigations and adjudication.

6. While an active law enforcement officer, executive staff officer, and chief, I have been consulted by cities and policing organizations on both the east and west coasts of the United States on matters involving police critical incidents, uses of force, lethal and nonlethal force, in-custody death investigations, police misconduct investigations, and traffic collisions investigations and adjudications.

7. Since 1996, I have been directly involved in investigating, overseeing, and adjudicating several hundred police-involved critical incidents, including traffic collisions. I have also

taken part in and been the architect of investigative policies and procedures that incorporate generally accepted police investigative best practices for police agencies, specifically the Los Angeles Police Department, the Baltimore Police Department, and the San Francisco District Attorney's Office, Bureau of Independent Investigations. I also updated and, in some cases, drafted policies and procedures for agencies such as the Los Angeles Police Department, the Baltimore Police Department, and the San Francisco District Attorney Investigators regarding handling critical incidents.

## SPECIALIZED POLICE TRAINING

8.  I am a former Police Captain of the Los Angeles Police Department. I served as a police officer in the Los Angeles Police Department for over twenty-six years until I retired in 2013 from the Los Angeles Police Department. During that period, I served as a patrol officer, field training officer, vice undercover investigator, use of force staff researcher, field supervisor, lieutenant, and patrol captain. I have also been involved in police training on subjects such as investigating allegations of police misconduct, police pursuits, review and adjudication of officers involved in traffic collisions, officer-involved uses of force, death investigations, and the adjudication of police administrative incidents.

9.  I also oversaw and managed the Baltimore Police Department's Professional Standards and Accountability Bureau.

10. During my 35 years of policing, I have developed specialized training, skills, knowledge, and experience in police practices, police enforcement activities, and accident review and

adjudication. Starting in late 1986, as a new police officer, I began to develop my skills in policing and investigated or assisted in investigating police-involved traffic accidents.

11. My review of police enforcement activity and traffic accidents began when I was promoted to patrol sergeant and continued as a lieutenant and captain. While assigned as the deputy police commissioner and chief of investigations, I also adjudicated police-related incidents and police-involved accidents involving members of my respective agency.

12. In each of these jobs, I investigated police-involved shootings. I have been involved in disciplining officer(s), up to and including termination, for their use of excessive, unreasonable, or out-of-policy on multiple occasions.

13. I am familiar with generally accepted police practices, which include tactics, techniques, and the determination of the reasonableness of police officers' actions in making decisions that ultimately lead to the discharge of the officer's weapons at another person.

14. I am familiar with the Supreme Court case of *Graham v. Connor*, setting the general rules that govern the determination of reasonableness, excessive force, and qualified immunity. I have taught and continue to teach the principles from that case and principles governing the police officers' use of force, lethal and nonlethal force.

15. I have been qualified as an expert witness on the use of force and the reasonableness of the force used by police in several lawsuits. To my knowledge, my opinions have never been stricken by any Court.

16. My understanding of the facts, based on the materials I reviewed, is that Officers Wasson, Estrada, and Goodluck were dispatched to 5308 Valley View Lane in Farmington, New Mexico, in the late evening hours of April 5, 2023, for a domestic dispute. The Officers arrived and, following the lead of Officer Wasson, a senior Officer, went to the wrong

address. Instead of going to 5308 Valley View Lane, the address to which they were dispatched, the Officers went to 5305 Valley View Lane. This address was across the street on the right and about 3 houses down from the address to which the Officers had been dispatched, which was on the left side.

17. On April 5, 2023, Robert and Kimberly Dotson and their children resided at 5305 Valley View.

18. Officer Wasson and the other Officers walked by the visible and illuminated address number "5305" on the side of the Dotson residence. I do not see how it would be possible to mistake a five for an eight in 5305, as the Officer Wasson says he did by contacting the wrong location.

19. The first thing that officers are trained to do is verify /confirm that they are at the right address. This is such a fundamental topic (ensure to respond to the right address) that it is taught early on to recruits in the academy and possibly also discussed at the planning stages of a search warrant service. These officers' deviation from such fundamental and basic police practices (to verify the address and compare it to the radio call address) is perplexing to me. While history has shown this to have happened in the past by other agencies, the experience has also shown us the possible dire consequences of such a mistake. As a police officer, responding to the accurate location (where your services have been requested) is one of the most basic and fundamental lessons taught early in my career.

20. This is despite Officer Wasson being alerted by Officer Goodluck that they were not at the correct address, as reflected in Exhibits E, K, L, and M in the Motion for Summary Judgment. Officer Wasson, in my opinion, pushed back, telling the junior officer (Officer Goodluck) not to question him again. I have experienced this behavior where senior

officers like Officer Wasson are not open to being questioned by junior officers. This, in my opinion, was a defining moment when the officers had an opportunity to correct what would soon lead to the tragic consequences of their mistake.

21. Officer Wasson's response to Officer Goodluck was for Officer Goodluck not to tell him he was wrong. Based on my specialized training, experience, skills, and knowledge of policing, this sounds to me more like a senior Officer who is keeping a trainee in his place rather than allowing the junior officer to express his concerns, which, in my opinion, is how we want to develop our trainees. This interaction is more likely than not indicative of a culture within the Farmington Police Department in which senior officers are not to be corrected by junior Officers. Generally accepted best practices encourage officers who see a potential issue to address the issue if tactically permissible. Officer Wasson's cavalier response to Officer Goodluck could lead someone to believe Officer Wasson was less interested in being at the correct address and more interested in being right, regardless of the consequences.

22. This is further borne out by Officer Goodluck's knowledge that the Officers were at the wrong address. I have been exposed to many similar situations where the junior officer was, more likely than not, either intimidated, too embarrassed, or fearful to correct the other, more senior officers and point out definitively that they were at the wrong address. Which Officer Goodluck attempted to do, based on his actions, I believe Officer Goodluck knew there was an issue (Ex. E, K, L, M).

23. The fact that the officers were obviously at the wrong address and did not confirm and recognize that they were at the wrong address, in my opinion, led directly to the officers' use of deadly force against Robert Dotson.

