## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

_____

ERNEST PADILLA, Personal Representative
of the Estate of ROBERT DOTSON, deceased;
KIMBERLY DOTSON, individually
and as parent and next friend of JULIA DOTSON;
and ZACHARY-MORA DOTSON,

      Plaintiffs,

v.                                   Case No. 1:23-cv-00790-MLG-KK

CITY OF FARMINGTON, NEW MEXICO;
DANIEL ESTRADA; DYLAN GOODLUCK;
and WAYLON WASSON,

      Defendants.

## MEMORANDUM OPINION AND ORDER GRANTING
## DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

The facts presented require the Court to make the difficult decision of determining whether Farmington Police Officers Daniel Estrada, Dylan Goodluck, and Waylon Wasson (collectively "Defendant officers") are shielded from liability for errors that resulted in the death of an innocent man, Robert Dotson. Given controlling precedent, the Court must resolve the question in the affirmative. The Defendant officers are entitled to qualified immunity and their motion for partial summary judgment will be granted. Doc. 42. The Court's reasoning and analysis follow below.

### GENERAL INTRODUCTION

The Defendant officers shot and killed Robert Dotson after mistakenly responding to his home. Doc. 82[1] at 2-3 ¶¶ 8-13. The personal representative of Dotson's estate, Dotson's children,

_____

[1] The operative complaint, Doc. 82, was filed several months after the instant motion for partial summary judgment. Doc. 42. Ordinarily, motions filed pertaining to a superseded complaint are moot. *Urioste v. Corizon & Centurion Health Care Providers*, No. 1:16-CV-00755, 2021 U.S. Dist. LEXIS 87443, at *21 (D.N.M. May 6, 2021). But consistent with the parties' intention to

and his widow (collectively, "Plaintiffs") sued the City of Farmington, New Mexico, and the Defendant officers (collectively, "Defendants"). *See generally id.* Plaintiffs allege violations of their rights secured by the federal and state constitutions, the New Mexico Tort Claims Act, NMSA 1978, §§ 41-4-1 to -30, the New Mexico Wrongful Death Act, NMSA 1978, §§ 41-2-1 to -4, and the New Mexico Civil Rights Act, NMSA 1978, §§ 41-4A-1 to -13. *Id.* at 5-6. The instant matter addresses the Estate's claims that the Defendant officers violated the Fourth Amendment's prohibition against unreasonable seizures by fatally shooting Dotson. *Id.* at 5 ¶¶ 20-21. The Defendants officers moved for partial summary judgment asserting they are entitled to qualified immunity. Doc. 42 at 3.

## UNDISPUTED FACTS[2]

Late in the evening of April 5, 2023, the Defendant officers were dispatched to 5308 Valley View Avenue in Farmington, New Mexico ("Valley View Residence") in response to a possible domestic violence situation. UMFs 1-2; Mot. Ex. A1 at 00:00-00:16 (audio recording of the 911 dispatch describing a domestic disturbance between a man and a woman). Officer Wasson utilized his service vehicle's mobile data terminal ("MDT") to locate the address, incorrectly placing the Valley View Residence on the right (south) side of the street. UMFs 8-10. Independently, and in his own vehicle, Officer Goodluck searched Google Maps to locate the property. UMF 11. Google

---

preserve this motion for resolution on the merits, the Court refrained from dismissing this motion as moot and resolves its arguments herein. *See* Doc. 81.

[2] The undisputed material facts ("UMFs") are drawn from those contained in "City Defendants' Motion for Partial Summary Judgment No. I," Doc. 35, because the Defendant officers incorporated the UMFs set forth in that motion by reference. *See* D.N.M.LR-Civ. 7.1(a) ("A party may adopt by reference . . . other paper by making specific reference to the filing date and docket number of such motion or other paper.").

Maps correctly identified the Valley View Residence as being situated on the left (north) side of Valley View Avenue. *Id.*

After arriving at the scene, the Defendant officers parked their patrol cars down the street from the Valley View Residence.[3] UMFs 17-18. Officer Wasson led Officers Goodluck and Estrada down the right (south) side of Valley View Avenue towards where he thought (incorrectly) the Valley View Residence was located. UMF 22. Although Officer Goodluck continued to question whether the Defendant officers were headed to the correct residence, he deferred to Officer Wasson's seniority and said nothing.[4] UMF 25.