---

24. Being at the wrong address and their unwillingness to realize or even notice the signs (street address visible on the house) that they were at the wrong address highlights for me the cavalier, callous, and the unprofessional attitudes of the officers, especially by Officer Wasson. In my opinion, the officers consciously ignored the signs, evidence, and claim by Officer Goodluck, that they may be at the wrong address. Experience has shown that radio calls of domestic incidents are very serious and often may result in violence toward the officers. However, when you consider the potential seriousness of these types of radio calls and compare it with Officer Wasson's joking, cavalier approach and his less-than-sound tactics of standing directly in front of the door and holding the outer door with one hand, it does not appear he was not taking the call seriously. When he heard noises from inside the residence, and the door finally opened, it caught Officer Wasson by surprise; it appeared his focus was not on the radio call and its potential hazards. Based on my experience, once Officer Wasson was questioned about the possibility that they were at the wrong address, he should have taken affirmative steps to compare the dispatched address (5308) with the actual address of the residences which they were standing in front of (5305). In my opinion, the attitude about having been at the wrong address was down-downplayed, yet this error set this tragic incident in motion. The lack of concern that they were possibly about to encounter people at the wrong address, who had not done anything wrong, had committed no crimes, were not under investigation, and had not called the Police Department for any reason was evident on the part of the responding officers.

25. Although Officer Wasson knocked on the door of the Dotson residence more than once and announced "Farmington Police" more than once, it is obvious that the Dotsons did not hear the announcement, nor did they know that police were at the door. This is reflected

both by the telephone call from Julia Dotson to 911, reporting that someone had shot her father, and by Kim Dotson's response after Officer Goodluck finally identified themselves as police. However, this was not until after firing at her and after having killed her husband, Robert Dotson. Furthermore, the house was two stories, and the announcement was made in a normal tone.   The police could not and should not have assumed that their announcement had been heard. I have had many occasions where residents did not hear the verbal announcement by police but heard the door knocks.

26. Another well-known principle of generally accepted police practices is to listen for sounds inside the house when Officers are called to a domestic violence disturbance. The reason for such a tactic is, often, in domestic situations, those involved are alleged to be arguing and yelling. Taking time to listen to what may or may not be occurring in the residence is very beneficial to responding officers.  The officers, in this case, did not listen at all. There was no loud noise coming from within the house, nor any noise at all, and this should have led them to consider possibly that they were at the wrong address. However, based on their documented action and their body-worn videos, it did not appear to have been considered or mentioned. It is my opinion that based on Officer Goodluck's prior question about possibly not being at the right address and the fact that they could not hear any evidence of a domestic disturbance, even though dispatch said you could hear people yelling, should have caused the officer to verify that they were at the right address. However, that did not happen.

27. Robert Dotson opened the door with a gun in his hand. He had the right to have that gun in his hand, in his own house, and was exercising his Second Amendment Rights. The Farmington Police Chief held a televised news interview with Dan Abrams on April 17,

2023, in which the Chief acknowledged that Robert Dotson had not done anything wrong. He went on to say that within the Farmington community, there is a gun culture, which the officers were well aware of and supported. If that is the case, I do not understand why the officers' tactics did not account for this. It was alleged that when Robert Dotson opened the door, it was in an aggressive manner. I have watched the body-worn video on many occasions, and I did not see any evidence to support that statement. The front door would be opened to the inside, and the screen door was pushed open; however, I did not see it done in an aggressive manner, as claimed. Mr. Dotson immediately encountered bright lights shining in his face. This is a common tactic by police that serves two purposes: one, it illuminates the subject, in this case, Robert Dotson, and the other, it tends to obscure the subject's ability to see the officers through the bright lights. None of the officers announced themselves as police when Robert Dotson opened the door; this, to me, is a critical issue. Robert Dotson did not expect the police; he never heard the officers announce themselves and could not see/or make out who was in the darkened yard through the bright lights of the officers' flashlights. Instead, Officer Wasson told Mr. Dotson to raise his hands and then virtually instantaneously started firing at him (Ex. K, L, M, P.) This, to me, was a tactical error by the officers, given the very real possibility that Robert Dotson did not know who was at the door at this late hour, Officer Wasson should first made it clear they were the police by yelling Farmington Police. He could have then said something like raise your hand or drop the weapon. Instead, Officer Wasson, followed by the other officers, immediately opened fire at Robert Dotson and into the inhabited residence.

28. I do not believe Mr. Dotson was aiming his gun at anyone. He did not know where anyone was located in his yard, and he did not know that they were police officers. Shots were

fired less than a second from the time Officer Wasson told Mr. Dotson to raise his hands. Additionally, Robert Dotson never fired his weapon.

29. Officer Estrada stated he was mainly concerned with his trainee's performance and was not looking or didn't catch the mistaken address. First and foremost, Officer Estrada is a senior officer tasked with ensuring they are approaching the correct address. Even after hearing his trainee's concern that they were at the wrong address, Officer Estrada did not take action to verify the accuracy of their location.

30. When officers give commands like: Let me see your hands or show me your hands, it is usually when the person (or subject) being commanded knows the commands are coming from a uniformed police officer. Mr. Dotson did not know who had knocked at his door in this case and never saw a parked police vehicle or uniformed officers. He could not make out who was in the shadows.

31. In the documents, it alleged that Mr. Dotson committed a felony when he pointed a gun at officers. Mr. Dotson did not know they were officers; Mr. Dotson was taking steps to protect his wife, children, and home at a late hour. Also, I question the conclusion that Robert Dotson pointed a gun at officers based on the materials reviewed. It is unclear to me what his intent was, and I certainly cannot say that Robert Dotson knowingly pointed his weapon at police officers. Especially when no one at the residence knew or heard of officers being at their residence until well after Robert Dotson was shot and killed.

32. The police had at least 5 seconds from the time Officer Wasson said, "Oh shit," and started backing up until shots were fired at Mr. Dotson. Based on generally accepted police practices, the proper procedure would have been to announce themselves as "Farmington Police" followed by the command "drop your weapon," and the command "raise your

hands," although this command was given too late, it could only worsen the situation if followed. These opinions are based on my over 35 years of specialized police experience, training, skills, and knowledge, which spanned both coasts and four different law enforcement agencies. See Exhibits K, L, M, and P.