The Defendant officers approached 5305 Valley View Avenue, the Dotsons' residence.[5] UMFs 31. Officers Wasson and Goodluck stepped onto the front porch while Officer Estrada positioned himself in the front yard. UMFs 45-46. A flood light illuminated the area, the Defendant officers were clearly in uniform, and the home was equipped with a video camera doorbell. UMFs 38-39

Officer Wasson approached the front door, knocked, and announced, "Police Department." UMF 48; Mot. Ex. K at 0:01:49-54. Approximately twenty-eight seconds later, he knocked again. UMFs 52-53; Mot. Ex. K at 02:20-02:24. He stated, "Farmington Police." Ex. K 02:33-02:37. After receiving no response, Officer Wasson radioed dispatch and requested that they phone the

---

[3] The Defendant officers did so in accordance with their training when responding to possible domestic violence situations. UMF 19.

[4] Officer Goodluck exited his vehicle saying to himself, "third house on the left," which referred to where Google Maps indicated 5308 Valley View Avenue was located. UMF 14; Mot. Ex. K at 00:06-00:10 (Officer Goodluck's body worn camera footage from April 5, 2023).

[5] Though the house number "5305" was marked and illuminated by a floodlight, UMF 23; Mot. Ex. K at 01:30-01:36, Officer Wasson nevertheless (mistakenly) believed the house number read 5308. UMF 23

911 caller. UMF 60; Mot. Ex. K at 02:50-03:12. Meanwhile, Officer Goodluck repositioned himself in the front yard diagonal to the front door near where Officer Wasson stood. UMF 58; Mot. Ex. K at 02:39-02:46. About thirty-eight seconds after his second announcement, Officer Wasson knocked a third time repeating, "Farmington Police." UMF 61; Mot. Ex. K at 03:10-03:19.

Still receiving no response, Officer Goodluck finally voiced his concern that the Defendant officers went to the wrong address:

Officer Goodluck: It might have been 4308.

Officer Wasson: Is it 43 or 5308?

Officer Goodluck: Yeah, it might have been 5308. Right there.

Officer Wasson: Is this not 5308? That's what it said right there, right?

Officer Goodluck: No. This is 5305, isn't it?

UMF 64; Mot. Ex. L at 03:10-03:23 (Officer Wasson's body worn camera footage from April 5, 2023); Mot. Ex. K at 03:30-03:41. Officer Wasson then asked dispatch to "10-9" (i.e., repeat) the address to which they sent the Defendant officers. Mot. Ex. L at 03:23-03:25; *see also* UMF 65 (explaining "10-9" means to repeat). The dispatcher responded "5308 Valley View Avenue." Mot. Ex. L at 03:26-03:30; UMF 65. Officer Wasson told Officer Goodluck (in a sarcastic tone), "Don't tell me I'm wrong, Dylan."[6] Mot. Ex. L at 03:29-03:31; UMF 67.

Immediately thereafter, Officer Wasson heard footsteps coming from inside the home; they were moving towards the front door. UMFs 69-70. A metallic sound registered, which Officer Wasson perceived to be "the sound of a firearm slide being racked . . . indicating someone within the house was feeding a round of ammunition into the firing chamber of a gun." UMF 71; Mot. Ex. L at 03:35-03:36. Officer Wasson released the screen door, backed into the front yard, and

---

[6] It is undisputed the Defendant officers were at the wrong address. UMF 32.

drew his weapon. Mot. Ex. L at 03:34-03:39; UMF 72. Seeing Officer Wasson's reaction, Officer Goodluck also drew his weapon. Mot. Ex. K at 03:54-03:58; UMF 73. Officer Estrada repositioned himself near Officer Wasson and did the same. Mot. Ex. M at 03:53-03:58 (Officer Estrada's body worn camera footage from April 5, 2023); UMFs 74-75. In the same motion, Officer Estrada turned his flashlight on and directed its beam on the front door. Mot. Ex. M at 03:55-03:58; UMF 78. Officers Wasson and Estrada were situated roughly fifteen feet from the front door. UMFs 86, 88. Officer Goodluck was approximately eighteen feet away. UMF 91.

Dotson emerged, pushed the screen door open, and stepped forward. Mot. Ex. L at 03:38-03:39; UMF 80. He held a firearm in his right hand. Mot. Ex. L at 03:39-03:40; Mot. Ex. K at 03:56-03:58; UMF 80. Without warning, Dotson placed both hands on his firearm and raised it in the direction of Officers Wasson and Estrada. Mot. Ex. L at 03:38-03:39; Mot. Ex. K at 03:57-03:58; UMF 81. The Defendant officers perceived Dotson to present an imminent threat to their safety. UMFs 84, 87, 90.