33. It is my opinion that had the police officers demonstrated proper focus and attention to duty from the onset, it would, more likely than not, have prevented them from mistakenly going to 5305 Valley View instead of 5308 Valley View. It is further my opinion that had the officers paid closer attention to the surroundings as they approached the location, it would have more likely than not led to their learning of their mistake. Their conduct was unreasonable as set forth above. The use of force was unreasonable. It was unreasonable for Officer Goodluck not to forcefully inform the other officers that they were at the wrong address. It was not reasonable for Officer Estrada not to confirm the correct address. He was, first and foremost, a senior police officer on the scene, not just an FTO.

34. The police assumptions, if in fact there were any, were also unreasonable. They had no reason to be at 5305 Valley View Lane. The homeowners did not know they were police officers, and the officers should have known that in this two-story house, Officer Wasson's announcement may not have been heard or was not heard. To me, their inability to hear Officer Wasson was evident by the fact that Robert Dotson did not immediately come downstairs and open the door.

**FURTHER, DECLARANT SAYETH NAUGHT**.

Jeronimo Rodriguez

My name is Jeronimo Rodriguez, my date of birth is September 30, 1963, and my mailing address is 2 Pine Cone Dr., Unit 350297, Palm Coast, FL 32137. I declare under penalty of perjury that the foregoing is true and correct.

Executed in the State of Florida, County of Flagler, on the 5 day of April of 2024.

Jeronimo Rodriguez

---

## MATERIALS PROVIDED TO JERONIMO RODRIGUEZ

---

The following records related to the officer-involved shooting of Robert Dotson by three Farmington, New Mexico police officers were provided to Jeronimo "Jerry" Rodriguez for his professional opinion:

1. Complete New Mexico State Police Report, dated 5/31/2023, with exhibits

2. Farmington Police Department's Report, dated (Tom Sent)

3. Prior use of force complaints against all 3 officers

4. All color photographs from the investigations

5. Farmington Police Department's Documentation of Internal Affairs Investigation

6. Photographs of the Dotsons' guns

7. Plaintiff's Original Petition

8. Report Seth Stoughton wrote for the Attorney General's investigation

9. Defendants' Motion for Partial Summary Judgment No. I, with exhibits

10. Defendants' Motion for Partial Summary Judgment No. II, with exhibits

11. Defendants' Motion for Partial Summary Judgment No. III, with exhibits

12. Wasson Notes

13. FPD Case Reports

14. Final Autopsy of Robert Dotson

15. Dotson Family Tree

16. Dotson Ring Camera Transcript



17. Dotson Lapel Camera Video FPD Release\

18. Ring Camera Videos

    a.  2023-04-05_23-47-14
    b.  2023-04-05_23-49-16
    c.  2023-04-06_00-28-02
    d.  2023-04-06_00-39-35
    e.  2023-04-06_00-41-43
    f.  2023-04-06_00-54-17 (1)
    g.  2023-04-06_00-54-17
    h.  2023-04-06_00-56-30
    i.  2023-04-06_00-58-47
    j.  2023-04-06_01-46-17
    k.  2023-04-06_04-16-40
    l.  2023-04-06_04-48-28
    m.  2023-04-06_06-02-00
    n.  2023-04-06_06-05-36
    o.  2023-04-06_06-38-44
    p.  2023-04-06_06-54-12
    q.  2023-04-06_11-16-33
    r.  2023-04-06_11-55-41
    s.  2023-04-06_11-57-01

19. Videos in New Mexico Department of Public Safety

- 12_RingVideo_20230406_020958
- 096_R_CH_2_Data_2023_04_06_00_06_31_by_Start_Time_asc
- 147_R_CH_10_FPD_Primary_2023_04_06_01_06_55_by_Start_Time_asc
- 166_R_CH_2_Data_2023_04_06_02_29_13_by_Start_Time_asc
- 169_R_CH_10_FPD_Primary_2023_04_06_03_08_43_by_Start_Time_asc
- 052_R_CH_10_FPD_Primary_2023_04_05_23_53_40_by_Start_Time_asc
- 053_R_CH_2_Data_2023_04_05_23_53_46_by_Start_Time_asc
- 073_R_CH_10_FPD_Primary_2023_04_05_23_59_35_by_Start_Time_asc
- 120_R_CH_10_FPD_Primary_2023_04_06_00_46_25_by_Start_Time_asc
- 138_R_CH_10_FPD_Primary_2023_04_06_00_55_43_by_Start_Time_asc
- 140_R_CH_10_FPD_Primary_2023_04_06_00_55_55_by_Start_Time_asc
- 149_R_CH_10_FPD_Primary_2023_04_06_01_07_10_by_Start_Time_as
- 152_R_CH_10_FPD_Primary_2023_04_06_01_08_31_by_Start_Time_asc
- 165_R_CH_2_Data_2023_04_06_02_29_10_by_Start_Time_asc
- 036_R_CH_10_FPD_Primary_2023_04_05_23_51_33_by_Start_Time_asc
- 047_R_CH_10_FPD_Primary_2023_04_05_23_52_48_by_Start_Time_asc
- 048_R_CH_10_FPD_Primary_2023_04_05_23_52_51_by_Start_Time_asc
- 050_R_CH_10_FPD_Primary_2023_04_05_23_53_36_by_Start_Time_asc
- 057_R_CH_10_FPD_Primary_2023_04_05_23_54_27_by_Start_Time_asc