Officer Wasson shouted to Dotson, "Hey, hands up!" Mot. Ex. L at 03:39-03:40; Mot. Ex. K at 03:58-03:59; UMF 82; *see* UMF 79 (Officer Wasson also calling out, "Hey."). At the same time, Dotson raised his firearm parallel to the ground and pointed it in Officers Wasson and Estrada's direction. UMF 83; Mot. Ex. L at 03:38-03:39. Officer Wasson fired his service weapon. Mot. Ex. L at 03:37-03:41; UMF 92. Officers Estrada and Goodluck fired as well. UMFs 92-93; Mot. Ex. K at 03:58-03:59; Mot. Ex. M, 03:58-03:59. The Defendant officers shot Dotson a total of twelve times. Doc. 82 at 3 ¶ 13. Dotson fell backwards into the residence, and the Defendant officers ceased shooting. UMFs 94-95. Dotson died from his injuries. UMFs 136-37. Just two

seconds elapsed from the moment Dotson opened his front door to the time the Defendant officers shot him.[7] UMF 97.

## PROCEDURAL HISTORY

Plaintiffs sued Defendants, alleging Defendants violated Plaintiffs' rights under federal and state law. *See generally* Doc. 82. The operative complaint asserts a Fourth Amendment unreasonable seizure claim pursuant to 42 U.S.C. § 1983 on behalf of Dotson's Estate. *Id.* at 5 ¶¶ 20-21. Plaintiffs contend that the Defendant officers' application of deadly force on Dotson constitutes an unreasonable and unconstitutional seizure. *Id.* Defendants moved for partial summary judgment asserting that they are entitled to qualified immunity. *See generally* Doc. 42.

## LEGAL STANDARD

A party is entitled to summary judgment if there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "The primary purpose of a summary judgment action is to determine whether factual questions exist such that a trial is necessary." *Mayer Botz Enters. LLC v. Cent. Mut. Ins. Co.*, 720 F. Supp. 3d 1081, 1082 (D.N.M. 2024) (citing *White v. York Int'l Corp.*, 45 F.3d 357, 360 (10th Cir. 1995)). In making that assessment, "the Court examines the factual record and draws all reasonable inferences in the light most favorable to the nonmoving party." *Madera v. Taos Health Sys., Inc.*, No. 1:22-CV-00285, 2025 U.S. Dist. LEXIS 29798, at *4 (D.N.M. Feb. 19, 2025) (citing *EFLO Energy v. Devon Energy Corp.*, 66 F.4th 775, 787 (10th Cir. 2023)).

---

[7]After the Defendant officers shot Dotson, his wife, Kimberly Dotson, found him dead in their front hall. *See* UMF 104. She began screaming. *Id.* In response, Officer Wasson ordered, "Hands up!" causing Mrs. Dotson to open the screen door and fire her gun in the Defendant officers' general direction. UMFs 105-06. Officers Wasson and Estrada returned fire; Officer Goodluck did not. UMFs 113-14. Officer Estrada directed the other Defendant officers to retreat down an alley. UMF 116. Later, other officers arrived on the scene and coaxed Mrs. Dotson to drop her firearm and exit her residence. UMFs 128-30. Thankfully, neither Mrs. Dotson nor the Defendant officers were harmed during the exchange.

Where, as here, the defendants raise qualified immunity, the summary judgment analysis deviates from the standard assessment.[8] *Medina v. Cram*, 252 F.3d 1124, 1128 (10th Cir. 2001) ("Because of the underlying purposes of qualified immunity, [the Tenth Circuit] review[s] summary judgment orders deciding qualified immunity questions differently from other summary judgment decisions."). When a defendant properly invokes the qualified immunity defense, "the burden shifts to the plaintiff to show: (1) a violation of a constitutional right, and (2) that the right was clearly established." *Prince v. Sheriff of Carter Cnty.*, 28 F.4th 1033, 1043 (10th Cir. 2022). "The test is an objective one, and the official's conduct is to be viewed with reference to prior decisional authority establishing the contours of the right at issue." *Madrid v. Padilla*, 699 F. Supp. 3d 1225, 1230 (D.N.M. 2023). "Ordinarily, . . . there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." *Currier v. Doran*, 242 F.3d 905, 923 (10th Cir. 2001)

---

[8] As part of the Civil Rights Act of 1871, Congress enacted 42 U.S.C. § 1983. Section 1983 provides a civil remedy against state actors for any person who suffers a "deprivation of any rights, privileges, or immunities secured by the Constitution[.]" "Although § 1983 . . . facially appear[s] to provide broad relief against public officials who act unlawfully to deprive a person 'of any rights, privileges, or immunities secured by the Constitution,' [its] reach . . . is cabined by the judicially-created doctrine of qualified immunity." Matthew L. Garcia & George Bach, *Iqbal Is Not a Game Changer for Discovery in Civil Rights Cases*, 42 N.M. L. REV. 329, 330-31 (2012). The doctrine "seeks to balance the remedies afforded by § 1983 . . . with the Court's desire to shield public officials 'from undue interference with their duties and from potentially disabling threats of liability.'" *Id.* at 331 (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 806 (1982)). As the Supreme Court explained in *Harlow*:

> Where an official could be expected to know that certain conduct would violate statutory or constitutional rights, he should be made to hesitate; and a person who suffers injury caused by such conduct may have a cause of action. But where an official's duties legitimately require action in which clearly established rights are not implicated, the public interest may be better served by action taken with independence and without fear of consequences.