- 066_R_CH_10_FPD_Primary_2023_04_05_23_57_31_by_Start_Time_asc
- 070_R_CH_10_FPD_Primary_2023_04_05_23_58_13_by_Start_Time_asc
- 083_R_CH_10_FPD_Primary_2023_04_06_00_01_49_by_Start_Time_asc
- 085_R_CH_10_FPD_Primary_2023_04_06_00_02_16_by_Start_Time_asc
- 091_R_CH_10_FPD_Primary_2023_04_06_00_05_36_by_Start_Time_asc
- 097_R_CH_10_FPD_Primary_2023_04_06_00_06_43_by_Start_Time_asc
- 098_R_CH_10_FPD_Primary_2023_04_06_00_06_49_by_Start_Time_asc
- 101_R_CH_10_FPD_Primary_2023_04_06_00_07_12_by_Start_Time_asc
- 109_R_CH_10_FPD_Primary_2023_04_06_00_09_27_by_Start_Time_asc
- 110_R_CH_10_FPD_Primary_2023_04_06_00_09_30_by_Start_Time_asc
- 117_R_CH_10_FPD_Primary_2023_04_06_00_30_24_by_Start_Time_asc
- 119_R_CH_10_FPD_Primary_2023_04_06_00_46_06_by_Start_Time_asc
- 141_R_CH_10_FPD_Primary_2023_04_06_00_58_06_by_Start_Time_asc
- 142_R_CH_10_FPD_Primary_2023_04_06_00_58_09_by_Start_Time_asc
- 143_R_CH_10_FPD_Primary_2023_04_06_00_58_12_by_Start_Time_asc
- 145_R_CH_10_FPD_Primary_2023_04_06_00_58_30_by_Start_Time_asc
- 160_R_CH_2_Data_2023_04_06_02_25_24_by_Start_Time_asc
- 170_R_CH_10_FPD_Primary_2023_04_06_03_08_46_by_Start_Time_asc
- 025_R_CH_10_FPD_Primary_2023_04_05_23_50_03_by_Start_Time_asc
- 028_R_CH_10_FPD_Primary_2023_04_05_23_50_35_by_Start_Time_asc
- 035_R_CH_2_Data_2023_04_05_23_51_32_by_Start_Time_asc
- 041_R_CH_10_FPD_Primary_2023_04_05_23_52_03_by_Start_Time_asc
- 065_R_CH_1_SO_Primary_2023_04_05_23_57_30_by_Start_Time_asc
- 087_R_CH_10_FPD_Primary_2023_04_06_00_04_23_by_Start_Time_asc
- 093_R_CH_2_Data_2023_04_06_00_06_14_by_Start_Time_asc
- 095_R_CH_10_FPD_Primary_2023_04_06_00_06_28_by_Start_Time_asc
- 099_R_CH_10_FPD_Primary_2023_04_06_00_07_00_by_Start_Time_asc
- 100_R_CH_10_FPD_Primary_2023_04_06_00_07_09_by_Start_Time_asc
- 116_R_CH_10_FPD_Primary_2023_04_06_00_30_21_by_Start_Time_asc
- 122_R_CH_10_FPD_Primary_2023_04_06_00_47_06_by_Start_Time_asc
- 128_R_CH_10_FPD_Primary_2023_04_06_00_49_41_by_Start_Time_asc
- 129_R_CH_10_FPD_Primary_2023_04_06_00_50_32_by_Start_Time_asc
- 131_R_CH_10_FPD_Primary_2023_04_06_00_50_59_by_Start_Time_asc
- 150_R_CH_10_FPD_Primary_2023_04_06_01_08_16_by_Start_Time_asc
- 153_R_CH_10_FPD_Primary_2023_04_06_01_15_30_by_Start_Time_asc
- 155_R_CH_10_FPD_Primary_2023_04_06_01_15_44_by_Start_Time_asc
- 161_R_CH_2_Data_2023_04_06_02_25_29_by_Start_Time_asc
- 163_R_CH_2_Data_2023_04_06_02_26_45_by_Start_Time_asc
- 026_R_CH_10_FPD_Primary_2023_04_05_23_50_06_by_Start_Time_asc
- 031_R_CH_10_FPD_Primary_2023_04_05_23_50_59_by_Start_Time_asc
- 032_R_CH_10_FPD_Primary_2023_04_05_23_51_09_by_Start_Time_asc
- 040_R_CH_2_Data_2023_04_05_23_51_52_by_Start_Time_asc
- 046_R_CH_10_FPD_Primary_2023_04_05_23_52_42_by_Start_Time_asc

MATERIALS PROVIDED TO JERONIMO RODRIGUEZ

- 058_R_CH_10_FPD_Primary_2023_04_05_23_54_31_by_Start_Time_asc
- 061_R_CH_10_FPD_Primary_2023_04_05_23_55_16_by_Start_Time_asc
- 064_R_CH_10_FPD_Primary_2023_04_05_23_57_25_by_Start_Time_asc
- 090_R_CH_10_FPD_Primary_2023_04_06_00_04_43_by_Start_Time_asc
- 107_R_CH_2_Data_2023_04_06_00_09_07_by_Start_Time_asc
- 108_R_CH_2_Data_2023_04_06_00_09_13_by_Start_Time_asc
- 137_R_CH_10_FPD_Primary_2023_04_06_00_54_58_by_Start_Time_asc
- 144_R_CH_10_FPD_Primary_2023_04_06_00_58_25_by_Start_Time_asc
- 172_R_CH_10_FPD_Primary_2023_04_06_03_08_58_by_Start_Time_asc
- 175_R_CH_10_FPD_Primary_2023_04_06_03_17_37_by_Start_Time_asc
- 043_R_CH_10_FPD_Primary_2023_04_05_23_52_16_by_Start_Time_asc
- 051_R_CH_2_Data_2023_04_05_23_53_37_by_Start_Time_asc
- 059_R_CH_10_FPD_Primary_2023_04_05_23_55_03_by_Start_Time_asc
- 072_R_CH_10_FPD_Primary_2023_04_05_23_59_30_by_Start_Time_asc
- 078_R_CH_10_FPD_Primary_2023_04_06_00_00_49_by_Start_Time_asc
- 084_R_CH_10_FPD_Primary_2023_04_06_00_01_54_by_Start_Time_asc
- 088_R_CH_10_FPD_Primary_2023_04_06_00_04_28_by_Start_Time_asc
- 136_R_CH_10_FPD_Primary_2023_04_06_00_54_51_by_Start_Time_asc
- 146_R_CH_10_FPD_Primary_2023_04_06_01_04_58_by_Start_Time_asc
- 168_R_CH_2_Data_2023_04_06_02_29_37_by_Start_Time_asc
- 062_R_CH_10_FPD_Primary_2023_04_05_23_56_38_by_Start_Time_asc
- 063_R_CH_10_FPD_Primary_2023_04_05_23_56_44_by_Start_Time_asc
- 068_R_CH_1_SO_Primary_2023_04_05_23_57_46_by_Start_Time_asc
- 071_R_CH_10_FPD_Primary_2023_04_05_23_58_18_by_Start_Time_asc
- 092_R_CH_10_FPD_Primary_2023_04_06_00_05_39_by_Start_Time_asc
- 106_R_CH_2_Data_2023_04_06_00_08_59_by_Start_Time_asc
- 112_R_CH_10_FPD_Primary_2023_04_06_00_29_43_by_Start_Time_asc
- 114_R_CH_10_FPD_Primary_2023_04_06_00_30_01_by_Start_Time_asc
- 118_R_CH_10_FPD_Primary_2023_04_06_00_46_01_by_Start_Time_asc
- 126_R_CH_10_FPD_Primary_2023_04_06_00_49_25_by_Start_Time_asc
- 148_R_CH_10_FPD_Primary_2023_04_06_01_06_58_by_Start_Time_asc
- 030_R_CH_10_FPD_Primary_2023_04_05_23_50_52_by_Start_Time_asc
- 054_R_CH_10_FPD_Primary_2023_04_05_23_53_46_by_Start_Time_asc
- 056_R_CH_10_FPD_Primary_2023_04_05_23_54_19_by_Start_Time_asc
- 067_R_CH_1_SO_Primary_2023_04_05_23_57_33_by_Start_Time_asc
- 069_R_CH_1_SO_Primary_2023_04_05_23_58_09_by_Start_Time_asc
- 080_R_CH_10_FPD_Primary_2023_04_06_00_01_06_by_Start_Time_asc
- 102_R_CH_2_Data_2023_04_06_00_08_18_by_Start_Time_asc
- 113_R_CH_10_FPD_Primary_2023_04_06_00_29_54_by_Start_Time_asc
- 173_R_CH_10_FPD_Primary_2023_04_06_03_09_03_by_Start_Time_asc
- 027_R_CH_10_FPD_Primary_2023_04_05_23_50_20_by_Start_Time_asc
- 089_R_CH_10_FPD_Primary_2023_04_06_00_04_37_by_Start_Time_asc
- 151_R_CH_10_FPD_Primary_2023_04_06_01_08_20_by_Start_Time_asc