457 U.S. at 819 (quotation marks omitted).

(citation omitted). A legal principle may be clearly established, however, where the wealth of case law from other jurisdictions has "placed the constitutional question regarding the illegality of the defendant's conduct beyond debate," or "when a public official's conduct is so egregious even a general precedent applies with 'obvious clarity,' . . . notwithstanding the absence of binding authority involving materially similar facts." *Ullery v. Bradley*, 949 F.3d 1282, 1291 (10th Cir. 2020) (first quoting *Cummings v. Dean*, 913 F.3d 1227, 1239 (10th Cir. 2019), then quoting *Lowe v. Raemisch*, 864 F.3d 1205, 1210 (10th Cir. 2017)).

## DISCUSSION

### I.    The Defendant officers acted reasonably in light of the circumstances presented.

"Apprehending a suspect 'by the use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment.'" *Est. of Waterhouse v. Direzza*, 129 F.4th 1212, 1220 (10th Cir. 2025) (quoting *Tennessee v. Garner*, 471 U.S. 1, 7 (1985)). Thus, the question presented is whether the Defendant officers' conduct was reasonable given the circumstances. *Graham v. Connor*, 490 U.S. 386, 397 (1989). The Supreme Court has provided a list of considerations, commonly referred to as the *Graham* factors, to be applied in making that determination. *Id.* at 396. They include: "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.*

### A.    The threat to the safety of the Defendant officers weighs in their favor.

Against this legal backdrop, the Court first assesses whether Dotson posed an immediate threat to the safety of officers or the public, which is the primary consideration in this case. *Pauly v. White*, 874 F.3d 1197, 1215-16 (10th Cir. 2017) (characterizing the threat to safety as "undoubtedly the 'most important' and fact intensive factor in determining the objective

reasonableness of an officer's use of force" (quoting *Bryan v. MacPherson*, 630 F.3d 805, 826 (9th Cir. 2010))). Factors germane to the inquiry include: "(1) whether the officers ordered the suspect to drop his weapon, and the suspect's compliance with police commands; (2) whether any hostile motions were made with the weapon towards the officers; (3) the distance separating the officers and the suspect; and (4) the manifest intentions of the suspect."[9] *Est. of Larsen ex rel. Sturdivan v. Murr*, 511 F.3d 1255, 1260 (10th Cir. 2008).

Here, it is undisputed that Dotson opened his front door with a firearm, placed both hands on the weapon, and raised it in the direction of Officers Wasson and Estrada. Mot. Ex. L at 03:36-03:39.[10] Though Officer Wasson loudly commanded Dotson to put his hands up, he did not comply. UMFs 82-83. Dotson continued to raise his firearm upwards and parallel to the ground. *See id.* at 0:38-0:40. It was only then that all three officers opened fire. *Id.* at 03:40-03:43.

Plaintiffs note that Dotson was never given an explicit command to drop his weapon; Officer Wasson only yelled, "Hands up!"[11] Doc. 55 at 8-9. While true, an officer need not warn a

---

[9] These considerations are collectively referred to as the *Larsen* factors. *See Est. of Taylor*, 16 F.4th at 765.

[10] At the summary judgment stage, the Court must consider all facts in the light most favorable to the nonmoving party and make all reasonable inferences in favor of the nonmovant. *Evans v. Sandy City*, 944 F.3d 847, 852 (10th Cir. 2019). Where video evidence contradicts one party's version of the facts, however, the Court may rely on the video evidence. *Thomas v. Durasanti*, 607 F.3d 655, 659 (10th Cir. 2010); *Scott v. Harris*, 550 U.S. 372, 380 (2007). Here, body worn camera footage from the shooting shows Dotson opening his front door, placing both of his hands on his firearm and raising it parallel to the ground. Mot. Ex. L at 0:03:38-0:03:40. Accordingly, although Plaintiffs' version of the facts asks the Court to infer Dotson raised his firearm to comply with Officer Wasson's command, the uncontroverted video evidence demonstrates Dotson raised his firearm in a shooting stance, not in a manner indicating surrender. *Id.*