- 156_R_CH_10_FPD_Primary_2023_04_06_01_21_59_by_Start_Time_asc
- 049_R_CH_10_FPD_Primary_2023_04_05_23_53_18_by_Start_Time_asc
- 060_R_CH_10_FPD_Primary_2023_04_05_23_55_08_by_Start_Time_asc
- 076_R_CH_10_FPD_Primary_2023_04_06_00_00_26_by_Start_Time_asc
- 127_R_CH_10_FPD_Primary_2023_04_06_00_49_33_by_Start_Time_asc
- 139_R_CH_10_FPD_Primary_2023_04_06_00_55_45_by_Start_Time_asc
- 154_R_CH_10_FPD_Primary_2023_04_06_01_15_33_by_Start_Time_asc
- 022_R_CH_10_FPD_Primary_2023_04_05_23_49_22_by_Start_Time_asc
- 042_R_CH_10_FPD_Primary_2023_04_05_23_52_07_by_Start_Time_asc
- 079_R_CH_10_FPD_Primary_2023_04_06_00_00_58_by_Start_Time_asc
- 104_R_CH_2_Data_2023_04_06_00_08_40_by_Start_Time_asc
- 133_R_CH_10_FPD_Primary_2023_04_06_00_52_22_by_Start_Time_asc
- 171_R_CH_10_FPD_Primary_2023_04_06_03_08_51_by_Start_Time_asc
- 029_R_CH_10_FPD_Primary_2023_04_05_23_50_40_by_Start_Time_asc
- 039_R_CH_10_FPD_Primary_2023_04_05_23_51_40_by_Start_Time_asc
- 055_R_CH_2_Data_2023_04_05_23_53_48_by_Start_Time_asc
- 081_R_CH_10_FPD_Primary_2023_04_06_00_01_21_by_Start_Time_asc
- 105_R_CH_2_Data_2023_04_06_00_08_49_by_Start_Time_asc
- 115_R_CH_10_FPD_Primary_2023_04_06_00_30_12_by_Start_Time_asc
- 023_R_CH_10_FPD_Primary_2023_04_05_23_49_42_by_Start_Time_asc
- 074_R_CH_10_FPD_Primary_2023_04_06_00_00_01_by_Start_Time_asc
- 082_R_CH_10_FPD_Primary_2023_04_06_00_01_39_by_Start_Time_asc
- 164_R_CH_2_Data_2023_04_06_02_26_52_by_Start_Time_asc
- NMSP23072268_CAD
- 024_R_CH_10_FPD_Primary_2023_04_05_23_49_52_by_Start_Time_asc
- 135_R_CH_10_FPD_Primary_2023_04_06_00_52_58_by_Start_Time_asc
- 045_R_CH_10_FPD_Primary_2023_04_05_23_52_31_by_Start_Time_asc
- 124_R_CH_10_FPD_Primary_2023_04_06_00_47_31_by_Start_Time_asc
- 159_R_CH_10_FPD_Primary_2023_04_06_02_03_01_by_Start_Time_asc
- 075_R_CH_10_FPD_Primary_2023_04_06_00_00_10_by_Start_Time_asc
- 077_R_CH_10_FPD_Primary_2023_04_06_00_00_36_by_Start_Time_asc
- 103_R_CH_2_Data_2023_04_06_00_08_28_by_Start_Time_asc
- 158_R_CH_10_FPD_Primary_2023_04_06_02_02_33_by_Start_Time_asc
- 174_R_CH_10_FPD_Primary_2023_04_06_03_17_21_by_Start_Time_asc
- 157_R_CH_10_FPD_Primary_2023_04_06_01_22_11_by_Start_Time_asc
- P029273_6.28.2023_OB.
- 094_R_CH_2_Data_2023_04_06_00_06_18_by_Start_Time_asc
- 130_R_CH_10_FPD_Primary_2023_04_06_00_50_42_by_Start_Time_asc
- 111_R_CH_10_FPD_Primary_2023_04_06_00_09_34_by_Start_Time_asc
- 086_R_CH_10_FPD_Primary_2023_04_06_00_02_22_by_Start_Time_asc
- 037_R_CH_2_Data_2023_04_05_23_51_37_by_Start_Time_asc
- 123_R_CH_10_FPD_Primary_2023_04_06_00_47_13_by_Start_Time_asc
- 125_R_CH_10_FPD_Primary_2023_04_06_00_47_49_by_Start_Time_asc