[11] In *Redd v. City of Oklahoma City*, the Tenth Circuit analyzed a similar set of facts where an officer told a suspect, "don't do it" after the suspect reached for his firearm. No. 20-6145, 2021 U.S. App. LEXIS 26396, at *6 (10th Cir. Sept. 1, 2021). The *Redd* court resolved the first *Larsen* factor in the officer's favor, stating, "[a]t the very least, it is an order to stop doing something. And in the context of a person armed with and apparently drawing a gun, the order was sufficiently

suspect of the danger of not complying with a command if doing so is not feasible. *Est. of Smart v. City of Wichita*, 951 F.3d 1161, 1174 (10th Cir. 2020) ("[T]he Supreme Court and [the Tenth Circuit] have consistently qualified [the warning] requirement as applying only where feasible or practical." (quotation marks omitted)). Given that the encounter between the Defendant officers and Dotson lasted only a few seconds, and that they were separated by less than 20 feet, the circumstances presented did not allow the Defendant officers to give any more direction than they did. UMF 85. *See Est. of Larsen*, 511 F.3d at 1260-61 (concluding that application of deadly force is reasonable when officers are threatened by an armed suspect within their close proximity); *Est. of Taylor v. Salt Lake City*, 16 F.4th 744, 769-70 (10th Cir. 2021) (same); *Palacios v. Fortuna*, 61 F.4th 1248, 1260 (10th Cir. 2023) (same).

Nevertheless, Plaintiffs assert that the Defendant officers failed to provide Dotson sufficient time to comply with Officer Wasson's command before opening fire. *See* Doc. 55 at 9. Under a different set of facts, that argument might be persuasive. Under these facts, however, Plaintiffs' position is unfounded. The Defendant officers were not required to "await the 'glint of steel' before taking self-protective action." *Est. of Larsen*, 511 F.3d at 1260. Indeed, "[n]o citizen can fairly expect to draw a gun on police without risking tragic consequences. And no court can expect any human being to remain passive in the face of an active threat on his or her life." *Est. of Valverde ex rel. Padilla v. Dodge*, 967 F.3d 1049, 1064 (10th Cir. 2020) (quoting *Elliott v. Leavitt*, 99 F.3d 640, 644 (4th Cir. 1996)). Moreover, whether the Defendant officers might have been able to deescalate the situation is uncertain, and the Defendant officers were not required to wait for a perceived threat to materialize before responding. *Id.* ("[A]n officer does not violate the Fourth

---

clear: do not use your firearm." *Id.* at *34. The *Redd* court reasoned that, in the context of the situation, the suspect was on notice that failure to comply with the officer's command may result in the application of deadly force. *Id.*

Amendment even when in retrospect it is clear that the officer made a mistake in shooting someone who did not pose a threat at the precise moment of the shot.").

Plaintiffs contend that Dotson likely did not know that it was law enforcement officers at his door. Doc. 55 at 12. Perhaps that is true, perhaps not. Either way, Dotson's understanding of the events is not material for purposes of the qualified immunity analysis. The relevant inquiry is not "the arrestee's subjective perception of the intrusion, but [] whether the officers' actions are objectively reasonable in light of the facts and circumstances confronting them." *Fisher v. City of Las Cruces*, 584 F.3d 888, 894 (10th Cir. 2009) (internal quotation marks omitted) (quoting *Graham*, 490 U.S. at 397). The "focus is on how a reasonable officer on the scene would have assessed the manifest indicators of [the suspect's] intentions—that is, [the suspect's] actions." *Est. of Taylor*, 16 F.4th at 770. Given the specific facts presented, the Court concludes the Defendant officers could reasonably believe that Dotson had hostile intentions. *See Palacios*, 61 F.4th at 1260 (determining suspect had hostile intentions when he refused to drop his firearm, despite opportunities to do so); *Wilson v. Meeks*, 52 F.3d 1547, 1553 (10th Cir. 1995), *abrogated on other grounds by Saucier v. Katz*, 533 U.S. 194 (2001) (confirming officer's belief that a suspect had hostile intentions was reasonable when the suspect held a firearm in the officer's direction and refused to drop it).

Ultimately, the Court finds the Defendant officers reasonably believed that Dotson posed a severe risk of imminent harm to the Defendant officers. *Alcala v. Ortega*, 128 F.4th 1298, 1307 (10th Cir. 2025) ("Deadly force is justified under the Fourth Amendment if a reasonable officer in the defendant's position would have had probable cause to believe that there was a threat of serious physical harm to the officer or to others.") (text only)). The key *Graham* factor—whether Dotson posed an immediate threat to the safety of the Defendant officers—therefore weighs in their favor.