- 167_R_CH_2_Data_2023_04_06_02_29_16_by_Start_Time_asc
- 2023_PII__NCIC__Medical__and_Law_Enforcement_14-2-1.2_A__5__ (1)
- 2023_PII__NCIC__Medical__and_Law_Enforcement_14-2-1.2_A__5__
- 033_R_CH_10_FPD_Primary_2023_04_05_23_51_14_by_Start_Time_asc
- 121_R_CH_10_FPD_Primary_2023_04_06_00_46_33_by_Start_Time_asc
- 162_R_CH_2_Data_2023_04_06_02_25_33_by_Start_Time_asc
- 134_Position_7_2023_04_06_00_52_47_by_Start_Time_asc
- 038_Position_5_2023_04_05_23_51_38_by_Start_Time_asc
- 044_Position_15_2023_04_05_23_52_27_by_Start_Time_asc
- 132_Position_6_2023_04_06_00_51_50_by_Start_Time_asc
- BingLin_202304060246_VXL1014281_31158154 (1)
- BingLin_202304060246_VXL1014281_31158154
- MatthewBurns_202304060054_WFC1055384_93547646
- BingLin_202304060246_VXL1014281_31158153 (1)
- BingLin_202304060246_VXL1014281_31158153
- BingLin_202304060518_VXL1014281_31176766 (1)
- BingLin_202304060518_VXL1014281_31176766
- DustinParsons_202304060928_10790_25668342
- 034_Position_7_2023_04_05_23_51_21_by_Start_Time_asc
- Jasperdomenici_202304061305_WFC1065098_123390366
- BrianCastillo_202304052345_VXL1005461_46469759
- Final_142E5E15BDB9-04-06-23-0545-04-06-23-0600-e596a5e5-fb6b-4077-a658-30cf65438d9a
- Final_7C8FDEE740C4-04-06-23-0545-04-06-23-0600-7ccad2fc-2ae6-4e77-b6c0-8afaa5d43935
- BingLin_202304060526_VXL1014281_31177746 (1)
- BingLin_202304060526_VXL1014281_31177746
- BingLin_202304060145_VXL1014281_31151052 (1)
- BingLin_202304060145_VXL1014281_31151052
- JustinAnaya_202304061426_WFC1110041_43539276_redacted
- NMSPR2303499_R
- BingLin_202304060220_VXL1014281_31155446 (1)
- BingLin_202304060220_VXL1014281_31155446
- Final_3802DEFFED89-04-06-23-0545-04-06-23-0600-c7935450-8b80-4c1d-8d51-579f28f1063a
- Final_142E5E15BD7C-04-06-23-0545-04-06-23-0600-6e0250f5-76a2-4e31-ac18-dbdd86d6e0d2
- BingLin_202304060143_VXL1014281_31151051 (1)
- BingLin_202304060143_VXL1014281_31151051
- Jasperdomenici_202304060937_WFC1065098_123365370
- JustinAnaya_202304060936_WFC1110041_43504574
- Jasperdomenici_202304061401_WFC1065098_123397162
- JustinAnaya_202304061313_WFC1110041_43530561

- KrisKowalski_202304061820_10636_49296987
- Final_88C9B3E97048-04-06-23-0545-04-06-23-0600-c293f2c3-cad6-4fa6-a960-057a18e7356f
- Jasperdomenici_202304061841_WFC1065098_123429761
- LucasHarper_202304060109_VXL1005309_100185488
- Unknown_202304060557_InterviewR_271109714
- Jasperdomenici_202304061147_WFC1065098_123381077
- KennethRaybon_202304060222_WFC1060855_113572033
- Jasperdomenici_202304061713_WFC1065098_123419878
- BingLin_202304060332_VXL1014281_31164049 (1)
- BingLin_202304060332_VXL1014281_31164049
- StormTallbull_202304060029_10561_43063905
- JoseHernandez_202304052349_WFC1055355_42945134
- BingLin_202304060208_VXL1014281_31154063 (1)
- BingLin_202304060208_VXL1014281_31154063
- JustinAnaya_202304060917_WFC1110041_43502248
- BingLin_202304060243_VXL1014281_31158152 (1)
- BingLin_202304060243_VXL1014281_31158152
- ChristopherLamonica_202304060201_VXL1005419_81896963
- Unknown_202304060635_InterviewR_271109715
- JustinAnaya_202304061428_WFC1110041_43539277_redacted
- BrandonHardy_202304060105_WFC1151068_6471841
- JustinAnaya_202304061419_WFC1110041_43538496
- KrisKowalski_202304061820_WFC1138094_1897786
- ManuelitoBenallie_202304060651_VXL1005463_122304271
- JonathonThornton_202304060454_WFC1055401_123729092
- BingLin_202304052349_VXL1014281_31139826_Redacted
- MatthewBurns_202304052350_10811_202601033 (1)
- MatthewBurns_202304052350_10811_202601033
- WaylonWasson_202304052345_10567_31010817 (1)
- WaylonWasson_202304052345_10567_31010817
- JustinAnaya_202304060216_WFC1110041_43451726
- Jasperdomenici_202304061833_WFC1065098_123429760
- BingLin_202304060221_VXL1014281_31155447 (1)
- BingLin_202304060221_VXL1014281_31155447
- BingLin_202304060547_VXL1014281_31180322 (1)
- BingLin_202304060547_VXL1014281_31180322
- BingLin_202304060359_VXL1014281_31167286 (1)
- BingLin_202304060359_VXL1014281_31167286
- Jasperdomenici_202304061823_WFC1065098_123428532
- StormTallbull_202304060030_WFC1068131_93242626
- CallieBoyd_202304052349_9845_202536815
- BingLin_202304060255_VXL1014281_31159679 (1)