11

**B.**     **The remaining *Graham* factors do not preclude summary judgment in the Defendants' favor.**

Per *Graham*, another consideration is the nature of the crime, i.e., whether it is a misdemeanor or felony. *Est. of Taylor*, 16 F.4th at 763-64. This question informs the general reasonableness inquiry and should not be assessed in a vacuum. Rather, the Court must undertake "a broad[] assessment of the reasons why the officers initiated an encounter" and account for the factual circumstances precipitating the use of force. *Andersen v. DelCore*, 79 F.4th 1153, 1164 (10th Cir. 2023). "[I]t would be insignificant whether [the suspect] was to be arrested for a minor crime or was not even a criminal suspect if it reasonably appeared that he was about to shoot a gun at an officer from close range." *Est. of Valverde*, 967 F.3d at 1061 (explaining that even a low-level offense may provide a reasonable basis for force depending on the suspect's conduct).

That holding applies here. *Id.* Though the moderate severity of the crime at issue (i.e. a domestic disturbance) may counsel against the application of force in some instances, this is not one of those cases.[12] The Defendant officers were confronted with a person raising a firearm in their direction and had only seconds to react. The reasons for their dispatch are therefore immaterial to the question of reasonableness in responding to Dotson's actions.

Similarly, the final *Graham* inquiry, which addresses whether Dotson actively resisted or attempted to evade arrest, does not overcome the Court's finding that Dotson's conduct posed a severe risk of imminent harm to the Defendant officers. Though it is true that Dotson did not flee or actively evade arrest, his threatening conduct nonetheless justified the application of deadly

---

[12] Though serious, the conduct relayed to 911 is not a felony. Assault and battery against a household member are both misdemeanors under New Mexico law. NMSA 1978, §§ 30-3-12(B); 30-3-15(B); *see also* Mot. Ex. A1 (911 caller reports a domestic disturbance between a man and a woman, which the Defendant officers were dispatched to respond to).

force. *See id.* ("[A]nyone who appears to be ready to shoot an officer certainly appears to be ready to resist arrest.").

> ### C.    The Defendant officers did not recklessly precipitate the need to apply deadly force.

Finally, the Court considers whether the Defendant officers' conduct recklessly precipitated the need to apply deadly force. *Flores v. Henderson*, 101 F.4th 1185, 1194 (10th Cir. 2024) (stating the Court "must also consider whether an officer's 'reckless or deliberate conduct during the seizure unreasonably created the need to use such force.'" (quoting *Arnold v. City of Olathe*, 35 F.4th 778, 789 (10th Cir. 2022))). An officer acts recklessly when they would know their "conduct recklessly created an unreasonable risk of harm" or consciously disregarded a "known or obvious risk." *Id.* at 1195.

Plaintiffs point to these holdings asserting that the Defendant officers recklessly created the need to apply deadly force by going to the wrong address, and that they did so despite Officer Goodluck's misgivings about dispatching to the Dotson residence. Doc. 55 at 14-15. While not a paragon of careful policework, the Defendant officers did not violate the Fourth Amendment by merely showing up at Dotson's home. "[P]olice officers do not violate the Fourth Amendment by going to the front door of a home and knocking, seeking to speak with the occupants." *United States v. Carloss*, 818 F.3d 988, 992 (10th Cir. 2016). "When law enforcement officers who are not armed with a warrant knock on a door, they do no more than any citizen might do." *Kentucky v. King*, 563 U.S. 452, 469 (2011). And though the Defendant officers' error was the reason they ended up at the Dotsons' residence, that mistake was not the factor precipitating their use of force. *See Sevier v. City of Lawrence*, 60 F.3d 695, 699 n.7 (10th Cir. 1995) ("Mere negligent actions precipitating a confrontation would not, of course, be actionable under § 1983."); *City & Cnty. of San Francisco v. Sheehan*, 575 U.S. 600, 615 (2015) (concluding the plaintiff could not "establish

a Fourth Amendment violation based merely on bad tactics that result in a deadly confrontation that could have been avoided" (citation omitted)). It was only after Dotson opened his door and began raising his firearm in the Defendant officers' direction that deadly force became necessary. Mot. Ex. L at 03:23-03:56. At that moment, the Defendant officers had insufficient time to deescalate the encounter without risking their safety. After all, the entirety of the interaction between the Defendant officers and Dotson lasted only a few seconds. UMFs 96-97.