- BingLin_202304060255_VXL1014281_31159679
- Jasperdomenici_202304061122_WFC1065098_123377990
- EthanGraff_202304052350_10838_14074000
- TyrellJohnson_202304060220_10553_44777955 (1)
- TyrellJohnson_202304060220_10553_44777955
- KennethRaybon_202304060159_WFC1060855_113569230
- EdwardoArreola_202304052343_10841_20533376
- BingLin_202304060431_VXL1014281_31171126 (1)
- BingLin_202304060431_VXL1014281_31171126
- BrandonHardy_202304052350_WFC1151068_6462792_Redacted
- ChristopherLamonica_202304060221_VXL1005419_81899342_Redacted
- CallieBoyd_202304052350_WFC1125153_99533940
- BingLin_202304060053_VXL1014281_31145023_Redacted (1)
- BingLin_202304060053_VXL1014281_31145023_Redacted
- Jasperdomenici_202304060910_WFC1065098_123362162
- BillyCancino_202304052353_10807_15627732 (1)
- BillyCancino_202304052353_10807_15627732
- JamesPrince_202304052349_10833_11044535
- WaylonWasson_202304052345_WFC1068148_24610052
- StormTallbull_202304052350_WFC1068131_93237829
- AndrewStandley_202304052350_VXL1004867_14488774 (1)
- AndrewStandley_202304052350_VXL1004867_14488774
- EthanGraff_202304052351_WFC1138160_2149088_Redacted
- DanielEstrada_202304052345_WFC1146750_87578669
- TyrellJohnson_202304052349_10553_44777954
- RhettSilver_202304052349_10559_204825702
- JarrettDuponte_202304052349_10288_41107988
- DylanGoodluck_202304052346_WFN1006173_22999929
- TyrellJohnson_202304052349_WFC1056591_56376850
- EdwardoArreola_202304052343_WFC1055515_96932264_Redacted
- Unknown_202304060420_InterviewR_271109713
- DylanGoodluck_202304052345_10551_20709675
- JamesPrince_202304060005_VXL1015255_32799769
- ChristopherLamonica_202304052349_10812_15684748
- JarrettDuponte_202304052344_VXL1015041_58847595
- BillyCancino_202304052353_WFC1067480_140983672_Redacted (1)
- BillyCancino_202304052353_WFC1067480_140983672_Redacted
- MatthewBurns_202304052351_WFC1055384_93542395
- BrandonHardy_202304060006_WFC1151068_6464813 (1)
- BrandonHardy_202304060006_WFC1151068_6464813
- JDCook_202304052350_WFC1062880_216272631
- RhettSilver_202304052350_WFC1138178_1772305
- ChristopherLamonica_202304052350_VXL1005419_81881151

- Unknown_202304060053_InterviewR_255684457
- BingLin_202304052349_10554_23251651 (1)
- BingLin_202304052349_10554_23251651

# JERONIMO "JERRY" RODRIGUEZ

2 Pine Cone Drive, Unit 350297
Palm Coast, Florida 32137
Office (386) 400-2333
Cell (951) 313-3951
www.JRInvestigates.com/

FL-A3200081; FL-C3200062      jrod631@msn.com

Over 35 years of law enforcement experience in all levels; 15 years in upper management and executive levels both within the East and West coast involving four different LE agencies.

## EXPERIENCE

**JULY 2021 – PRESENT**
**POLICE CONSULTANT, EDUCATOR/ POLICE TRAINER,** SELF EMPLOYED

**FEBRUARY 2019 – MAY 2021**
*SPECIAL PROJECT INVESTIGATOR,* SAN LUIS OBISPO COUNTY SHERIFF'S OFFICE, CALIFORNIA
- CAL-ID Program Manager; Special Investigator; Police Trainer

**DECEMBER 2016 – FEBRUARY 2019**
*CHIEF OF INVESTIGATIONS,* SAN FRANCISCO DISTRICT ATTORNEY'S OFFICE, CALIFORNIA
- Oversaw all Investigations and Investigators involving the District Attorney's Office

**MAY 2015 – SEPTEMBER 2016**
*LAW ENFORCEMENT BUSINESS DEVELOPMENT MANAGER,* NICE SYSTEMS
- Public Safety Division

**JANUARY 2013 – MAY 2015**
*DEPUTY POLICE COMMISSIONER (SWORN),* BALTIMORE POLICE DEPARTMENT, MARYLAND
- Professional Standards & Accountability Bureau

**JULY 1986 – JANUARY 2013**
*CAPTAIN,* LOS ANGELES POLICE DEPARMENT, CALIFORNIA
- Police Officer; Field Training Officer; Undercover Vice Investigator; Sergeant I & II; Lieutenant I & II; Patrol Commanding Officer

## EDUCATION/CERTIFICATIONS

*2022 – LICENSED PRIVATE INVESTIGATIVE AGENCY & PRIVATE INVESTIGATOR LICENSE,* FLORIDA
*2019 – MASTER of SCIENCE in LEADERSHIP,* SAINT MARY'S COLLEGE of CALIFORNIA
*2018 – LLMRI LEGAL & LIABILITY RISK MANAGEMENT INSTITUTE*
*2015 – POLICE CORRECTIONAL TRAINING COMMISSION,* MARYLAND
*2013 – CAL POLICE OFFICER STANDARDS & TRAINING (POST),* CALIFORNIA
*2011 – ADVANCED NIMS/ICS,* TEXAS A & M
*2010 – MANAGEMENT POST CERTFICIATE,* CALIFORNIA


PLAINTIFF'S EXHIBIT B   PENGAD-Bayonne, N. J.

# JERONIMO "JERRY" RODRIGUEZ

2 Pine Cone Drive, Unit 350297
Palm Coast, Florida 32137
Office (386) 400-2333
Cell (951) 313-3951
www.JRInvestigates.com/
jrod631@msn.com

FL-A3200081; FL-C3200062

*2008 – FBI NATIONAL ACADEMY-QUANTICO,* VIRGINIA
*2005 – BACHELOR of SCIENCE in BUSINESS MANAGEMENT,* UNIVERSITY of PHOENIX
*2004 – NTSB MAJOR INCIDENT INVESTIGATION & PHOTO DOCUMENTATION,* VIRGINIA
*2001 – WEST POINT LEADERSHIP,* CALIFORNIA
*2000 – SUPERVISORY LEADERSHIP INSTITUTE,* CALIFORNIA