Nevertheless, Plaintiffs point out that the Defendant officers were at the wrong address, and in their brief encounter with Dotson, he was likely blinded by a flashlight and had little reason to know that police were at his home and not some would-be assailant. Doc. 55 at 14; *see* Mot. Ex. M at 03:55-03:58. These contentions are largely speculative. There is nothing in the record to substantiate Plaintiffs' suggestion that Dotson was blinded and was unaware of who was knocking at his door. What can be said, given the evidence before the Court, is that Officer Estrada's use of his flashlight was reasonable given the circumstances. Just seconds prior, Officer Wasson heard oncoming footsteps behind the front door, then a metallic sound that he construed (probably correctly) to be a firearm racking, and then faced Dotson raising a firearm in his direction. *See* UMFs 69-81; Mot. Ex. L at 03:38-03:40. After seeing Officer Wasson's reaction, Officer Estrada's use of the flashlight was necessary to identify the anticipated threat. Even assuming, arguendo, that there were additional safety measures the Defendant officers could have taken, they were not required to pursue the most cautious course of action. *See Johnson v. City of Roswell*, 752 F. App'x 646, 652 (10th Cir. 2018) (upholding grant of qualified immunity where "there may have been safer ways to contact [the plaintiff], [yet] no reasonable jury could find that the officers recklessly or deliberately created the need to shoot him").

**D.    The Defendant officers' application of deadly force was reasonable.**

Ultimately, given the significant threat Dotson posed when he pointed his firearm at Officers Wasson and Estrada, the immediacy of that threat, the proximity between Dotson and the Defendant officers, and considering that the events unfolded in only a few seconds, the Court finds that the Defendant officers reasonably applied deadly force. *See Thomas*, 607 F.3d at 664 ("The use of deadly force is not unlawful if a reasonable officer would have had probable cause to believe that there was a threat of serious physical harm to himself or others."). All three Defendant officers believed that Dotson posed an imminent threat of death or great bodily harm to Officers Wasson and Estrada. UMFs 84, 87, 90. To be sure, the Defendant officers erroneously entered Dotson's property without confirming the address, but did not do so recklessly. Nor did their actions run afoul of constitutional considerations. Although the Defendant officers' application of deadly force resulted in tragic consequences for Dotson and his family, they did not violate Dotson's Fourth Amendment rights.

## II. The Defendant officers' conduct did not violate a clearly established right at the time of Dotson's death.

The second prong of the qualified immunity inquiry asks whether the Defendant officers violated a clearly established right.[13] A right is clearly established when, at the time of the challenged conduct, "the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he [or she] was violating it." *Plumhoff v. Rickard*, 572 U.S. 765, 778-79 (2014). A plaintiff can satisfy the clearly established prong of the qualified immunity analysis through citation to "an on-point Supreme Court or published Tenth Circuit decision; [or] alternatively [by demonstrating that] the clearly established weight of

---

[13] A district court has discretion to determine "which of the two prongs of the qualified immunity analysis" to "address[] first in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). For completeness, the Court addresses both prongs of the inquiry.

authority from other courts" defines the contours of the right at issue. *Quinn v. Young*, 780 F.3d 998, 1005 (10th Cir. 2015) (quoting *Weise v. Casper*, 593 F.3d 1163, 1167 (10th Cir. 2010)). Specificity is key. "The rule must be settled law, which means it is dictated by controlling authority or a robust consensus of cases of persuasive authority." *District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018) (internal citations and quotation marks omitted). And "[i]t is particularly important that a Fourth Amendment right be clearly established in a specific factual scenario because it can be difficult for an officer to determine how the prohibition against excessive force will apply in novel situations." *Arnold*, 35 F.4th at 793.

Here, Plaintiffs primarily rely on *Pauly v. White*, 874 F.3d 1197 (10th Cir. 2017), in support of their contention that the "law was clearly established that Defendants' actions were a violation of Mr. Dotson's rights under the Fourth Amendment to the Constitution." Doc. 55 at 16. That case is inapposite.

In *Pauly*, officers entered the plaintiff's property upon receipt of information that Daniel Pauly was driving while intoxicated. 874 F.3d at 1203-04. Although the officers agreed that there was not enough evidence to arrest Daniel nor were there exigent circumstances, they nevertheless went to the residence to "get his side of the story, 'to make sure nothing else happened,' and to find out if he was intoxicated." *Id*. at 1203-1204. Upon arriving at the residence, officers did not activate their security lights and used their flashlights intermittently. *Id* at 1204. Daniel and his brother, Samuel, were at the home. *See id.* The Pauly brothers could see flashlights approaching in the dark and feared it might be intruders. *Id.* They called out asking, "Who are you?" and "What do you want?" *Id.* The officers mocked the Pauly brothers and responded with, "Hey [expletive], we got you surrounded. Come out or we're coming in." *Id.* One of the officers claimed they announced themselves as State Police, but Daniel did not hear them. *Id.* Before Daniel could

respond, "he heard someone yell: 'We're coming in. We're coming in.'" *Id.* at 1205. Fearing a violent home invasion, the brothers armed themselves and one called out that they had guns. *Id.* The officers took cover and continued to shout at the brothers. *Id.* Daniel fired two warning shots out the back door of the house. *Id.* Within seconds Samuel, opened a window and pointed a handgun at one of the officers. *Id.* Four or five seconds later, the officer—from a covered position fifty feet away—shot and killed Samuel. *Id.*