## TEACHINGS

*2022 - Present – LLRMI,* Various Cities throughout the US, please see attached for specifics
*2022 – TOMBALL POLICE DEPARTMENT,* Texas
*2018 to 2021 – SAN LUIS OBISPO COUNTY SHERIFF'S OFFICE,* California
*2013 to 2015 – BALTIMORE POLICE DEPARTMENT,* Maryland
*2001 to 2013 – LOS ANGELES POLICE DEPARTMENT,* California
*2006 – INTERNATIONAL ASSOCIATION of CHIEF of POLICE,* Florida

## PROFESSIONAL PROGRAMS

*FBI National Academy, Class 234*
*Fingerprinting Identification – Basic Training*
*POST Executive Development I & II*
*Senior Management Institute for Police*
*Command Development*
*Homicide Investigation*
*Officer-Involved Shooting Investigations*
*Internal Affairs Investigations*
*Vice Investigations*
*Narcotics Investigations*

## SKILLS

- Use of Force Investigations (Lethal & Less Lethal), excessive force
- Employee Misconduct, Corruption
- Internal Administrative Investigations
- Police In-Custody Death Investigations
- Internal/External Administration Investigations

- Vice Procedures & Investigations
- Vehicle Pursuit Investigations
- Policy Reviews & Analysis
- Jail Use of Force and Death Investigations
- Employee Investigations (Criminal & Civil)
- Investigative Policies & Procedures

*References available upon request*

# JERONIMO "JERRY" RODRIGUEZ

2 Pine Cone Drive, Unit 350297
Palm Coast, Florida 32137
Office (386) 400-2333
Cell (951) 313-3951
www.JRInvestigates.com/
jrod631@msn.com

FL-A3200081; FL-C3200062

Legal & Liability Risk Management Institute

Training Sites throughout the United States

| | | | | | |
|---|---|---|---|---|---|
| "Internal Affairs Investigative Course: A Comprehensive Look at the Investigative Process and Techniques " | 12/14/2021 | 12/15/2021 | Pickens County Sheriff's Office | Pickens | SC |
| National Internal Affairs Training and Certification | 04/04/2022 | 04/08/2022 | Tennessee Law Enforcement Training Officer's Association | Franklin | TN |
| Internal Affairs Administrative Investigation and Officer Discipline | 04/26/2022 | 04/27/2022 | Rio Rancho Police Department | Rio Rancho | NM |
| Internal Affairs Administrative Investigation and Officer Discipline | 05/25/2022 | 05/26/2022 | Abington Police Department | Abington | PA |
| Internal Affairs Investigation Certification for Jail/Corrections | 06/14/2022 | 06/17/2022 | Kentucky Department of Corrections | LaGrange | KY |
| "Online-You Have Just Been Assigned as the Lead Investigator of an Officer Involved Shooting. Are You Ready? " | 08/03/2022 | 08/03/2022 | | | |
| Internal Affairs Administrative Investigation and Officer Discipline | 08/23/2022 | 08/24/2022 | Columbus Police Department | Columbus | OH |
| Internal Affairs Administrative Investigation and Officer Discipline | 08/30/2022 | 08/31/2022 | Surprise Police Department | Surprise | AZ |
| Online: Investigating Officer Involved Use of Force | 10/06/2022 | 10/06/2022 | | | |
| Internal Affairs Administrative Investigation and Officer Discipline | 11/01/2022 | 11/02/2022 | Tarrant County Sheriff's Department | Fort Worth | TX |
| National Internal Affairs Training and Certification | 11/07/2022 | 11/11/2022 | | Las Vegas | NV |

3

# JERONIMO "JERRY" RODRIGUEZ

2 Pine Cone Drive, Unit 350297
Palm Coast, Florida 32137
Office (386) 400-2333
Cell (951) 313-3951
www.JRInvestigates.com/
FL-A3200081; FL-C3200062               jrod631@msn.com

| | | | | |
|---|---|---|---|---|
| Internal Affairs Investigations | 12/15/2021 | | Pickens | South Carolina |
| National Internal Affairs | 04/08/2022 | | Franklin | Tennessee |
| Officer Involved Shootings Internal Affairs Administrative Investigation and Officer Discipline | 11/29/2022 | 11/30/2022 | Lafayette Parish Sheriff's Office | Scott | LA |
| "Online-You Have Just Been Assigned as the Lead Investigator of an Officer Involved Shooting. Are You Ready? " | 01/05/2023 | 01/05/2023 | Web based | |
| Officer Involved Shootings | 01/11/2023 | 01/12/2023 | Birmingham Police Department | Birmingham | AL |
| Officer Involved Shootings | 01/18/2023 | 01/19/2023 | Tarrant County Sheriff's Department | Fort Worth | TX |
| Officer Involved Shootings | 02/01/2023 | 02/02/2023 | St. Tammany Parish Sheriff's Office | Pearl River | LA |
| Officer Involved Shootings | 02/21/2023 | 02/22/2023 | Virgin Islands Police Department | St Thomas | VI |
| "Online-Managing an Officer Involved Shooting From the Eyes of a Homicide Investigation " | 02/27/2023 | 02/27/2023 | Webinar | |
| 5-Day Use of Deadly Force and Officer Involved Shooting | 03/27/2023 | 03/31/2023 | St. John Parish Sheriff's Office | LaPlace | LA |
| Officer Involved Shooting | 03/09/2023 | 03/12/2023 | Hidalgo Co Sheriff's | Hidalgo Co. Tx |
| Officer Involved Shootings | 04/11/2023 | 04/12/2023 | Hidalgo County Sheriff's Office | |
| 2023 Law Enforcement Liability Risk Management Conference | 05/01/2023 | 05/03/2023 | SDPAA and Safety Benefits Inc. | |
| Officer Involved Shootings | 05/22/2023 | 05/23/2023 | Georgetown Police Dept | |
| Officer Involved Shootings | 04/11/2023 | 04/12/2023 | Hidalgo County Sheriff's Office | |
| 2023 Law Enforcement Liability Risk Management Conference | 05/01/2023 | 05/03/2023 | SDPAA and Safety Benefits Inc. | |
| Officer Involved Shootings | 05/22/2023 | 05/23/2023 | Georgetown Police Department | |
| Internal Affairs Investigations | 05/12/23 | 05/13/23 | Massilon, Ohio, Spark CO. | |

4