The Tenth Circuit explained that although the officers in *Pauly* violated Samuel's Fourth Amendment rights by recklessly creating the need to shoot, the district court should have found that the officers were entitled to qualified immunity because there was "no case 'close enough on point to make the unlawfulness of [the officer's] actions apparent[.]'" *Id.* at 1223 (citing *Pauly v. White* (*Pauly I*), 814 F.3d 1060, 1091 (10th Cir. 2016) (Moritz, J., dissenting)). The Tenth Circuit therefore found that the officers were entitled to qualified immunity for lack of clearly established law. *Id.*

The facts presented in *Pauly* differ significantly from those at issue here. In that case, the officers exhibited a mix of antagonism and foolhardiness (not to mention disregard for the Paulys' constitutional rights) that directly precipitated the need to use deadly force. And the Court understands those facts to establish a Fourth Amendment violation where officers recklessly intensify an altercation that necessitates the application of deadly force. *See Pauly*, 874 F.3d at 1221 ("The threat made by the brothers, which would normally justify an officer's use of force, was precipitated by the officers' own actions and . . . use of force was therefore unreasonable."). By contrast, in this case, the Defendant officers did not antagonize Dotson; they did not provoke Dotson to initiate a conflict; and they identified themselves as law enforcement multiple times. *See* UMFs 48-64. There is more. At no point did the Defendant officers attempt or threaten to enter

Dotson's home. *Id.* at 18 ¶ 63. Perhaps most significantly, unlike the facts presented in *Pauly*, the Defendant officers did not have an opportunity to deescalate the situation. The interaction between Dotson and the Defendant officers became immediately hostile as soon as Dotson opened his front door with a firearm, and the entire encounter lasted only a few seconds. *See Est. of Smart*, 951 F.3d at 1177 (instructing that "[c]ourts are particularly deferential to the split-second decisions police must make[.]"). Neither the facts of *Pauly*, nor the resulting right are controlling.[14]

In short, the Court has not been provided a sound basis to hold that the Defendant officers— albeit negligent—committed an established constitutional violation. The Court has not located, and Plaintiffs have not provided, any case law addressing similar facts that call into question the lawfulness of the Defendant officers' conduct. *See Lobozzo v. Colo. Dep't of Corr.*, 429 F. App'x 707, 710 (10th Cir. 2011) ("A clearly established right is generally defined as a right so thoroughly developed and consistently recognized under the law of the jurisdiction as to be 'indisputable' and 'unquestioned.'"). Absent such controlling authority establishing the right at issue, the Court holds

---

[14] In a case with strikingly similar facts, *Powell v. Snook*, the Eleventh Circuit affirmed a district court's decision granting summary judgment on qualified immunity grounds because the plaintiff had not demonstrated a violation of a clearly established right. 25 F.4th 912, 924-25 (11th Cir. 2022). In that case, Officer Snook received imprecise dispatch directions and mistakenly ended up at the home of David Powell. *Id.* at 917. It was undisputed that Powell had not committed any crime but came out to his driveway armed with a pistol believing there was a prowler at his home. *Id.* at 917-18. Powell began raising the pistol in his right hand, getting it to hip height. *Id.* Officer Snook dropped to his knee and rapidly fired three shots with his rifle, killing Powell. *Id.* Powell's wife sued on behalf of her husband's estate claiming, inter alia, Fourth Amendment violations. *Id.* In her suit, she noted that Officer Snook did not give a warning before firing his weapon and that Powell did not threaten officers, refuse their command, or otherwise undertake conduct that suggested he was a threat. *Id.* at 919. The Eleventh Circuit affirmed the district court's finding that Officer Snook was entitled to qualified immunity and agreed that "it was not clearly established that the use of deadly force in these circumstances violated the Fourth Amendment." *Id.* at 920. Notably, Powell's estate had "not identified case law with materially similar facts or with a broad statement of principle giving Snook fair notice that he had to warn [Powell] at the earliest possible moment and before using deadly force[.]" *Id.* at 924-925.

that Plaintiffs have not shown the Defendant officers violated clearly established law. They are therefore entitled to qualified immunity.

## CONCLUSION

For the foregoing reasons, the Court grants Defendants' motion for partial summary judgment and dismisses Dotson's Estate's Fourth Amendment unreasonable seizure claim with prejudice. Doc. 42.

It is so ordered.

_____

UNITED STATES DISTRICT JUDGE
MATTHEW L. GARCIA

19